UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DOCKET NO.: 05-10003RGS

| | |
|---|---|
| FITNESS RESOURCE ASSOCIATES, INC. | : |
| | : |
| Plaintiff | : |
| | : |
| v. | : |
| | : |
| AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC. | : |
| | : |
| Defendant | : |

**OPPOSITION OF FITNESS RESOURCES ASSOCIATES, INC.
TO DEFENDANT AEROBICS AND FITNESS ASSOCIATION
OF AMERICA, INC.'S MOTION TO TRANSFER VENUE
AND REQUEST FOR ORAL ARGUMENT**

The plaintiff Fitness Resources Associates, Inc. ("FRA") submits this

memorandum in opposition to the Motion of Defendant Aerobics and Fitness Association

of America ("AFAA") to transfer venue from this court to the United States District

Court for the District of California (Central Division).

## FACTUAL AND PROCEDURAL BACKGROUND

Many of the facts set forth in AFAA's recital are not in dispute. Where there are

differences, FRA's statements of fact are set forth below, numbered to correspond with

AFAA's numbered assertions.

**Factual Assertion 3**

AFAA is correct that FRA and AFAA are separate entities and each was involved

in the fitness industry before the 1990 joint venture agreement. However, before 1990

AFAA did certification only in "group exercise" training as opposed to "personal

training" which was the subject of the joint venture agreement.   Only FRA did training and certification of personal trainers, a different type of program.  FRA effectively contributed its personal trainer training program and course materials to the joint venture and then recruited and trained presenters nationally for the programs operated jointly with AFAA under the agreement.  Affidavit of Paula Besson, ¶¶ 3-4.

**Factual Assertion 4**

FRA disagrees with the conclusion in AFAA's Paragraph 4 that the Joint Venture Agreement failed to create a joint venture and asserts that the parties effectively did share in the profits and losses by sharing gross revenues out of which each party was obligated to pay its own expenses.  Affidavit of Paula Besson, ¶ 4.

**Factual Assertions 6 and 7**

FRA denies that the partnership operated without complaint by FRA up to the thirteenth year of the joint venture.  FRA admits that AFAA's conduct became more egregious and warranted louder and more frequent complaints from 2002 forward when AFAA's late payments and abusive venue selection practices became more problematic.

For example, AFAA began complaining about late payment no later than 1991. The joint venture agreement called for payment to FRA of its share within "21 days of course completion."  Paula Besson Affidavit Attachment A.  AFAA was late in making payment almost from the start and FRA complained of this no later than June 27, 1991. Affidavit of Paula Besson, ¶ 6.

The late payment problem worsened over time and in 2003 exceeded $180,000 of which $120,000 was more than 30 days late.  Affidavit of Paula Besson, ¶ 10.

There were also complaints about venue selection well before the 13th year.  The Joint Venture Agreement set out guidelines that called for the courses to be taught in hotels with chairs, a quiet lecture area, an overhead projector and space for 100 people. Paula Besson Affidavit, Attachment A.   FRA complained in mid-1997 that AFAA was giving free enrollment in exchange for reduced cost or free space in health and sports clubs, often eschewing more populated urban areas for suburbs and smaller towns where enrollments were, naturally, far lower. Affidavit of Paula Besson, ¶ 12. That practice benefited only AFAA at the expense of FRA.   First, health clubs were less expensive (or free), reducing the expenses that AFAA had to deduct from its share of the gross revenues.  Second, when AFAA waived the fees that had been agreed upon in the Joint Venture Agreement FRA would suffer the loss of its share of participant revenues without any compensating savings on the expense side since it still had to provide a presenter and pay travel expenses. Affidavit of Paula Besson, ¶¶ 8, 11.

The dispute did come to a head between 2002 and 2004 when FRA's direct out-of-pocket losses from being forced by AFAA to provide its program at underenrolled venues increased from approximately $19,000 in 2000 to $50,000 in 2003.  In addition, in that period, AFAA's delinquent payment balance increased to some $180,000.  Affidavit of Paula Besson, ¶¶ 13-14. Together, these actions and AFAA's refusal to enter into serious negotiations concerning disputed issues made it clear to FRA that AFAA's interest was in forcing FRA out of the partnership. Affidavit of Paula Besson, ¶ 19.

### Factual Assertion 8

Contrary to AFAA's assertions, no rational person in the position of AFAA's president, Linda Pfeffer, could honestly claim to believe that FRA's claims would be

resolved without court action given the history of the dispute between the parties to the Joint Venture Agreement.  It is true that FRA was desirous of resolving the problems that were caused by AFAA's unreasonable and self serving actions as set forth above.  FRA did propose solutions at various times.  In December, 2004, FRA proposed a minimum rate of  $900 that AFAA would pay FRA for workshops.  The purpose was to remove the incentive for AFAA to schedule workshops that would inevitably be underenrolled. (The $900 rate was designed to cover FRA's direct costs of its $700 minimum to its presenter, plus average travel costs).  AFAA tried the "minimum rate" proposal for one month, canceled the underenrolled workshops during that period so that it would not incur the $900 cost and then rejected the concept.   Affidavit of Paula Besson, ¶ 16.

On January 20, 2004 FRA proposed a buyout of FRA's interests in the joint venture for a $40,000-per-month consulting fee over a period of four years.  AFAA rejected this proposal on Feb. 10, 2004 with no counter offer or suggestion for resolution of the dispute.  Affidavit of Paula Besson, ¶ 17.

On Feb. 12, FRA suggested that AFAA simply make up FRA's out of pocket losses for workshops that AFAA insisted on holding despite the fact that FRA would lose money.  That solution would have allowed FRA to break even and, in many instances, still allow AFAA to make a profit, albeit less than otherwise.  That proposal was also rejected.  Affidavit of Paula Besson, ¶  18.

On May 24, 2004 AFAA made its only substantive proposal of a resolution which was to suggest that FRA have a right to cancel any workshop, so long as it was done 23 days in advance.  AFAA then reserved to itself the right to substitute its own program.  Since reliable enrollment numbers were seldom available that far in advance, this would

leave AFAA in a position to take over any workshop that turned profitable in the last few weeks or cancel if it did not.  It also would have allowed AFAA to essentially compete against the joint venture and, given FRA's concerns that AFAA was attempting to eliminate it, FRA rejected this proposal.  AFAA otherwise never made a substantive response to FRA's proposals and it continued to withhold consent to canceling unprofitable workshops, if anything increasing their numbers.  Affidavit of Paula Besson, ¶¶ 19-20.

FRA viewed these responses as indicating that AFAA had no real interest in resolving the differences between the parties to the joint venture, but rather simply wanted to freeze FRA out of the partnership.  Affidavit of Paula Besson, ¶ 19.

Then, after issuing the notice of termination on July 16, 2004, on Dec. 6, 2004 AFAA offered to pay $11,171.22 admittedly owing to FRA for post termination workshops, but only if  FRA agreed to a release of all claims against AFAA.  AFAA also threatened litigation against FRA if FRA failed to agree.  Affidavit of Paula Besson, ¶ 20.  At no time after the termination did FRA ever mislead AFAA into believing that it would accept any such proposal or that there would be a negotiated settlement. Affidavit of Paula Besson, ¶  22.

### Factual Assertion 10

FRA agrees with the facts set forth in ¶ 10 except that the low enrollments that FRA alleges were caused by AFAA's actions hurt primarily FRA and not AFAA to any significant degree, for the reasons set forth in Paragraph 4 above.

**Factual Assertion 11**

FRA agrees that many and perhaps the majority of documents relevant to the claims made in this case are located in California.  However, a large minority of the documents are located in Massachusetts.   Documents in Massachusetts relevant to the claims of underenrolled workshops are described in the Affidavit of Paula Besson, ¶¶ 23-25:  FRA estimates that there are at least 20,000 pages (four cartons) of relevant documents in Massachusetts. Affidavit of Paula Besson, ¶ 27.

With respect to witnesses, it is FRA's position that of the 21 witnesses listed by AFAA, only a handful are likely to be called at trial.  The remaining witnesses are duplicative or unlikely to be called for other reasons.  For example, 10 witnesses are identified in the Linda Pfeffer affidavit as having knowledge relating to host site locations.  FRA dealt almost exclusively with two persons at AFAA to coordinate workshop locations.  Most of the 10 witnesses said to have knowledge of this topic are almost certainly redundant.  Four persons in AFAA's bookkeeping and accounting department are listed, again suggesting much redundancy.  A Lisa Shapiro is listed as a witness concerning the 1990 agreement.  Ms. Shapiro has only worked for AFAA for a few years and was not even an employee of AFAA in 1990.  Affidavit of Paula Besson, ¶ 28.

FRA anticipates that seven Massachusetts witnesses employed by FRA and perhaps five of 15 presenters in the New England area would be called.  Affidavit of Paula Besson, ¶ 29.

**Factual Assertion 12**

To the extent that it is relevant that AFAA filed suit against FRA in California claiming that FRA's non-compete agreement with its presenters is unenforceable, FRA believes that the suit was filed only to oppress FRA and create an impression that FRA would be hiring counsel in California to defend that action, somehow making a California jurisdiction for this matter less of an inconvenience for FRA.  FRA has no intention to defend the California action. The action appears spurious inasmuch as AFAA did not even name as a party the alleged presenter who, it claims, is prevented from working for it.  Moreover, FRA is aware that California law disfavors non-competes and plans to take no steps to enforce it in that state or to defend against the AFAA suit.  Affidavit of Paula Besson, ¶¶ 30-31.

**ARGUMENT**

**I.    HAVING CHOSEN ITS HOME FORUM AND IN THE ABSENCE OF UNFAIR CONDUCT WITH RESPECT TO THE DEFENDANT, FRA IS ENTITLED TO A STRONG PRESUMPTION OF ENTITLEMENT TO ITS CHOSEN FORUM.**

Defendant's argument rationalizing transfer of this case to California is based on the faulty premise that plaintiff's choice of forum is "normally given some deference."

In fact, in 1996 the First Circuit quoted as follows from the Supreme Court:

> "[The plaintiff] should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative or legal problems."

*Nowak v. Tak How Invs., Ltd*, 94 F.3d 708, 720 (1996)(quoting *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 91 L. Ed. 1067, 67 S. Ct. 828 (1947).

The concept that the plaintiff is entitled to a strong presumption in favor of his choice of forum has been universally acknowledged in First Circuit trial court decisions. *Kleinerman v. Luxtron Corp.*, 107 F. Supp.2d 122, 125 (D. Mass. 2000); *Holmes Group v. Hamilton Beach*, 249 F.Supp. 2d 12, 15 (D. Mass. 2002); *Lyons v. Litton Industries, Inc.*, 1984 U.S. Dist. LEXIS 20563, *8 (also noting that "since venue is a procedural rule of convenience, the convenience of the aggrieved party should first be accommodated); *Veryfine v. Phlo Corp.*, 124 F.Supp. 2d 16, 14 (D. Mass. 2000); *Atari v. United Parcel Service, Inc.*,  211 F. Supp. 2d 360, 362 (D. Mass. 2002).

The *Veryfine, Kleinerman* and *Atari* cases all specifically found that the strong presumption in favor of a plaintiff filing in his home forum is applicable in the context of venue decisions under 28 U.S.C. 1404(a), the venue statute applicable here.

The burden is on the party seeking a change of venue to present sufficient countervailing facts to overcome the strong presumption in favor of the plaintiff's choice of forum.  *Holmes*, 249 F.Supp. 2d, 15; *Kleinerman*, 107 F.Supp. 2d, 125; *Atari*, 211 F.Supp. 2d, 362.  This is particularly so where the plaintiff has chosen his home forum where the choice more likely represents considerations of convenience rather than vexation or harassment to the defendant, justifying elevating the hurdle the defendant is required to clear to warrant transfer.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981); *Nowak*, 94 F. 3d at 719.

Some courts in the District of Massachusetts have found that "the preference for the first-filed action may be overcome where (1) there are special circumstances

justifying a transfer or (2) convenience favors the later-filed action." *Holmes Gr*oup, 249 F. Supp.2d at 16 (citing *Veryfine Prods*., 124 F. Supp.2d at 22-25 and *Kleinerma*n, 107 F. Supp.2d at 124).

Special circumstances might arise "where, for example, a plaintiff (1) misleads the defendant into foregoing litigation in order to negotiate a settlement and then files suit or (2) reacts to a defendant's notice of imminent filing by 'literally sprinting to the courthouse the same day' ...." *Holmes Group*, 249 F. Supp.2d at 16 (citations omitted).

There are no such special circumstances in this case. After a lengthy period in which AFAA took advantage of the terms of the Joint Venture Agreement in a patent effort to squeeze out FRA, AFAA finally terminated the agreement on July 16, 2004 giving 90 days notice. In doing so, it repudiated the existence of a joint venture between the parties and reserved "all rights and remedies." Linda Pfeffer Affidavit, Ex. 3. In the period between termination and the filing of suit FRA neither "sprinted" to the courthouse nor misled AFAA into foregoing litigation.

FRA filed in the Massachusetts Superior Court on Dec. 15, 2004 <u>five months</u> after AFAA's notice of termination. The circumstances leading up to the filing of suit demonstrate that AFAA cannot honestly claim to have been misled into believing that the dispute between the parties would be resolved without litigation.

In December, 2003, FRA proposed a minimum rate of $900 that AFAA would pay FRA for workshops. The purpose was to remove the incentive for AFAA to schedule workshops that would inevitably be underenrolled. (The $900 rate was designed to cover FRA's direct costs of its $700 minimum to its presenter, plus average travel costs). AFAA tried the "minimum rate" proposal for one month, canceled the underenrolled

workshops during that period so that it would not incur the $900 cost and then rejected the concept.  Affidavit of Paula Besson, ¶ 16.

On January 20, 2004 FRA proposed a buyout of FRA's interests in the joint venture for a $40,000-per-month consulting fee over a period of four years.  AFAA rejected this proposal on Feb. 10, 2004 with no counter offer or suggestion for resolution of the dispute.  Affidavit of Paula Besson, ¶ 17.

On Feb. 12, FRA suggested that AFAA simply make up FRA's out of pocket losses for workshops that AFAA insisted on holding despite the fact that FRA would lose money.  That solution would have allowed FRA to break even and, in many instances, still allow AFAA to make a profit, albeit less than otherwise.  That proposal was also rejected.  Affidavit of Paula Besson, ¶ 18.

On May 24, 2004 AFAA made its only substantive proposal of a resolution which was to suggest that FRA be given a right to cancel any workshop, so long as it was done 23 days in advance.  AFAA then reserved to itself the right to substitute its own program.  Since reliable enrollment numbers were seldom available that far in advance, this would leave AFAA in a position to take over any workshop that turned profitable in the last few weeks or cancel if it did not.  It also would have allowed AFAA to essentially compete against the joint venture.  FRA rejected this proposal since at that point FRA believed that AFAA was not sincere about trying to resolve the issues and wanted to force FRA out of the partnership.  Affidavit of Paula Besson, ¶ 19.

AFAA otherwise never made a substantive response to FRA's proposals and it continued to withhold consent to canceling unprofitable workshops, if anything increasing their numbers.  Affidavit of Paula Besson, ¶ 20.

On Dec. 6, 2004 AFAA rubbed salt in the wounds by offering to pay $11,171.22 admittedly owed to FRA for post termination workshops, but only if FRA agreed to a mutual release. AFAA also threatened litigation against FRA if FRA failed to agree. Affidavit of Paula Besson, ¶ 21.

At no time after the termination did FRA ever mislead AFAA into believing that it would accept any such proposal or that there would be a negotiated settlement. Affidavit of Paula Besson, ¶ 22.

Far from racing to the courthouse as alleged here by AFAA, FRA sent its complaint by first class mail on Dec. 15, five months after termination and some two weeks after AFAA's Dec. 6 slap and its threat of litigation. That Ms. Pfeffer could conclude in these circumstances that settlement talks were likely to lead to a happy conclusion is incomprehensible. There is simply no factual basis for depriving FRA of the strong deference it is entitled to as the aggrieved party filing first, in its own jurisdiction.

## II.     THE CLAIMED ADVANTAGES OF A CALIFORNIA FORUM FAIL TO OUTWEIGH THE STRONG PRESUMPTION FAVORING PLAINTIFF'S CHOICE OF ITS HOME FORUM.

Plaintiff has no disagreement with the considerations set out by defendant as those to be weighed. However, the facts fail to support the burden defendant must meet to overcome the strong presumption in favor of deference to the plaintiff's choice of forum.

### A.     Private Interests.

#### 1. Convenience of parties.

Clearly, wherever this case is tried, one party will be the more inconvenienced due to the time and expense involved in travel. Where there is a presumption in favor of

plaintiff's choice, transfer is not appropriate where the effect is merely to shift the inconvenience from one party to the other. *Kleinerman*, 107 F.Supp 2d at 125.

Finally, "the convenience of the aggrieved party should first be accommodated (citations omitted)" *Lyons,* 1984 U.S. Dist. Lexis 20563 at *9.

AFAA has set forth no compelling reason why, in its corporate capacity, it would be unduly inconvenienced by a Massachusetts forum.

### 2.  Convenience of witnesses.

The court must consider not just the number of potential witnesses located in the alternative districts, but also the nature and quality of their testimony. *Atari,* 211 F. Supp. 2d at 362. For the reasons set forth below, proof of this case will for the most part be through documents.  The sheer number of California witnesses listed by AFAA (21) suggests AFAA named every one of its employees in California who had his or her hands on any aspect of the matter.  It is doubtful that any attorney would want to present half that number of witness in a case of this nature and more doubtful that a court would permit that to occur.  In fact, only a few of the listed witnesses have knowledge beyond what the documents reveal making them likely to be called at trial.  See the Affidavit of Paula Besson ¶ 28.

FRA's list of witnesses likely to be called includes six in Massachusetts and perhaps five of 15 possible in New England in California.  See the Affidavit of Paula Besson ¶ 29.   All of the California witnesses listed by AFAA are employees of AFAA and thus will not be unduly inconvenienced by absence from work.  AFAA has provided no factual basis for a finding that travel would be a hardship for any witnesses due to health or family reasons.

### 3.  Ease of access to sources of proof.

Proof of this case will be for the most part through documents.  FRA anticipates that AFAA's decisions to force it to provide presenters at poorly attended workshops around the country and excessive granting of complementary attendance to benefit only itself will be documented by attendance and payment records many of which are in the hands of both parties.  Similarly, proof concerning FRA's claims that it was denied participation in producing books will be based on documents showing FRA's demand to participate and revenue records.  To the extent that AFAA has tens of thousands of documents to be produced, those documents and FRA's will need to be copied for the opposing party wherever the forum.  The only relevance in the choice of forum will be the difference in the cost of shipping if AFAA has the greater number of documents and they must be shipped to Massachusetts, a negligible cost in the context. The location of documents is of little significance.  *Princess House*, 136 F.R.D at 21.

### 4.  Availability of process to compel unwilling witnesses.

Since all of the California witnesses are employees of AFAA, there is little likelihood of need to compel the appearance of important witnesses. *Kleinerma*n, 107 F. Supp. 2d at 125-126; *Princess House*, 136 F.R.D. at 20.

### 5.  Cost to obtain willing witnesses.

Since all witnesses are employees, the issue is the cost to the parties (as opposed to the witnesses) and is addressed in the first factor.

### 6.  Other practical problems.

None identified by the defendants.

**B.    Public Factors**

    **1.  Forum's knowledge of applicable law**.

While a federal court in California would likely have more familiarity with the law of that state, federal courts are accustomed to applying the laws of varying states in diversity actions so that this is not a significant factor.

    **2.  Conflicts of law.**

There is no issue concerning conflicts of laws here, since the Joint Venture Agreement specifies that California law is to govern.

    **3.  Local interest in having local controversies decided at home.**

This factor is neutral as both states have an interest in seeing justice done for their citizens and the alleged wrongs involve citizens of both states.  AFAA appears to suggest that the California lawsuit that it filed upon receipt of this suit somehow creates a greater local interest in California since it concerns the issue of whether a non-compete may be enforced against a California resident.  Clearly, that suit was filed for the sole purpose of harassment of FRA and creating a fictitious California interest since it does not even identify the alleged California resident to say nothing of making him or her (if any) a party.  Affidavit of Paula Besson, ¶ 30, 31.

    **4.  Unfairness to citizens required to serve as jurors.**

There is no unfairness here since the aggrieved party is a citizen of the Commonwealth.

**5. Court administrative difficulties.**

AFAA indicated that it was aware of no such difficulties in either forum. The same applies to FRA.

Dated: February 4, 2005                           Respectfully submitted,

                                                                   FITNESS RESOURCE
                                                                   ASSOCIATES, INC.


                                                                   /s/ Gregg S. Blackburn
                                                                   Gregg S. Blackburn (BBO# 044430)
                                                                   CASNER & EDWARDS, LLP
                                                                   303 Congress Street, 2nd Floor
                                                                   Boston, MA 02210
                                                                   (617) 426-5900

### CERTIFICATE OF SERVICE

I, Gregg S. Blackburn, hereby certify that on February 4, 2005, that I caused the MEMORANDUM OF FITNESS RESOURCES ASSOCIATES IN OPPOSITION TO MOTION TO TRANSFER VENUE to be filed within the tracking time standards or by leave of the Court, and further that I caused a copy of said document to be electronically filed to:

    Edward V. Colbert, III, Esq.
    Looney & Grossman LLP
    101 Arch Street
    Boston, MA  02110-1112


                                                                   /s/ Gregg S. Blackburn
                                                                   Gregg S. Blackburn (BBO#044430)

### REQUEST FOR ORAL ARGUMENT

The plaintiff, FRA, hereby requests oral argument to aid the court.


                                                                   /s/ Gregg S. Blackburn
                                                                   Gregg S. Blackburn (BBO#044430)

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DOCKET NO.: 05-10003RGS

FITNESS RESOURCE ASSOCIATES, INC. :
 :
  Plaintiff :
 :
v. :
 :
AEROBICS AND FITNESS ASSOCIATION :
OF AMERICA, INC. :
 :
  Defendant :

### AFFIDAVIT OF PAULA BESSON

I, Paula Besson, hereby depose and state that:

1. I am the president of Fitness Resource Associates, Inc. ("FRA").

2. The Joint Venture Agreement dated October 30, 1990 and attached as Attachment A is a true and accurate copy of the agreement that is the subject of this action.

3. Before the 1990 Joint Venture Agreement was executed, the defendant Aerobics and Fitness Association of America, Inc. ("AFAA") provided training and certification in "group exercise" activities which generally qualified those certified to lead group exercise programs such as aerobics. Before the 1990 Joint Venture Agreement, AFAA was not involved in training or certifying persons to offer "personal training" where the focus is on fitness for individuals. At the time the agreement was entered into, FRA ran its own certification and training program for personal trainers in the New England area and it had developed a course and written materials for such training. In addition, it had trained a number of presenters of its personal training ("PT") program in the New England area. FRA contributed its existing programs and course materials to the joint venture and then recruited and trained presenters nationally for the programs operated in conjunction with AFAA under the Joint Venture Agreement.

4. It was my belief at the time the Joint Venture Agreement was entered into that each of the parties would share in the gross profits on a 60%-40% basis as set forth in the agreement. It was also my belief that such a split was fair and reasonable based on the expenses that each of the parties

would be likely to bear to fulfill its duties under the joint venture arrangement. AFAA had the expense of promoting the programs and paying for hotels and similar venues with meeting facilities, overhead projectors and chairs as described in the agreement. The Joint Venture Agreement established guidelines for selection of venues that included a preference for hotels, chairs, a quiet lecture area, an overhead projector and space for 100 people. Attachment A. FRA was responsible to pay for presenters and their travel expenses which often meant air fares and hotels. It was further my understanding that the two parties would cooperate to develop the most profitable operation for the benefit of both of the parties.

5.  At the outset, the partnership operated as contemplated in the Joint Venture Agreement with AFAA promoting the PT workshops, signing up enrollees and arranging for suitable venues. The cities and dates were jointly agreed upon based on schedules proposed by FRA. The workshops were generally held in urban areas with a sufficient population base to ensure enough enrollees to generate a profit for both parties as provided for in the Joint Venture Agreement.

6.  AFAA did schedule some PT workshops in poorly equipped health clubs early on in the joint venture arrangement and FRA complained.

7.  For the most part, through approximately 1998, the venues arranged by AFAA were in hotels in metropolitan areas conforming to the guidelines set out in the Joint Venture Agreement. Thereafter, AFAA began unilaterally selecting more and more venues in less populated areas and at health clubs poorly equipped for what was largely a lecture program. By 2000, hotels were no longer used at all, on instructions of AFAA's president, Linda Pfeffer.

8.  AFAA's move to health clubs benefited AFAA and harmed FRA. Health clubs were less expensive than hotels and thus reduced those expenditures for which AFAA alone was responsible. In addition, AFAA unilaterally began to waive the enrollment fees that had been agreed upon in the joint venture agreement in exchange for free or reduced cost facilities. When this occurred, AFAA would receive the sole benefit of the free or reduced-cost space and FRA would suffer the loss of participant revenues without any compensating savings on the expense side. Contrary to AFAA's statement of facts, FRA also began to complain of this practice as early as June 27, 1991. See the attached letter from FRA to Linda Pfeffer dated June 27, 1991, a true and accurate copy of which is attached hereto as Attachment B.

9.    Early on in the joint venture, AFAA also began to delay payment to FRA.
      AFAA would collect workshop fees in advance.  Upon completion of a
      workshop, FRA would provide to AFAA a list of attendees and submit an
      invoice for 40% of the revenues based on that number of attendees,
      usually within one week and almost always within two weeks of the event.
      The joint venture agreement called for payment to FRA of its share within
      "21 days of course completion."  Attachment A.  Contrary to AFAA's
      assertions that there were no complaints until the last year of the joint
      venture, FRA complained of this practice no later than June 27, 1991.
      Attachment B.

10.   As time went on, the payment delays became more egregious.  FRA had to
      pay airfares and hotel bills for its presenters on a current basis.   Its
      presenters were compensated on a paid when paid basis.  Therefore, the
      presenters were often not paid for approximately 90 days which caused
      stress on FRA's relationships with its contractor-presenters.  The late
      payment problem worsened over time until, in breach of the joint venture
      agreement and in violation of is fiduciary duties, AFAA's overdue
      receivables reached an amount in excess of $180,000 as of Dec. 31, 2003
      with $120,000 of that more than 30 days overdue. See Attachment C, a
      true and accurate copy of correspondence from my counsel with attached
      invoice summaries.

11.   In addition to delaying payment and moving the venue to less expensive or
      free health clubs, AFAA began moving the physical trainer program to
      locations in more out-of-the-way places with fewer potential enrollees.
      The result was that at the same time that AFAA was reducing its own
      costs, it was forcing FRA into the position of operating with fewer
      enrollees per workshop meaning substantial net losses to FRA on many
      workshops.  FRA guaranteed its presenters a minimum of $700 per
      workshop and paid for air fare, local transportation and hotel costs.
      AFAA would often schedule a workshop with only a few enrollees
      making it impossible for FRA to even cover its costs.  The joint venture
      agreement provided that any course would be "subject to cancellation if
      enrollment does not meet a minimum of fifteen (15) people with the
      mutual consent of both parties." Attachment A.  In recent years, when
      FRA sought AFAA's agreement to cancel underenrolled workshops,
      AFAA would unreasonably refuse to consent.  Since AFAA's costs were
      modest due to its deals with health clubs, and since it was receiving 60%
      of the gross, it could still make money even with only a few enrollees in a
      given program.

12.   Starting no later than  mid-1997 FRA complained of poorly chosen venues
      in non-urban areas and from then forward it repeatedly asked for AFAA to
      book the workshops in better facilities in areas where enrollments would

be higher. See Attachment D, a true and accurate copy of an undated letter written by me in approximately mid-June, 1997 concerning planning for 1998 PT workshops.

13.    After 2000, when AFAA was scheduling workshops almost exclusively in smaller venues and using health clubs rather than hotels, FRA repeatedly asked for cancellation of such workshops since FRA was losing money at the smaller workshops. By way of example FRA requested on February 11, 2004 that AFAA cancel a workshop in Hilton Head SC that was expected to generate only 3 enrollees, and gross revenue of $1,201.00. In conducting this workshop FRA would incur an out-of-pocket loss of $551.00. See Attachment E, a true and accurate copy of FRA's request to cancel.

14.    In 2002, FRA presented a total of 364 PT workshops. Of those, FRA lost money on 82 PT workshops creating a total out-of-pocket loss of $30,064.29 as to those money losing workshops. In 2003, there were 125 money losing workshops and the total lost on those increased to $49,032.31. In 2000 the losses from such workshops had been under $20,000.

15.    Despite AFAA's onerous late payment policy and its insistence on FRA providing presenters for money-losing workshops, FRA made sincere efforts all through 2003 and 2004 to salvage the situation by making proposals for alterations in the Joint Venture Agreement and offering a buyout to AFAA.

16.    In December, 2003, FRA proposed a minimum rate of $900 that AFAA would pay FRA for workshops. The purpose was to remove the incentive for AFAA to schedule workshops that would inevitably be underenrolled. (The $900 rate was designed to cover FRA's direct costs of its $700 minimum to its presenter, plus average travel costs). AFAA tried the "minimum rate" proposal for one month, canceled the underenrolled workshops during that period so that it would not incur the $900 cost and then rejected the concept.

17.    On January 20, 2004 FRA proposed a buyout of FRA's interests in the joint venture for a $40,000-per-month consulting fee over a period of four years. AFAA rejected this proposal on Feb. 10, 2004 with no counter offer or suggestion for resolution of the dispute.

18.    On Feb. 12, FRA suggested that AFAA simply make up FRA's out of pocket losses for workshops that AFAA insisted on holding despite the fact that FRA would lose money. That solution would have allowed FRA to break even and, in many instances, still allow AFAA to make a profit, albeit less than otherwise. That proposal was also rejected.

19. On May 24, 2004 AFAA made its only substantive proposal of a resolution which was to suggest that FRA be given a right to cancel any workshop, so long as it was done 23 days in advance. AFAA then reserved to itself the right to substitute its own program. Since reliable enrollment numbers were seldom available that far in advance, this would leave AFAA in a position to take over any workshop that turned profitable in the last few weeks or cancel if it did not. It also would have allowed AFAA to essentially compete against the joint venture. FRA rejected this proposal since at that point I believed that AFAA was not sincere about trying to resolve the issues and wanted to force FRA out of the partnership.

20. AFAA otherwise never made a substantive response to FRA's proposals and it continued to withhold consent to canceling unprofitable workshops, if anything increasing their numbers.

21. On Dec. 6, 2004 AFAA rubbed salt in the wounds by offering to pay $11,171.22 admittedly owed to FRA for post termination workshops. However, AFAA would pay the money it owed only if FRA agreed to a release of all claims against AFAA. AFAA also threatened litigation against FRA if FRA failed to agree. See the attached letter from Jonathan Kirsch to David J. Chavolla dated December 6, 2004, a true and accurate copy of which is attached hereto as Attachment F.

22. At no time after the termination did FRA ever mislead AFAA into believing that it would accept any such proposal or that there would be a negotiated settlement

23. Documents in Massachusetts relevant to the claims of underenrolled workshops are:

    a.    Attendance lists prepared by FRA's presenters;

    b.    Invoices prepared by FRA;

    c.    Workshop cost and expense reconciliations and backup documents;

    d.    Workshop scheduling documents and correspondence;

    e.    Correspondence concerning underenrollment; and

    f.    Accounting documents and ledgers showing revenue and expense data and trends related to AFAA's wrongful conduct.

24.  Documents in Massachusetts relevant to the claims that AFAA benefited itself at FRA's expense in selecting workshop locations include:

   a.  Correspondence concerning the issue;

   b.  Accounting documents showing the effect of unreasonable venue selection; and

   c.  Records showing attendance trends and backup documents.

25.  Documents in Massachusetts relevant to AFAA's wrongful failure to make timely payments to FRA include:

   a.  Accounting records relating to receipts and disbursements over a 13-year period;

   b.  Loan documents;

   c.  Correspondence with AFAA; and

   d.  Correspondence with presenters;

26.  Documents in Massachusetts relating to the failure to share opportunities in text publishing admittedly are largely in California, being revenue and expense records of AFAA.

27.  FRA believes that it has at least four cartons of documents in Massachusetts relevant to the claims involved in this matter.

28.  I have reviewed the list of 21 witnesses that AFAA claims will be called at trial of this case. I note that Carol Mejia, Felice Rojas, Jennifer Ell, Claudia Gaer, Meagan Stern, Chris Cuthrell, Sue Pieroni, Lauri Reimer, Tracy Guirnela and Dennis Zebate all supposedly have knowledge and may testify concerning host site locations. Of that list of ten people, FRA dealt almost always with two persons. For the most part, the issues relating to the selection of host sites will be clear from the documents of the parties. I cannot imagine why more than two people would be required to flesh out the information largely contained in the documents. I also note that Lisa Shapiro is listed as having knowledge concerning the 1990 agreement between the parties. I also note that there are four persons listed from AFAA's accounting department, again suggesting redundancy. Lisa Shapiro has only worked for AFAA for the past two or three years and would have no knowledge concerning the formation of the 1990 agreement or its implementation in the early years.

29.   The following persons from Massachusetts and New England states are likely to be called as witnesses in this matter on behalf of FRA:

    a.    Paula Besson – Author/President, knowledge of negotiation of Joint Venture Agreement and all pertinent issues. I have owned and operated FRA since 1986.

    b.    Kim Deleo – Knowledgeable of cancellation policies of both FRA and AFAA.  Coordinated with to AFAA employees re same.

    c.    Kristen Smith – Office Manager, knowledge concerning all AFAA issues. Ms. Smith has maintained and organized the records concerning conflicts with AFAA over the years.

    d.    Patsy Croteau – Customer Service Representative with knowledge regarding invoicing AFAA and providing backup documents concerning the number of attendees and presenter expenses as well as AFAA practices concerning "no pays" and complimentary enrollments.  She can also testify about the speed with which invoicing packets sere submitted to AFAA.

    e.    Richard Pendzick – Mr. Pendzick has done all the analysis of FRA's losses.

    f.    Dean Martins – Mr. Martins is FRA's accountant and has knowledge of all of the financial issues regarding AFAA's late payment and the cost to FRA. Mr. Martins arranged for a loan for me because of FRA's financial difficulties when AFAA was delinquent in payment.

    g.    Finally, there are 15  presenters in the New England area who have knowledge of poorly equipped and located facilities in many parts of the country and the effects of those practices on the experience of participants.

30.   Within days after this action was filed in the Massachusetts state court, AFAA filed suit in California seeking a declaratory judgment to declare invalid the non-compete agreement included in FRA's contracts with its presenters.  A copy of the complaint is attached hereto as Attachment G.

31.     AFAA failed to name any presenter with whom FRA had an agreement that included the allegedly invalid noncompete clause.  FRA recognizes that non-compete clauses are construed very narrowly in California and it has no intention of defending the action brought there or seeking to enforce the noncompete clause against any California resident.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _4th_ DAY OF _February_, 2005.

Paula Besson, President
Fitness Resource Associates, Inc.

# ATTACHMENT "A"

A JOINT VENTURE AGREEMENT
between
AFAA and FRA

This agreement is entered into this 3𝔪 day of
October, 1990, between the Aerobics and Fitness Association of
America, a California corporation, with offices located at 15250
Ventura Boulevard, Suite 310, Sherman Oaks, California, 91403,
called "AFAA", and Fitness Resource Associates ,Inc, a
Massachusetts corporation, with offices located at 19 Brook Road,
Suite 103, Needham, Massachusetts, 02194, called "FRA".

RECITAL

AFAA is an educational and publishing company that
specializes in the training and certification of aerobics and
fitness instructors, throughout the world, emphasizing techniques
in safety presentations and form.

FRA has developed and is teaching and training fitness
counselors in various aspects of aerobics and fitness excellence.
A copy of their Course Outline is attached and a part hereof.

Comes now the desire of both parties to jointly present
fitness courses to the general public, all in accordance with the
covenants defined hereunder.

NOW THEREFORE IT IS AGREED

I. COURSE OBJECTIVE

As the fitness industry continues to grow in terms of
participation and dollars spent, so grows the need for more
qualified fitness professionals.

In spite of great advancements in the past decade, our
industry continues to cater to the inherently motivated,
intrinsic exerciser and ignores the 66-80% of adult Americans who
do not exercise regularly. It is clearly time to provide this
non-athletically elite population, with information and guidance.

Using health related fitness goals, the course will
provide information and skills assisting the participant in
working one-on-one with individual clients.

The knowledge base of the program will integrate the most
practical methods and procedures for fitness assessment and
exercise prescription, with educational theory on how people
learn and how the trainer can develop basic counseling skills
which will in turn help the client assume new health behaviors.

page one of six

## II. THE COURSE

FRA will develop the course and make revisions as deemed appropriate, AFAA having the right to review and approve the course content.

All books and/or training workbooks or manuals developed for and during these courses shall be the joint property of both parties and any profits derived from their publication and sale, outside the courses , will be shared equally. It shall be the responsibility of FRA to timely file necessary copyrights for all materials used in the courses and for obtaining permission from any contributing authors, editors or publishers for the use of any reprinted materials.

AFAA publishes various books and manuals as a general course of doing business. They, therefore, agree that they will not use any of the materials developed for this course in their other publications, unless with the written permission of FRA. However, AFAA does not exclude their right to develop and publish books and manuals that may cover like material: including but not limited to: methods/formats.

The copy of the initial Course Outline, attached hereto is hereby agreed too.

## III. PREREQUISITE

The prerequisite for enrollment in this course for Personal Trainers/ Fitness Counselors is that each participant meets one or more of the following criteria;

1. Be certified by AFAA, IDEA, ACSM or IAR
2. Have a bachelor degree in a health/fitness science program
3. Successfully completed FRA's six hour "Introduction to Exercise Science" course

All sales staff will be aware of this prerequisite and be required to ascertain that all participants meet this requirement before enrollment.

Introduction to Exercise Science will be held prior to any certification training and exam for Personal Trainers/ Fitness Counselors with the mutual agreement of AFAA and FRA. FRA having developed this course maintains the right to final decision on content and materials used with AFAA having review and approval rights. FRA has the exclusive rights to offer and hold Introduction to Exercise Science in Massachusetts, New Hampshire and Rhode Island.

**page two of six**

## IV. INSTRUCTORS AND EXAM

FRA will, after consultation with AFAA, have the responsibility and final approval of hiring and training the instructors to be used in teaching the courses.

AFAA and FRA will co-develop the exam with final approval of FRA. Scoring and notification of results and issuance of a certification to the participants will be the responsibility of AFAA.

It shall be required by all Course Instructors, before they commence teaching a course, to show proof they have obtained liability insurance to cover their personal training; and, they must sign FRA's Standard Independent Contractor's Agreement.

## V. LOCATIONS

FRA and AFAA will jointly choose city locations for all course workshops and their dates. AFAA will find the host facility for each location using the following guidelines:

1.  Hotel preferred
2.  Available parking
3.  Chairs for participants
4.  Quiet lecture area
5.  Overhead projector for lectures
6.  Space enough for 100 people
7.  Easy access

FRA will maintain exclusive rights to offer and run this course in Massachusetts, New Hampshire and Rhode Island. In conjunction with FRA 's courses in this restricted area AFAA will hold a challenge exam for certification of Personal Trainers/ Fitness Counselors. All monies collected for the courses held in the restricted area will go to FRA. All monies collected for the challenge exam in the restricted area will go to AFAA. Any changes regarding the exclusivity of Massachusetts, New Hampshire and Rhode Island will be the decision of FRA.

## VI. MARKETING AND SALES

AFAA will provide their marketing and sales department to advertise, promote and register participants in the courses. FRA reserves the right to assist the development and revision of course description, phone scripts, registration procedure and post sales follow-up techniques.

Advertising and promotion of the courses by either party shall be readily identified with the names and/or logos of both AFAA and FRA.

**page three of six**

### VII. CONTINUING EDUCATION CREDITS

As a part of maintaining certification as an AFAA Certified Instructor, each instructor must continue to enhance their knowledge and skills through programs, workshops, home-study course, etc... After the full development and approval of AFAA, of the course to be offered hereunder, AFAA shall grant to each course participant 12 AFAA Continuing Education Credits.

### VIII. CONTINUING EDUCATION PROGRAM

As part of the ongoing educational process AFAA will institute a continuing education program for all certified Personal Trainers/ Fitness Counselors in order that they may maintain their certification. Paula Besson, M.Ed., from FRA, will be a member of the decision making continuing education provider system.

### IX. INCOME AND EXPENSES

The initial charge to attend the course for Personal Trainers/ Fitness Counselors is two-hundred and ninety-five dollars ($295.00). The charge to attend Introduction to Exercise Science is ninety dollars ($90.00). The price may only be changed or revised by the mutual consent of both parties.
Distribution of these fees shall be :
         AFAA    Sixty Percent    (60%)
         FRA     Forty Percent    (40%)
Distribution will be within 21 days of each course completion.

AFAA shall be responsible to pay from their portion of the income all expenses to:

         a. Advertise
         b. Furnish course material
         c. Telemarketing costs
         d. Telemarketer commissions
         e. Credit card clearing
         f. Bank charges
         g. Registration and administration costs

FRA shall be responsible to pay from their portion of the income all expenses to:

         a. Develop and update the course program
         b. Pay instructor expenses to include; airfare and hotel
         c. Instructor fees
         d. Instructor assistants fees as required

page four of six

It is agreed that any course will be subject to cancellation if enrollment does not meet a minimum of fifteen (15) people with the mutual consent of both parties.

## X.   SPONSORSHIP

Both parties shall make every effort to interest a sponsor or sponsors to support the program.  FRA, recognizes that AFAA already works with several sponsors on other programs and conflicts of interest could be created; therefore, FRA will cooperate with AFAA in these endeavors and agrees to AFAA's final approval of any sponsor.

Incomes generated from any sponsor shall be divided as referred to above.

## XI.   TERMINATION

This agreement shall be for a period of one year from the date fully executed and be automatically extended for one year periods so long as both parties agree.
To terminate this agreement, either party shall give the other a ninety day written notice after the first nine month period.

## XII. INSURANCE

Both parties agree to maintain their own liability insurance in the amount of one million dollars.  Each party will name the other party as additionally insured on their existing policy and have a certificate of insurance to that effect mailed to the named insured.

## XIII.   MISCELLANEOUS

This agreement may not be assigned in whole or in part to another person, organization or entity.
This agreement is a California Contract.  It is the intention of the parties that this Agreement, including any suits or special proceedings hereunder (wherever commenced) shall be governed and interpreted by the laws of the State of California.

page five of six

This is the only contractual area in which the parties have agreements and any further agreements, changes or revision must be first submitted and agreed in writing.

The consideration of each party to the development of the programs outlined hereunder shall constitute the consideration to enter into this agreement.

IN WITNESS WHEREOF, the parties hereto cause this agreement to be duly executed and delivered as of the day and year above written.

Aerobics and Fitness Association of America


_____Linda Pfeffer_____

Linda Pfeiffer, President


Fitness Resource Associates, Inc.


_____Paula Besson_____

Paula Besson, President


page six of six

# ATTACHMENT "B"



**FITNESS RESOURCE ASSOCIATES INC.**

Educational Services
in Health & Fitness

Linda Pfeffer
AFAA
15250 Ventura Blvd #310
Sherman Oaks, CA 91403

June 27, 1991

Dear Linda,

I hope this letter finds you well and enjoying summer.  I wanted
to touch base with you on a few things.  To avoid playing phone
tag I thought a letter would best serve the need.

First off I have enclosed an inventory list as per your request.
I could only begin as of the last order in May.  As you can see we
sold almost all the sweatshirts and need to order more for the
month of July.  Paula will be calling you soon to verify that with
you.  I believe the bag supply is down to less than 5 but we are
looking to order a new bigger bag if we can find one.

Regarding the Certificate Program for Personal Trainers/ Fitness
Counselors we are ALL very pleased with the development of this
program.  Although attendance at some workshops are not as large
as we all would like, the number totals for the month have been
great.  I do have some concerns regarding the business end of
things.

First I am working with Tony to see what we can do to help
expedite payments so that they are on time.  I have also spoken to
him regarding discrepancies in the amount we are receiving.  I
have asked him to send me an explanation of any discrepancies
rather than a check for a figure different than the amount
invoiced.

19 Brook Road
Suite 105
Needham, MA 02194
617 444 5032

Second, I wanted to point out to you that the workshop is being sold at fees different than we have agreed to. Our agreement was $295.00 or $275.00 (AFAA members) for certificate program and $90.00 or $80.00 (AFAA members) for Intro. to Exercise Science except for consultants who would be offered the standard 50% discount. I understand AFAA offers discounts for large group registrations, however it was not something we discussed.  I have been billing you for 40% of $275.00 or 80.00 for any registration fee that is less than the amount of above.

Some of the workshops Vince has arranged a barter for workshop registration in lieu of rent and/or hotel rooms for the workshop leaders.  When it is in lieu of rent and hotel rooms both FRA and AFAA benefit due to our costs being cut.  However, when the barter is arranged for rent only then AFAA benefits with FRA not receiving compensation for the attendees who receive complimentary services.

In looking at this, one thought I had would be that FRA still receive 40% of the minimum corresponding fee for the complimentary participants so that the workshop leaders are still compensated for all participants in the workshop.  For example there were three comps. in Atlanta equalling $330.00 that would have been sent to FRA.  I am not sure what you are paying in rent but that must still be a savings for you.

I look forward to speaking to you regarding these matters.  Feel free to call me after July 7 due to a vacation I must go on next week.

Warmly,

Nancy J. Curran

# ATTACHMENT "B"



**FITNESS
RESOURCE
ASSOCIATES
INC.**

Educational Services
in Health & Fitness

Linda Pfeffer
AFAA
15250 Ventura Blvd #310
Sherman Oaks, CA 91403

June 27, 1991

Dear Linda,

I hope this letter finds you well and enjoying summer. I wanted
to touch base with you on a few things. To avoid playing phone
tag I thought a letter would best serve the need.

First off I have enclosed an inventory list as per your request.
I could only begin as of the last order in May. As you can see we
sold almost all the sweatshirts and need to order more for the
month of July. Paula will be calling you soon to verify that with
you. I believe the bag supply is down to less than 5 but we are
looking to order a new bigger bag if we can find one.

Regarding the Certificate Program for Personal Trainers/ Fitness
Counselors we are ALL very pleased with the development of this
program. Although attendance at some workshops are not as large
as we all would like, the number totals for the month have been
great. I do have some concerns regarding the business end of
things.

First I am working with Tony to see what we can do to help
expedite payments so that they are on time. I have also spoken to
him regarding discrepancies in the amount we are receiving. I
have asked him to send me an explanation of any discrepancies
rather than a check for a figure different than the amount
invoiced.

19 Brook Road
Suite 105
Needham, MA 02194
617 444 5032

Second, I wanted to point out to you that the workshop is being sold at fees different than we have agreed to. Our agreement was $295.00 or $275.00 (AFAA members) for certificate program and $90.00 or $80.00 (AFAA members) for Intro. to Exercise Science except for consultants who would be offered the standard 50% discount. I understand AFAA offers discounts for large group registrations, however it was not something we discussed. I have been billing you for 40% of $275.00 or 80.00 for any registration fee that is less than the amount of above.

Some of the workshops Vince has arranged a barter for workshop registration in lieu of rent and/or hotel rooms for the workshop leaders. When it is in lieu of rent and hotel rooms both FRA and AFAA benefit due to our costs being cut. However, when the barter is arranged for rent only then AFAA benefits with FRA not receiving compensation for the attendees who receive complimentary services.

In looking at this, one thought I had would be that FRA still receive 40% of the minimum corresponding fee for the complimentary participants so that the workshop leaders are still compensated for all participants in the workshop. For example there were three comps. in Atlanta equalling $330.00 that would have been sent to FRA. I am not sure what you are paying in rent but that must still be a savings for you.

I look forward to speaking to you regarding these matters. Feel free to call me after July 7 due to a vacation I must go on next week.

Warmly,

Nancy J. Curran

# ATTACHMENT "C"

**CASNER & EDWARDS, LLP**

ATTORNEYS AT LAW

303 Congress Street
Boston, Massachusetts 02210

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

December 31, 2003

BY TELECOPIER (310) 286-9573
AND FIRST CLASS MAIL

Jonathan Kirsch, Esq.
1875 Century Park East
Suite 1700
LosAngeles, CA 90067

Re:    Fitness Resource Associates, Inc. ("FRA");
Aerobics and Fitness Association of America ("AFAA")

Dear Mr. Kirsch:

Reference is made to our letter dated December 2, 2003 to Linda Pfeffer, President of
AFAA, and your letter dated December 3, 2003 to my attention. As you probably know, our
respective clients are in discussions concerning issues arising under their Joint Venture
Agreement dated October 30, 1990 (the "Agreement"). Please be advised that we are working
with FRA to develop a proposal in an effort to resolve those issues and to address other matters
described in your December 3, 2003 letter.

You should be aware, however, that your client remains seriously in arrears in the
payment of amounts due and payable to FRA pursuant to the Agreement. Attached is a summary
of overdue invoices as of the date hereof, in the total amount of $185,553.34. An aggregate of
$120,499.26 in payments are more than 30 days overdue.

Such amounts owed to our client represent its allocable share of fees collected by AFAA
from personal training and other fitness workshops jointly presented by FRA and AFAA. Your
client has had the full use of all monies collected from such programs, which are paid by
participants directly to AFAA at or prior to the date of course completion. AFAA has an
obligation to pay FRA its rightful share of such monies in accordance with the Agreement.
Failure of AFAA to pay amounts due and payable to FRA within a commercially reasonable
period of time has had a devastating effect on our client's business, jeopardizing its ability to
meet essential operating expenses, including payroll and medical insurance premiums.

Without intending to waive the 21-day payment term, FRA in the past accepted payment
delays within reasonable limits from time to time. Such forbearance was intended by FRA as a
means of promoting the joint venture in the parties' mutual interest and not an invitation for

## CASNER & EDWARDS, LLP

Jonathan Kirsch, Esq.
December 31, 2003
Page 2

AFAA's current pattern of abuse. AFAA's payment performance, involving increasingly larger overdue amounts, has deteriorated significantly from prior custom and practice, leading to the conclusion that your client may be intentionally using payment delays to our client's detriment.

It is imperative that AFAA make immediate payment of amounts due and payable to FRA. Our client reserves all rights and remedies with respect to collection of such amounts as well as enforcement of other rights under the Agreement and applicable law.

Very truly yours,

David J. Chavolla

DJC:mtl

cc:    Paula Besson, President

#307849

## Past Due AFAA invoices as of 12/31/2003

### Yoga Section I

| City | State | Dates | Invoice | | Due Date | # Days Past Due |
|------|-------|-------|---------|--|----------|-----------------|
| Miami | FL | 9/5/2003 | $ | 343.20 | 9/26/03 | 97 |
| Long Island | NY OH | 9/19/2003 | $ | 1,746.00 | 10/10/03 | 83 |
| San Diego | CA | 9/19/2003 | $ | 2,402.40 | 10/10/03 | 83 |
| Los Angeles | CA | 9/26/2003 | $ | 514.80 | 10/17/03 | 76 |
| Las Vegas | NV | 9/26/2003 | $ | 514.80 | 10/17/03 | 76 |
| Baltimore | MD | 10/3/2003 | $ | 514.80 | 10/24/03 | 69 |
| Dallas | TX | 10/3/2003 | $ | 514.80 | 10/24/03 | 69 |
| San Jose | CA | 10/10/2003 | $ | 686.40 | 10/31/03 | 62 |
| Atlanta | GA | 10/10/2003 | $ | 686.40 | 10/31/03 | 62 |
| Ithaca | NY | 10/10/2003 | $ | 514.80 | 10/31/03 | 62 |
| Northampton | MA | 10/17/2003 | $ | 343.20 | 11/7/03 | 55 |
| Cherry Hill | NJ | 10/24/2003 | $ | 504.00 | 11/14/03 | 48 |
| Bloomington | IL | 10/24/2003 | $ | 514.80 | 11/14/03 | 48 |
| Hartford | CT | 11/7/2003 | $ | 1,029.60 | 11/28/03 | 34 |
| Raleigh | NC | 11/7/2003 | $ | 686.40 | 11/28/03 | 34 |
| Lake Hopatcong | NJ | 11/14/2003 | $ | 858.00 | 12/5/03 | 27 |
| Monroe | MI | 11/14/2003 | $ | 585.00 | 12/5/03 | 27 |
| Farmington | ME | 11/21/2003 | $ | 1,201.20 | 12/12/03 | 20 |
| Hampton Bays | NY | 11/21/2003 | $ | 686.40 | 12/12/03 | 20 |
| Ft Myers | FL | 12/5/2003 | $ | 300.30 | 12/26/03 | 6 |
| Rocky River | OH | 12/5/2003 | $ | 686.40 | 12/26/03 | 6 |
| **Total Yoga Sec I** | | | **$** | **15,833.70** | | |

### Yoga Section 3 (wknd 2 + tutorial)

| City | State | Dates | Invoice | | Due Date | # Days Past Due |
|------|-------|-------|---------|--|----------|-----------------|
| Atlantic City | NJ | 10/11/2003 | $ | 504.00 | 11/1/03 | 61 |
| Miami | FL | 10/25/2003 | $ | 840.00 | 11/15/03 | 47 |
| Long Island | NY | 11/8/2003 | $ | 1,680.00 | 11/29/03 | 33 |
| San Diego | CA | 11/8/2003 | $ | 1,848.00 | 11/29/03 | 33 |
| Los Angeles | CA | 11/15/2003 | $ | 504.00 | 12/6/03 | 26 |
| Las Vegas | NV | 11/22/2003 | $ | 672.00 | 12/13/03 | 19 |
| Baltimore | MD | 11/22/2003 | $ | 672.00 | 12/13/03 | 19 |
| Dallas | TX | 11/15/2003 | $ | 672.00 | 12/6/03 | 26 |
| San Jose | CA | 11/22/2003 | $ | 672.00 | 12/13/03 | 19 |
| Atlanta | GA | 11/22/2003 | $ | 504.00 | 12/13/03 | 19 |
| Ithaca | NY | 11/22/2003 | $ | 504.00 | 12/13/03 | 19 |
| Northampton | MA | 12/6/2003 | $ | 504.00 | 12/27/03 | 5 |
| **Total Yoga Sec 3 + tutorial:** | | | **$** | **9,576.00** | | |

### Advanced Personal Trainer

| City | State | Dates | Invoice | | Due Date | # Days Past Due |
|------|-------|-------|---------|--|----------|-----------------|
| San Diego | CA | 9/20/2003 | $ | 3,134.00 | 10/11/03 | 82 |
| St Peters | MO | 9/20/2003 | $ | 1,954.40 | 10/11/03 | 82 |
| Huntsville | AL | 9/27/2003 | $ | 588.40 | 10/18/03 | 75 |
| Roseville | MI | 9/27/2003 | $ | 418.80 | 10/18/03 | 75 |
| Chicago | IL | 10/4/2003 | $ | 448.80 | 10/25/03 | 68 |
| Houston | TX | 10/4/2003 | $ | 418.80 | 10/25/03 | 68 |

| City | State | Dates | Invoice | | Due Date | # Days Past Due |
|------|-------|-------|---------|---|----------|-----------------|
| Norwalk | CT | 10/11/2003 | $ | 588.40 | 11/1/03 | 61 |
| Washington | DC | 10/11/2003 | $ | 558.40 | 11/1/03 | 61 |
| Orlando | FL | 10/18/2003 | $ | 279.20 | 11/8/03 | 54 |
| Charlotte | NC | 10/25/2003 | $ | 377.20 | 11/15/03 | 47 |
| Montrose | | 10/25/2003 | $ | 1,051.20 | 11/15/03 | 47 |
| New Orleans | LA | 10/25/2003 | $ | 418.80 | 11/15/03 | 47 |
| Randolph | NJ | 10/25/2003 | $ | 758.00 | 11/15/03 | 47 |
| Detroit | MI | 11/8/2003 | $ | 714.80 | 11/29/03 | 33 |
| Los Angeles | CA | 11/15/2003 | $ | 399.20 | 12/6/03 | 26 |
| Durham | NH | 11/22/2003 | $ | 698.00 | 12/13/03 | 19 |
| Arlington | VA | 11/22/2003 | $ | 648.40 | 12/13/03 | 19 |
| San Diego | CA | 12/6/2003 | $ | 500.00 | 12/27/03 | 5 |
| | **Total APT** | | $ | **13,954.80** | | |

| Personal Trainer | | | | | | # Days |
|------|-------|-------|---------|---|----------|-----------------|
| City | State | Dates | Invoice | | Due Date | Past Due |
| **Negril** | **JA** | **5/9/2003** | **$** | **1,426.80** | **5/30/03** | **216** |
| San Diego | CA | 9/19/2003 | $ | 11,577.20 | 10/10/03 | 83 |
| Long Island | NY | 9/19/2003 | $ | 7,086.40 | 10/10/03 | 83 |
| Louisville | KY | 9/26/2003 | $ | 746.40 | 10/17/03 | 76 |
| New Orleans | LA | 9/26/2003 | $ | 1,887.60 | 10/17/03 | 76 |
| Doylestown | PA | 9/26/2003 | $ | 4,336.40 | 10/17/03 | 76 |
| Houston | TX | 9/26/2003 | $ | 1,694.40 | 10/17/03 | 76 |
| Oxnard | | 10/3/2003 | $ | 2,418.80 | 10/24/03 | 69 |
| San Jose | | 10/3/2003 | $ | 2,063.40 | 10/24/03 | 69 |
| Tampa | FL | 10/3/2003 | $ | 1,806.00 | 10/24/03 | 69 |
| Augusta | GA | 10/3/2003 | $ | 888.00 | 10/24/03 | 69 |
| Charlotte | NC | 10/3/2003 | $ | 2,290.80 | 10/24/03 | 69 |
| Southern Pines | | 10/3/2003 | $ | 171.60 | 10/24/03 | 69 |
| Nashville | TN | 10/3/2003 | $ | 1,634.40 | 10/24/03 | 69 |
| Quantico | | 10/3/2003 | $ | 1,402.80 | 10/24/03 | 69 |
| Homer | | 10/10/2003 | $ | 1,887.60 | 10/31/03 | 62 |
| Dekalb | | 10/10/2003 | $ | 2,059.20 | 10/31/03 | 62 |
| Myrtle Bch | | 10/10/2003 | $ | 1,402.80 | 10/31/03 | 62 |
| Salt Lake City | UT | 10/10/2003 | $ | 858.00 | 10/31/03 | 62 |
| Los Angeles | CA | 10/17/2003 | $ | 6,127.54 | 11/7/03 | 55 |
| Durham | | 10/17/2003 | $ | 2,462.40 | 11/7/03 | 55 |
| Birmingham | AL | 10/24/2003 | $ | 1,152.04 | 11/14/03 | 48 |
| Fayetteville | | 10/24/2003 | $ | 1,029.60 | 11/14/03 | 48 |
| Lees Summit | | 10/24/2003 | $ | 1,081.08 | 11/14/03 | 48 |
| Astoria | | 10/24/2003 | $ | 3,568.40 | 11/14/03 | 48 |
| Warwick | RI | 10/24/2003 | $ | 3,074.40 | 11/14/03 | 48 |
| Austin | TX | 10/24/2003 | $ | 1,870.00 | 11/14/03 | 48 |
| Miami | FL | 10/31/2003 | $ | 686.40 | 11/21/03 | 41 |
| Reno | NV | 10/31/2003 | $ | 1,166.82 | 11/21/03 | 41 |
| Brockport | ME | 10/31/2003 | $ | 1,716.00 | 11/21/03 | 41 |
| Mobile | AL | 11/7/2003 | $ | 1,544.40 | 11/28/03 | 34 |
| Tuscon | AZ | 11/7/2003 | $ | 1,226.88 | 11/28/03 | 34 |
| Modesto (PAC) | CA | 11/7/2003 | $ | 604.80 | 11/28/03 | 34 |
| Hartford | CT | 11/7/2003 | $ | 2,745.60 | 11/28/03 | 34 |
| Orlando (PAC) | FL | 11/7/2003 | $ | 1,977.60 | 11/28/03 | 34 |
| Atlanta | GA | 11/7/2003 | $ | 2,512.00 | 11/28/03 | 34 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Baton Rouge | LA | 11/7/2003 | $ | 2,604.00 | 11/28/03 | 34 |
| Albuquerque | NM | 11/7/2003 | $ | 1,201.20 | 11/28/03 | 34 |
| Brooklyn | NY | 11/7/2003 | $ | 1,876.80 | 11/28/03 | 34 |
| Williamsburg | VA | 11/7/2003 | $ | 1,291.20 | 11/28/03 | 34 |
| Yorktown Heights (PAC) | | 11/7/2003 | $ | 2,604.00 | 11/28/03 | 34 |
| Arlington | | 11/7/2003 | $ | 1,359.90 | 11/28/03 | 34 |
| san Ramon (PAC | CA | 11/14/2003 | $ | 5,340.96 | 12/5/03 | 27 |
| Athens | GA | 11/14/2003 | $ | 2,512.00 | 12/5/03 | 27 |
| Chicago | IL | 11/14/2003 | $ | 2,694.00 | 12/5/03 | 27 |
| Lexington | KY | 11/14/2003 | $ | 918.00 | 12/5/03 | 27 |
| Meredith | | 11/14/2003 | $ | 544.80 | 12/5/03 | 27 |
| manalapan | | 11/14/2003 | $ | 1,261.20 | 12/5/03 | 27 |
| Plattsburg | | 11/14/2003 | $ | 4,167.20 | 12/5/03 | 27 |
| Newark | NJ | 11/14/2003 | $ | 771.20 | 12/5/03 | 27 |
| Pittsburg | PA | 11/14/2003 | $ | 1,887.60 | 12/5/03 | 27 |
| Houston (PAC) | TX | 11/14/2003 | $ | 2,045.60 | 12/5/03 | 27 |
| Solana Beach (P | CA | 11/21/2003 | $ | 2,522.40 | 12/12/03 | 20 |
| Mill Valley (PAC) | CA | 11/21/2003 | $ | 1,527.24 | 12/12/03 | 20 |
| Palm Beach | FL | 11/21/2003 | $ | 2,260.80 | 12/12/03 | 20 |
| Cape Giraudaeu | | 11/21/2003 | $ | 2,119.20 | 12/12/03 | 20 |
| Morristown | | 11/21/2003 | $ | 4,521.60 | 12/12/03 | 20 |
| Toledo | OH | 11/21/2003 | $ | 1,321.20 | 12/12/03 | 20 |
| Woodland (PAC) | | 12/5/2003 | $ | 1,435.18 | 12/26/03 | 6 |
| San Jacinto (PAC) | | 12/5/2003 | $ | 1,389.90 | 12/26/03 | 6 |
| Washington | | 12/5/2003 | $ | 1,947.60 | 12/26/03 | 6 |
| Oakwood | | 12/5/2003 | $ | 2,145.00 | 12/26/03 | 6 |
| Witchita | | 12/5/2003 | $ | 1,372.80 | 12/26/03 | 6 |
| Springfield | | 12/5/2003 | $ | 900.00 | 12/26/03 | 6 |
| Charlotte | | 12/5/2003 | $ | 973.80 | 12/26/03 | 6 |
| Nashua | | 12/5/2003 | $ | 2,775.60 | 12/26/03 | 6 |
| Woodridge | | 12/5/2003 | $ | 1,409.50 | 12/26/03 | 6 |
| oswego | | 12/5/2003 | $ | 900.00 | 12/26/03 | 6 |
| Cincinatti | | 12/5/2003 | $ | 900.00 | 12/26/03 | 6 |
| Richmond | | 12/5/2003 | $ | 900.00 | 12/26/03 | 6 |
| Pullman | | 12/5/2003 | $ | 1,029.60 | 12/26/03 | 6 |
| | | Total PT | $ | 146,188.84 | | |

**Total invoices past due:   $     185,553.34**

```
                    ***********************
                    ***   TX REPORT   ***
                    ***********************


        TRANSMISSION OK

        TX/RX NO              4654
        CONNECTION TEL        336#5880#1#13102869573#
        CONNECTION ID
        ST. TIME             12/31 15:41
        USAGE T              02'17
        PGS. SENT              6
        RESULT               OK
```



# CASNER & EDWARDS, LLP

## ATTORNEYS AT LAW

303 Congress Street
Boston, Massachusetts 02210

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

## FACSIMILE COVER SHEET

**PLEASE DELIVER:**  *6*  **PAGES (INCLUDING COVER)**

**TO:**   Jonathan Kirsch, Esq.        **FAX NO.:**    (310) 286-9573

**FROM:**  David J. Chavolla

**DATE:**  December 31, 2003        **CLIENT NO.:**  5880.1

**MESSAGE/INSTRUCTIONS:**

# ATTACHMENT "D"

To: Linda
From:Paula
RE: PT/RT 1998-Providing  excellence, and various and sundry
items  leading to making lots of $$$$

    Hi Linda,
    I just got back from Jamaica and before I get overwhelmed by
my life, I wanted to touch base with you. Getting away often
allows a  perspective slightly different than the one that is so
often colored by the pressures of the everyday grind. I sent you
a copy  of a book yesterday that was given to me called "The
Corporate Mystic". I got you a copy because it is very wise and
supports and inspires wonderfully positive ideologies regarding
business and life. You will see many of your own qualities in the
book. I hope you enjoy it.
    It is once again time to begin the daunting task of putting
together the PT/RT schedule for the upcoming year. This is the
8th year that I will be doing this (for anyone keeping track).
The past few years (last 2 especially) have been disappointing
and frustrating in many ways. As I prepare for 1998 I am asking
for your support as we plan for the future. There are many
details to discuss which will follow, but the bottom line is that
both FRA and AFAA want excellence from A to Z resulting in lots
of very happy people and lots and lots of money. As I look toward
1998 I want to be excited and motivated to achieve the above.
With your support and respect I think we can have an incredible
1998.(RT too with strategy and promotion). For the past 11 years
we have tracked every phone call at FRA. I bet you are not
surprised to hear that an overwhelming number of callers say that
they heard of FRA from a friend who recommended that they call.
With this in mind, I ask you to support the philosophy that every
issue from the customer's first phone call to the last hand-shake
and  sincere goodbye  at the workshop, are  all critical.$$$$$
Here are some recommendations. I ask you to give these issues
your serious consideration. The only thing you have to lose is an
eroding reputation from problems that are easily solved.

1.The telemarketers continue to give bogus information. Can we
re-train them??? Every weekend several people who paid for, and
need intro, show up at 6:30 on Friday night. Other people who
should have been required to come, say they were never told about
intro.They still come with no pencils or calculaters. These seem
like such  easy problems to fix, yet each weekend, workshops
begin with a number of people already very unhappy.

2.7 out of 10 times clubs are the pitts. It is simply not worth
the money you save in rent. Many times it is a pure embarrassment
from beginning to end. $419 is a lot of money. At several clubs
we have found that often nobody is accountable. We often get
locked out, have no overhead projector, (lately RT has had no
overhead at the location almost every time) no tables, not enough
chairs, a room far too small, no water, sometimes there isn't an
enclosed room. This year was particularly bad.

3. We need to go to the biggest cities with the biggest populations I painstakingly and carefully schedule cities based on years of data. It is a multi-variable strategic puzzle. It's goal is optimizing income potential. We lost money big-time this year when instead of going to Philly or Chicago etc. we went 55 minutes away to a club that wanted to host. I understand the concept of free rent, but it was simply not worth it when you look at the number of people we lost and the poor quality of the workshop experience due to inadequate and embarrassing facilities. Don't forget that poeple associate AFAA with the facility it is held at. I have been very encouraged, however, after several conversations with Michael. I hope you will support staying very close to metropolitan areas and place PT workshops in facilities that provide what is needed to optimize the experience of our customers. It is just good business. $$$$$

4.RT is a diamond in your treasure chest with value that we have yet to realize. I understand everyone's recommendation about making RT "personal trainer II", What I suggest however, is that A Master Personal Trainer/Fitness Counselor Certificate is awarded to those who gain both PT and RT certifications. The two courses are designed to go together. What do you think? Remember that I carefully schedule RT programs to follow PT programs by 5-8 weeks in all of the cities scheduled.

5.Various and sundry other issues and things to talk about in the future

a.Trying to run our business is very difficult when our invoices are, at any given time, $100,000 overdue. I am especially concerned because we will be adding more workshops next year. I know that you appreciate the difficulty involved in lack of cash flow$$$$

b. As requested by the board, we have revised the PT practical for past and potential complaints about it's objectivity and reliability as a testing tool. I sent the final copies to Robin several weeks ago. We would like to begin using the new and improved PT practical.

c. We await the new policy for challenges. We will begin rewriting both PT and RT exams when the board has decided the new policy for test security. I can not stress enough my concern about this issue. It is totally out of hand. No wonder people say our exam is easy. You can buy the answers from your examiners and specialists in their local programs. They are doing this with all your exams. Again I suggest that you change your exams, and provide a better, more secure system of test administration. Nancy has sent a separate fax which outlines how in fact, it is dramatically more financially advantageous for you to eliminate challenges.

d. We sent an updated version of the RT course manual several

months ago.  Even if you decide to sell a book to support this
program, we still need that course outline. Can you please update
our RT manual?  You have an edited version in your office.

e. What do you think about February being APEX month? Or more
than just one week? If February was APEX month we could then set
up the PT programs followed by RT programs in 2 weeks. We lost
lots of money by not having RT programs at the same cities as the
PT programs. We have had between 80-120 people at RT at APEX in
Atlanta every year since we started doing it.

f. Judy and I have begun meetings on a book that we are working
on called (surprise, suprise) "The Art and Science of Personal
Training." We will be using it as preparatory study materials
that expands on the course outline. It will help those who need
the extra preparation and go into the details that the
constraints of the short time together at the workshop do not
allow. We have not yet investigated our publishing options, but
we would eventually like to sell it to AFAA PT workshop
participants as required course materials. Although you have
chosen not to participate in marketing our written work in the
past I hope you will support this venture.

I think that's it for now. Please take my comments in the spirit
intended. Looking forward to talking with you. Hope to hear from
you soon.

# ATTACHMENT "E"

Fitness Resource Associates, Inc.
74 Crescent Road
Needham, MA 02494

February 10, 2004

Linda Pfeffer, President
Aerobics and Fitness Association of America
15250 Ventura Boulevard
Suite 200
Sherman Oaks, CA 91403

      Re:    Fitness Resource Associates, Inc. ("FRA"); Aerobics and Fitness Association
              of America ("AFAA")

Dear Linda:

      We hereby request AFAA's consent to cancellation of the Personal Trainer program
scheduled to be held in Hilton Head, SC on February 27, 2004, due to low enrollment. To date
only 3 individuals have subscribed to the program. FRA would incur direct damages in excess
of $551.00 to conduct the program at such enrollment level. We do not believe it is reasonable
or fair to impose such losses on FRA. FRA remains prepared to reconsider its request for
cancellation up until 48 hours prior to the scheduled program date based on subsequent increase
in enrollment.

              Very truly yours,

              FITNESS RESOURCE ASSOCIATES, INC.

By:                           
          Paula Besson, President

#308791

# ATTACHMENT "F"

LAW OFFICES OF
## JONATHAN KIRSCH
A PROFESSIONAL CORPORATION
1880 CENTURY PARK EAST
SUITE 515
LOS ANGELES, CALIFORNIA 90067
COPYRIGHT, TRADEMARK AND PUBLISHING LAW

TELEPHONE (310) 785-1200
FAX (310) 286-9673

E-MAIL: jk@jonathankirsch.com
WEBSITE: www.jonathankirsch.com

## OFFER TO COMPROMISE

*By Fax to (617) 426-8810*

December 6, 2004

David J. Chavolla
Casner & Edwards, LLP
303 Congress Street
Boston, Massachusetts 02210

>          Re:    **Aerobics and Fitness Association of America**
>                 *Fitness Resource Associates, Inc.*

Dear Mr. Chavolla,

        On behalf of my client, Aerobics and Fitness Association of America (AFAA), please let me ask you to raise the following matter with your client, Fitness Resource Associates.

        Enclosed is a copy of AFAA's final accounting of the certification workshops conducted by AFAA and FRA pursuant to their co-marketing arrangements through October 31, 2004, when the arrangements came to an end. As you will note, the final sum owing to FRA is $11,171.22, subject to adjustments for the claims discussed below.

        AFAA is entitled to bring claims against FRA for various wrongful acts as detailed in previous correspondence, and additional new claims that have arisen since we last corresponded.

        For example, FRA is aggressively promoting its new business activities in a manner that wrongfully suggests that AFAA is no longer offering a personal trainer certification course and thus creates confusion among both presenters and participants. As a result, AFAA has received numerous inquiries from individuals who have the impression from FRA that AFAA had been sold or that AFAA certifications are no longer valid.

        Since AFAA has been damaged far in excess of the amount referenced above, AFAA is entitled to offset its damages against the sum otherwise payable to FRA and to recover additional damages far in excess of the final sum.

        I must point out, once again, that no joint venture exists between the parties, but if FRA continues to assert the existence of a joint venture, then it is FRA — and not AFAA — that has breached its duties under any alleged joint venture.

LAW OFFICES OF JONATHAN KIRSCH

David J. Chavolla
**Re: Aerobics and Fitness Association of America**
   *Fitness Resource Associates, Inc.*
December 6, 2004
Page 2

However, AFAA is willing in principle to waive its claims against FRA and pay the final sum in full, but only in the context of a full and final settlement by which both parties will enter into a mutual general release on a "walkaway" basis.

Once a mutual general release, in a form acceptable to AFAA, has been signed, AFAA will pay FRA the sum of $11,171.22

If, on the other hand, FRA declines to enter into a final settlement, AFAA will be compelled to fully litigate all of its own claims against FRA.

Please let me know if your client is willing to accept this offer to compromise. If so, I will prepare and send a draft of a Mutual General Release.

I must continue to reserve all rights, remedies, claims, causes of action that AFAA is entitled to assert, including new, different and additional claims that may not have been raised in earlier correspondence.

Thank you for your attention to this matter.

Sincerely yours,

Jonathan Kirsch

JK:jw
cc:   Linda D. Pfeffer, President
      Aerobics and Fitness Association of America



Page 1 of 1

# FITNESS RESOURCE ASSOCIATES
### Educational Services in Health & Fitness

**AFAA Code: 04100516**
Location: **PT, Augusta, GA**
Workshop Date: **10/22/2004**

| Last Name | First Name | Amount |
|---|---|---|
| Blocker | Kelley | $ 245.00 √ |
| Brown | Suzanne | $ 429.00 √ |
| Deas | Richard | $ — comp |
| Gibson | Antwan | $ 75.00 √ |
| Glore | Dennis | $ 429.00 √ |
| Hall | Carol | $ 429.00 √ |
| Howell | Samuel Bronson | $ ~~429.00~~ 386.10 √ |
| Leeseberg | Christy | $ 386.10 √ |
| Petrides | Julia | $ ~~429.00~~ 386.10 √ |
| Prather | Frank | $ 429.00 √ |
| Rentz | Carrie | $ comp |
| Sadler | Paul | $ 429.00 √ |
| Watkins WM00312 | Stephen 633687 | $ 75.00 √ |
| attended | **Total** | **$3,784.10** |

245 · 00  +
429 · 00  +
75 · 00  +
429 · 00  +
429 · 00  +
386 · 10  +
386 · 10  +
386 · 10  +
429 · 00  +
429 · 00  +
75 · 00  +

3,698 · 30  ＊
3,698 · 3  ×
40 · -  %
1,479 · 32  ◇



| | |
|---|---|
| Due FRA | **$1,613.64** |
| Date Due | **11/19/2004** |

**POSTED**

---

**Fitness Resource Associates, Inc.  ■  74 Crescent Rd.  ■  Needham, MA 02494**
Phone: 781 449 7372  ■  Fax: 781 449 5372  ■  E-mail: info@frausa.com
www.FRAUSA.com



AFAA Code: **04100526**
Location: **PT Lewiston, ME**
Workshop Date: **10/29/2004**

| Last Name | First Name | Amount |
|---|---|---|
| Allen | Joe | $    429.00 |
| Blanchard | Mark | $    429.00 |
| Davis | James | $    75.00 |
| Fagan | Karen | $    429.00 |
| Hayden | Lucas | $    429.00 |
| Hurley *121504951* | Donna *523583* | $  386.10 |
| Lamb | Mandy | $    429.00 |
| Reynolds *00780602* | Debbie *53249B* | $    321.75 |
| Sowtell | Deanne | $    429.00 |
| White | Anthony | $    429.00 |
| **attended** | | |
| | Total | **$3,936.00** |
| | **Due FRA** | **$1,574.40** |
| | **Date Due** | **11/30/2004** |

POSTED

**Fitness Resource Associates, Inc.**  ■  **74 Crescent Rd.**  ■  **Needham, MA 02494**
Phone: **781 449 7372**  ■  Fax: **781 449 5372**  ■  E-mail: **info@frausa.com**
www.FRAUSA.com



**FITNESS RESOURCE ASSOCIATES**

Educational Services
in Health & Fitness

Page 1 of 1

AFAA Code: 04100536
Location: PT, Fishkill, NY
Workshop Date: 10/22/2004

| Last Name | First Name | | Amount |
|-----------|-----------|---|--------|
| Blum | Suzanne | $ | 320.00 |
| Casarella | Deborah | $ | 75.00 |
| Fray - Oates | Josephine | $ | 75.00 |
| Grable | Robert | $ | 429.00 |
| Harkins | Rita | $ | 429.00 |
| Hayden | Diane | $ | 420.00 |
| Passaro | Matthew | $ | 75.00 |
| Pironti | Mary | $ | 429.00 |
| Rafter | John | $ | 429.00 |
| Rama | Elizabeth | $ | 429.00 |
| Thompson | William | $ | 420.00 |
| Urbanak | John | $ | 420.00 |
| Waldo | Beth | $ | 75.00 |
| Zeoli | Nina | $ | 429.00 |

| | | | |
|---|---|---|---|
| attended | | Total | $4,481.00 |

| | |
|---|---|
| Due FRA | $1,792.40 |
| Date Due | 11/19/2004 |

POSTED

Fitness Resource Associates, Inc.   ■   74 Crescent Rd.   ■   Needham, MA 02494
Phone: 781 449 7372   ■   Fax: 781 449 5372   ■   E-mail: info@frausa.com
www.FRAUSA.com



Page 1 of 1

**FITNESS RESOURCE ASSOCIATES**
Educational Services
in Health & Fitness

AFAA Code: Unknown
Location: PT Plattsburgh, NY
Workshop Date: 10/29/2004

| Last Name | First Name | | Amount |
|---|---|---|---|
| Balun | Christopher | $ | 429.00 321.75 |
| Chiovarelli | Jonathan | $ | 429.00 321.75 |
| Choppy 109704576 | Lindsay 508481 | $ | 429.00 no payment |
| Conley CON000031 | Daniel 524886 | $ | 420.00 321.75 |
| Finisterke FIN00018 | Ian 534817 | $ | 420.00 321.75 |
| French | Andy | $ | 429.00 321.75 |
| Joyal | Derek | $ | 429.00 321.75 |
| Mccallion | Robert | $ | 429.00 321.75 |
| O Connor | Keith | $ | 429.00 00 |
| Preston | Rachel | $ | 429.00 321.75 |
| Salvatore | Matthew | $ | 245.00 18375 |
| York | Chelsea | $ | 429.00 321.75 |

|  |  | Total | $4,964.00 |
| attended |  |  |  |
|  |  | Due FRA | $1,985.60 |
|  |  | Date Due | 12/1/2004 |

**Fitness Resource Associates, Inc.** ■ **74 Crescent Rd.** ■ **Needham, MA 02494**
Phone:  781 449 7372 ■ Fax:  781 449 5372 ■ E-mail:  info@frausa.com
www.FRAUSA.com



Page 1 of 1

FITNESS
RESOURCE
ASSOCIATES
Educational Services
in Health & Fitness

0 · c

429 · 00  +
75 · 00  +        AFAA Code: 04100535
429 · 00  +        Location: PT New York, NY
75 · 00  +    Workshop Date: 10/29/2004
429 · 00  +
429 · 00  +
429 · 00  +
245 · 00  +
75 · 00  +
429 · 00  +
429 · 00  +
75 · 00  +
143 · 00  +
429 · 00  +
429 · 00  +
429 · 00  +
429 · 00  +
75 · 00  +
75 · 00  +
386 · 10  +
75 · 00  +
429 · 00  +
75 · 00  +
429 · 00  +
429 · 00  +
429 · 00  +
143 · 00  +

026

7,523 · 10  *

| Last Name | First Name | | Amount |
|---|---|---|---|
| Arrington 094606926 | Nicole 536230 | | 429 |
| Briones | Leonore | $ | 75.00 |
| Carbone | Jenna | $ | 429.00 |
| Chase | Johanna | $ | -75.00 comp |
| Cole | Michele | $ | 75.00 |
| Collins | Sarah | $ | 429.00 |
| Cropanese | Christy | $ | 429.00 |
| D'Amore | Michael | $ | 429.00 |
| Fisher 0815240390 | Miki 528450 | $ | 245  429.00 |
| Hassan | Mohamed | $ | 75.00 |
| Karl | Adam | $ | 429.00 |
| Kellicky | Jacob | $ | 429.00 |
| Maung | Orsiolo | $ | 75.00 |
| Middleton | Bernard | $ | 429.00  143 |
| O Dowd | Melanie | $ | 429.00 |
| Oquendo | Feliz | $ | 429.00 |
| Protopopov | Boris | $ | 429.00 |
| Quick | Walter | $ | 75.00 |
| Reddrick | Bruel | $ | 75.00 |
| Richmond | Brian | $ | 429.00  286.10 |
| St. Cloud | Rodney | $ | 75.00 |
| Stone | Deborah | $ | 429.00 |
| Suarez | Sophia | $ | 75.00 |
| Taylor | Brooke | $ | 429.00 |
| Trumpet | Ronald | $ | 429.00 |
| Walker | Michael | $ | 429.00 |
| William Wikle Iii | Charles | $ | -429.00  143 |

7,523 · 1  ×

40 · 7  ×    attended    Total    $8,397.00

3,009 · 24  o

000

0 · *

| | |
|---|---|
| Due FRA | $3,358.80 |
| Date Due | 11/30/2004 |

---

**Fitness Resource Associates, Inc.**  ■  **74 Crescent Rd.**  ■  **Needham, MA 02494**
**Phone: 781 449 7372**  ■  **Fax: 781 449 5372**  ■  **E-mail: info@frausa.com**



Page 1 of 1

0 · ✕

199·00 ┼        AFAA Code: **04105002C**
199·00 ┤         Location: **PTChall., Needham, MA**
75·00 ┼        Workshop Date: **10/3/2004**
199·00 ┼
199·00 ┼   | Last Name | First Name | | Amount |

005

| Last Name | First Name | | Amount |
|-----------|-----------|---|--------|
| Bouque | Roland | $ | 199.00 |
| Collins | Richard | $ | 199.00 |
| Erlichman | Beth | $ | 75.00 |
| Fava | Kristen | $ | 199.00 |
| Fortes | Ivone | $ | 199.00 |

871·00 ✳
871 · ✕
40 · ˀ        **attended**              **Total**    **$871.00**
34·8·40 ○

000

0 · ✕                              Due FRA      **$348.40**
                                    Date Due    **10/29/2004**

**Fitness Resource Associates, Inc.   ■   74 Crescent Rd.   ■   Needham, MA 02494**
**Phone: 781 449 7372  ■  Fax: 781 449 5372  ■  E-mail: info@frausa.com**
**www.FRAUSA.com**

Page No.    1
10/26/2004

PERSONAL TRAINER CERTIFICATION WORKSHOP

Location: HONOLULU, HI
Date: October 29, 2004

Code: [041005I8]

Testing Dept. Use only

| Participant's Name | Test# | Type | | | 0 - * | Date | Writ | Prac | Grade | Cert-Num |
|---|---|---|---|---|---|---|---|---|---|---|
| 37818 BICOY, MYSTI | 424 | | | | 429.00 | + L | . | P | | |
| 33019 CARPER, MAXIMILLIAN | 424 | 424 | | | 386.10 | + L | . | P | | |
| 40262 CORRIGAN, JAY | 424 | 424.10 | | | 429.00 | + L | . | P | | |
| 34230 FORNES, KELLY | 424 | 424 | | | 321.75 | + H | . | P | | |
| 35293 HOGGATT, CHRISTINA | 424 | 424.75 | | | 321.75 | + F | . | P | | |
| 38438 LEBLANC, LISA | 424 | 424 | | | 321.75 | , + | . | | | |
| | | | | | 429.00 | + | | | | |
| | | | | | 386.10 | + | | | | |
| 32962 MATSMURA, STEFFY | 424 | 424.75 | | | 321.75 | + H | . | P | | |
| 37522 MILLES, GEORGE | 424 | 421.75 | | | 429.00 | x 1/5/06 | . | NP | | |
| 37438 NEWMAN, LEA | 424 | 421.75 | | | 321.75 | + L | . | P | | |
| | | | | | 429.00 | + | | | | |
| 37821 PALMER, JASON | 424 | loAMP | 017 | | 6,456.45 | * H | . | P | | |
| 39580 PANG, MARK | 424 | 424 | | | 6,456.45 | x H | . | P | | |
| 34608 SALGADO, LYNN | 424 | 424.10 | | | 40. | x RCS | | P | | |
| 31808 SANTIAGO, AURELIA | 424 | 421.75 | | | 2,582.58 | o 2/4/05 | | | | |
| 34843 STEWART, STACEY | 424 | 424 | 000 | | 0. | x 2/16 | | | | |
| 30752 TOKUDA, MICHELE | 424 | 424 | | | | W/H | | | | |

1/5/04/06

# ATTACHMENT "G"

1  WILLIAM K. HENLEY, State Bar No. 45328
   HAHN & HAHN LLP
2  NINTH FLOOR
   301 E. COLORADO BOULEVARD
3  PASADENA, CALIFORNIA 91101-1977
   Telephone: (626) 796-9123
4  Facsimile: (626) 449-7357

5  Attorneys for Plaintiff, Aerobics and Fitness
   Association of America, a California corporation

6

7

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

JAN 0 7 2005

John A. Clarke, Executive Officer/Clerk
By_____, Deputy
        **J. SUNGA**

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10

11  AEROBICS AND FITNESS ASSOCIATION
    OF AMERICA, a California corporation,      CASE NO. BC 326969

12                                              **COMPLAINT FOR DECLARATORY**
              Plaintiff,                        **RELIEF**
13
      vs.
14
    FITNESS RESOURCE ASSOCIATES, INC.,         Attest: A True Copy
15  a Massachusetts corporation,

16            Defendant.

17                                              Constable

18       COMES NOW Plaintiff, Aerobics And Fitness Association of America, and for cause of

19  action against Defendant complains and alleges as follows:

20       1.    Plaintiff is a corporation, duly organized and existing under the laws of the State of

21  California.

22       2.    Defendant is a corporation, organized and existing under the laws of the

23  Commonwealth of Massachusetts, and doing business in the State of California.

24       3.    Plaintiff and Defendant are competitors in the business of sponsoring training and

25  certification workshops and programs for physical fitness instructors throughout the United States.

26       4.    Plaintiff is informed and believes and upon such information and belief alleges that

27  in conducting its business Defendant has entered into written agreements with individuals

28  (hereinafter "Contractors") to conduct its workshops and programs, in the form of the Contractor

DMA\99999\4TN\S01!.DOC [225054.1]                    1

1    Agreement, a copy of which is attached hereto as Exhibit 1 and incorporated herein by this

2    reference.

3              5.        At least one Contractor, a resident of California, whose agreement with Defendant

4    has been terminated for less than 12 months, has been in contact with Plaintiff seeking to conduct

5    Plaintiff-sponsored workshops.  Plaintiff is informed and believes and upon such information and

6    belief alleges that various other similarly situated Contractors would also be willing to conduct

7    Plaintiff-sponsored workshops.  Plaintiff is informed and believes and upon such information and

8    belief alleges that Defendant has informed said Contractors that paragraph 6 of Exhibit 1

9    (Non-Competition Covenant) prevents them from conducting Plaintiff-sponsored workshops.

10   Defendant has threatened Plaintiff with legal action if Plaintiff seeks to contract with Contractors

11   as set forth above.  The Contractors have advised Plaintiff they would accept an engagement to

12   conduct Plaintiff-sponsored workshops if it was determined by a court that they are not restrained

13   from doing so by paragraph 6 of Exhibit 1.  Plaintiff would like to contract with some or all of

14   such Contractors as set forth above.

15             6.        An actual controversy has arisen and now exists between Plaintiff and Defendant

16   concerning their rights and duties in that Plaintiff contends that paragraph 6 of Exhibit 1 is invalid

17   and unenforceable under the laws and public policy of California, that Plaintiff is free to contract

18   with said Contractors, and that said Contractors would not be violating any cognizable rights of

19   Defendant by conducting Plaintiff-sponsored workshops.  Plaintiff is informed and believes and

20   upon such information and belief alleges that Defendant disputes Plaintiff's contentions and

21   contends that said Contractors are legally bound by the provisions of paragraph 6 of Exhibit 1 and

22   can be enjoined from conducting Plaintiff-sponsored workshops.

23             7.        A judicial declaration is necessary and appropriate at this time under the

24   circumstances in order that Plaintiff may ascertain its rights and the rights of said Contractors to

25   enter into an independent contractor relationship with Plaintiff.

26             WHEREFORE, Plaintiff prays for judgment as follows:

27             1.        For a declaration that paragraph 6 of Exhibit 1 is invalid and unenforceable under

28   the laws and public policy of California;

DMA\99999\4TNS011.DOC [225054.1]

2

COMPLAINT FOR DECLARATORY RELIEF

1    2.    For Plaintiff's costs of suit incurred herein; and,

2    3.    For such other and further relief as the court may deem just and proper.

3  DATED: January 6, 2005        HAHN & HAHN LLP

4

5                    By: _____
                         William K. Henley
6                        Attorneys for Plaintiff, Aerobics and Fitness
                         Association of America, a California corporation
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DMA\99999\4TN$01!.DOC [225054.1]                3

# *CONTRACTOR AGREEMENT*

AGREEMENT made, effective as of January 1, 2004, by and between Fitness Resource Associates, Inc., a Massachusetts corporation with principal offices at 74 Crescent Road, Needham, MA 02494 (herein referred to as "FRA") and _____ _____, an individual having a mailing address at _____ _____ , _____ , _____ , (herein referred to as the ("Contractor").

FRA has developed materials regarding aerobic exercise and personal training for use in conducting educational programs and workshops for aerobic instructors, personal trainers and health/fitness professionals. FRA wishes to engage Contractor as an independent contractor to conduct training and educational programs, certification workshops and examinations as more fully defined below, and Contractor wishes to provide such services on an as needed basis.

In consideration of the mutual covenants and agreements set forth herein, the parties hereto agree as follows:

1.    <u>Services.</u> While this Agreement remains in effect Contractor agrees, upon the assignment by FRA and acceptance by Contractor, to:

(i)    conduct training and educational programs for FRA students on topics related to aerobic exercise and fitness, pursuant to written program guidelines established by FRA ("Programs");

(ii)    conduct certification workshops and exams for FRA students, pursuant to written certification guidelines established by FRA ("Workshops")' and

(iii)    perform such other projects ("Projects") as may be agreed upon by FRA and Contractor.

Contractor shall perform the above services in a competent and effective manner in accordance with written guidelines established by FRA, as modified or amended from time to time ( the "Guidelines"). Contractor represents that (s)he meets FRA's minimum requirements to act as a Contractor and has obtained sufficient instruction and training for the performance of all duties under this Agreement.

2.    <u>Compensation.</u> (a) As compensation for the services to be rendered by Contractor FRA shall pay to Contractor a fee in accordance with Schedule 1, 2 and or 3 attached hereto.

(b)    Contractor will be paid following Contractor's submission to FRA of a written statement of services rendered following completion of each Program, Workshop or Project. Such statement shall be accompanied by any supporting documentation reasonably required by FRA.

EXHIBIT 1
4

(c)    It is agreed and understood that the only compensation payable to Contractor under this Agreement is for completed Programs, Workshops or Projects assigned by FRA and accepted by Contractor. FRA has the right to make assignments to Contractor, in the sole discretion of FRA. Contractor has no right under this Agreement to receive assignments for, nor any obligation to accept assignments of any particular number or type of Programs, Workshops or Projects.

3.    Term.    This Agreement shall have a term of one (1) year commencing on the date hereof and shall automatically be renewed for successive 12 month terms unless written notice of non-renewal is given by either party to the other sixty (60) days prior to the expiration of the then current term.

4.    Termination. (a) Either party hereto may terminate this Agreement for any material breach by the other party which has not been cured within thirty (30) days after written notice of such breach. In the absence of proof of a cure, termination will become effective upon the expiration of such thirty (30) day period.

(b)    This Agreement shall terminate immediately upon the occurrence of any of the following events:

(i)    the bankruptcy, insolvency, or dissolution of FRA or the discontinuance of its business as a going concern; or

(ii)    the bankruptcy, insolvency, death, incapacity or revocation of certification of Contractor, the commission by Contractor of any act which exposes FRA to liability, which calls into question the quality of the Programs or Workshops, or which reflects adversely on the name or public image of FRA, or a determination that Contractor must be considered an employee of FRA for purposes of tax reporting.

(c)    In the event that Contractor gives less than 30 days notice of termination of this agreement, FRA maintains the right to deduct the cost of all unused tickets held in Contractor's name from any compensation FRA still owes Contractor.

5.    Confidentiality. Contractor shall not at any time while this Agreement remains in effect or at any time thereafter, reveal or disclose to any person outside FRA, or use for Contractor's own benefit, without FRA's specific written authorization, any information not already lawfully available to the public concerning the Guidelines, the Programs, the Workshops or any proprietary property of FRA (as hereinafter described) or any sales or marketing technique or cost method, or any customer, vendor or mailing list of FRA (which term shall include any subsidiary or affiliate of FRA). All originals and copies of any of the foregoing relating to the business of FRA shall be the sole property of FRA, not to be removed from the premises or custody of FRA without first obtaining written consent or authorization of FRA. Upon termination of this Agreement for any reason whatsoever, Contractor shall promptly surrender to FRA all copies of any of the foregoing, and Contractor shall not thereafter retain or deliver to any other person any of

EXHIBIT 1
5

the foregoing or any summary of memorandum thereof. For purposes of this Agreement, "proprietary property" shall include all research, information, inventions, designs, plans, procedures, developments, discoveries, improvements, patent, trademarks, copyrights, applications for any patents, trademarks or copyrights, study guides, trade secrets, drawings, plans, systems, methods of operation, configurations, programs, codes, formulae, specifications, and all other technical, research and development data and know-how made, conceived, developed and/or acquired by FRA.

6.     Non-Competition Covenant. Contractor retains the right to perform any services for other clients, persons, companies or other entities, as long as the performance of such services does not interfere with Contractor's performance of any assignment accepted by Contractor under this Agreement. Notwithstanding the foregoing sentence, Contractor agrees that while this Agreement remains in effect and for a period of 12 months thereafter, Contractor will not, directly or indirectly, either for Contractor's own account or as an employee, consultant, officer, director, partner or joint venture with another, accept, receive, solicit or undertake service as a consultant to or employee of agent of any company or entity which develops or conducts programs or workshops for aerobic instructors and personal trainers, which are substantially similar to the Programs or Workshops, within the United States. The parties agree that the period of time, geographic area and the proscribed activities specified are reasonable, in view of the knowledge of such business. However, if any of the time period, geographic area or scope of proscribed activities should be adjudged unreasonable in any judicial proceeding, then such period, area, or scope, as the case may be, shall be reduced so that this covenant may be enforced in such area, during such period and with respect to such activities as are adjudged to be reasonable.

7.     Relationship Created.     (a) It is expressly agreed and understood between FRA and Contractor that Contractor, by entering into this Agreement and accepting assignments hereunder, is an independent contractor working for himself or herself and is not, shall not be deemed to be, and shall not hold himself or herself out as an agent, legal representative, or employee of FRA. Contractor is not granted any right or authority to assume or to create any obligation, liability or responsibility, expressed or implied, on behalf of or in the name of FRA, to bind FRA in any manner to any contractual or other undertaking whatsoever, or to accept payment from any party of any obligation owing to FRA.

(b)     Contractor shall be responsible for all costs which Contractor may incur in connection with this Agreement, except as specifically set forth herein, and the payment of all taxes due to any state or federal taxing authority on account of the compensation paid to Contractor by FRA, it being understood that FRA does not intend to withhold any part of Contractor's compensation for taxes since Contractor is not an employee of FRA. FRA shall issue to Contractor and file with the Internal Revenue Service a Form 1099 reporting compensation paid to Contractor. Should such tax withholding become required in the opinion of FRA, FRA shall be entitled to withhold any amounts required to be withheld by it pursuant to the Internal Revenue Code (the "Code"), notwithstanding FRA's right to terminate this Agreement. Contractor shall, at the request of FRA,

EXHIBIT 1

6

complete, execute and deliver to FRA any forms required to be so executed pursuant to the Code.

(c)     Contractor shall obtain and maintain liability insurance, at Contractor's sole expense, covering Contractor's performance under this Agreement. Such insurance shall include liability limits as specified by FRA.

(d)     Contractor will supply all tools and equipment necessary for the performance of services under this Agreement and will secure all necessary licenses, permits and bodies required by law which relate to the performance of the services to be rendered to FRA hereunder. FRA will provide or arrange for meeting room facilities and audiovisual equipment used in conjunction with Programs, Workshops and Projects.

(e)     Contractor agrees to hold FRA harmless from and indemnify FRA against all costs, expenses, liabilities, actions, causes of action, or claims brought by any third party against FRA arising out of the services rendered by Contractor to FRA, or in which FRA is named as a party as a result of any business activities of Contractor, except to the extent that FRA has committed any negligent act of willful misconduct.

8.     Other Representation and Covenants. (a) Contractor agrees that obligations under Paragraphs 5 through 7 of this Agreement shall be binding irrespective of the reasons for the termination of this Agreement or the amount of compensation paid to Contractor and shall survive the termination or expiration of this Agreement.

(b)     Contractor represents to FRA that Contractor is not under any obligation to any person, firm or corporation, and has no other interest which is inconsistent or in conflict with this Agreement, or which would prevent, limit or impair, in any way, their performance by Contractor of services under this Agreement.

9.     Remedies. Contractor acknowledges that FRA does not have an adequate remedy at law in the event that Contractor breaches any of the foregoing provisions of this Agreement, and agrees that FRA, in addition to any other available rights and remedies, whether existing under this Agreement or at law in or equity, shall be entitled to injunctive relief and specific performance to the extent permitted by law.

10.     Assignment. The services of the Contractor are recognized to be personal and unique in nature and neither this Agreement nor any duties or obligations under this agreement may be assigned by Contractor.

11.     General Provisions. (a) Any notice required or permitted to be given under this Agreement shall be sufficient, if in writing and if delivered by hand or sent by certified or registered mail, return receipt requested, or by Federal Express or other comparable courier service, addressed to Contractor, or to FRA, as the case may be, at

EXHIBIT 1

7

the addresses hereinabove set forth or to such other address as a party may hereafter specify by written notice to the other party.

(b)    The waiver by either party of any provision of this Agreement or of any breach hereof on any one occasion shall not operate or be construed as a waiver of such provision or any similar breach on any subsequent occasion.

(c)    The provisions of the Agreement are independent of and separate from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of any other provision(s) being deemed by a court or competent jurisdiction to be invalid or unenforceable.

(d)    This Agreement embodies the entire agreement between the parties hereto with respect to the subject matter hereof, and there are no inducements, promises, terms, conditions or obligations which are not incorporated herein.  This Agreement may not be amended, modified or changed except by a writing signed by the party against whom enforcement is sought.

(e)    This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts.  Contractor hereby consents to the jurisdiction of the courts of the Commonwealth of Massachusetts with respect to all matters concerning this Agreement.

(f)    This Agreement shall inure to the benefit of and shall be binding upon the parties hereto, their legal representatives, heirs, successors and assigns, provided however that Contractor shall not assign or delegate to another the performance of any of Contractor's duties or obligations hereunder.

## CONTRACTOR AGREEMENT
## AMENDMENT SEPTEMBER 1. 2002

4.    Termination.

(c)    In the event that Contractor gives less than 30 day notice of termination of this agreement, FRA maintains the right to deduct the cost of all unused travel tickets held in Contractor's name from any compensation FRA still owes Contractor.

(d)    Upon termination by either party, the following items of merchandise (calipers, metronomes, books, overheads and AFAA Personal Trainer, Advanced Personal Trainer, and Yoga exams), will be returned to the FRA office before the last check can be issued to the presenter.  FRA will reimburse postage if mailed or shipped directly to the FRA office.

IN WITNESS WHEREOF, the parties have executed this Agreement under seal as of the date first above written.

EXHIBIT 1
8

**FITNESS RESOURCE ASSOCIATES, INC.:**      **CONTRACTOR/Presenter:**

Name:_____          Name: _____
Signature:_____          Signature:_____
Title:_____          Date:_____
Date:  _____

EXHIBIT 1
9

Schedule 1
Payment Schedule
**Fitness Resource Associates, Inc. Workshops, Seminars, Programs**

Payment will be mailed within two weeks of FRA receiving the completed workshop course package, including all paperwork, receipts, monies collected, etc. with the exception of the Six, eight and ten week courses. Payment for the six, eight, and ten week courses will be paid on a weekly basis, and are outlined as follows.

**Fee Schedule:**

**Teaching Aerobic Course**
> 40% of net paid in installments over eight weeks with a minimum payment to be $100.00 per week, or $600.00 minimum for the weekend course.

**Personal Trainer Course**
> 40% of net paid in installments over ten weeks with a minimum of $120.00 per week. If there are two presenters, payment is based on 20% of net divided by ten paychecks over ten weeks with a minimum of $120.00 per week, or $600.00 minimum for the weekend course.

**Yoga Teacher Training Course**
> 40% of net paid in installments over ten weeks with a minimum of $120.00 per week.

**Advanced Personal Training Course**
> 40% of net with a minimum of $600.00 per course.

**Anatomy, Biomechanics, and Injury**
> 40% of net paid in installments over six weeks with the minimum payment to be $100.00 per week.

**Diet & Nutrition Course**
> 40% of net with a minimum of $600.00 per course.

**Continuing Education Course**
> 40% of net with a minimum of $100.00 per course.

**CPR Course**
> 50% of net with a minimum of $100.00 per course.

EXHIBIT 1
10

IN WITNESS WHEREOF, the parties have executed this Agreement under seal as of the date first above written.

FITNESS RESOURCE ASSOCIATES, INC.:    CONTRACTOR/Presenter:

Name:_____    Name:_____
Signature:_____    Signature:_____
Title:_____    Date:_____
Date: _____

EXHIBIT 1
11

## Schedule 2
### Payment Schedule and Reimbursement
### Aerobic and Fitness Association of America
### Joint Venture Program

**Fee Schedule:**
**Personal Trainer Course**
> Two Presenter courses: each presenter will be paid 20% of net with a minimum payment of $500.00 per course.
> One Presenter workshops: The Presenter will be paid 40% of net with a minimum payment of $700.00 per course.

**Advanced Personal Trainer Course**
> 40% of net with a minimum payment of $300.00

**Yoga Teacher Trainer Course**
> 40% of net with a minimum payment of $1,200.00

**Reimbursements:**
FRA agrees to reimbursement expenses as listed below for AFAA travel courses only. Presenter must supply FRA with original receipts for all expenses in the workshop package if reimbursement is to be paid.

Expense reimbursement is as follows:
- Shuttle, cab, toll and parking fees if incurred as a result of travel in host city
- .34 cents per mile when using personal vehicle as designed by FRA
- Car rental, as designated by FRA in advance
- Postage for package return, for use with U.S. Postal service at a minimum shipping rate of $3.95

Hotel Accommodations and Airplane tickets will be specified by FRA Travel consultant and purchased for Presenter as needed in advance of AFAA course. If Presenter has a special request above and beyond the designated travel arrangements made by FRA; Presenter may provide FRA with written notification 8 weeks before travel date. If cost of additional request exceeds expected cost by FRA Travel consultant, Presenter will pay the difference to FRA, or have it deducted from presenter pay.

IN WITNESS WHEREOF, the parties have executed this Agreement under seal as of the date first above written.

FITNESS RESOURCE ASSOCIATES, INC.:    CONTRACTOR/Presenter:

Name:_____    Name: _____
Signature:_____    Signature:_____
Title:_____    Date:_____
Date: _____

EXHIBIT 1
12

## Schedule 3
## Authors Payment Schedule
### Fitness Resource Associates, Inc. Workshops, Seminars, Programs

Payment will be mailed within two weeks after receiving the completed workshop package, including all paperwork, original receipts, monies collected, etc.

Authors of FRA Certification Programs and other designated programs will receive 10% of net provided that they maintain the program on an ongoing basis to the specifications of the Director of Educational Services and have signed a current contract.

Maintenance of program includes:
- Evaluating and updating of existing handouts, study guides and overheads
- Meeting with, training and providing ongoing communication with new presenters
- Responding to FRA requests in a timely basis for develop

All programs are property of FRA.  FRA reserves the right to discontinue use of any program provided by author.

IN WITNESS WHEREOF, the parties have executed this Agreement under seal as of the date first above written.

FITNESS RESOURCE ASSOCIATES, INC.:        CONTRACTOR/Presenter:

Name:_____        Name: _____
Signature:_____        Signature:_____
Title:_____        Date:_____
Date: _____

EXHIBIT 1
1 3