UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| FITNESS RESOURCE ASSOCIATES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action |
| | ) | No. 05-10003-RGS |
| AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

---

**MEMORANDUM IN SUPPORT OF MOTION OF AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC., FOR A PROTECTIVE ORDER PREVENTING FITNESS RESOURCE ASSOCIATES, INC. AND THE HUSBAND OF ITS PRESIDENT FROM VIEWING AFAA'S TRADE SECRETS AND CONFIDENTIAL INFORMATION**

**A.** **Background**

1.      In December 2004, Fitness Resources Associates, Inc. ("FRA") filed a complaint against Aerobics and Fitness Association of America, Inc. ("AFAA") in Massachusetts State Superior Court, based upon the terms of a written contract between the parties that was in effect from 1990 to 2004.

2.      In January 2005, AFAA, a California corporation, removed the action to this Court pursuant to its diversity jurisdiction.  AFAA also filed a motion to transfer venue to California, where AFAA claimed much of the discovery would take place due to the large number of documents at AFAA relating to the contract.  FRA successfully opposed the motion to transfer venue.

3.      On February 17, 2005, AFAA filed an answer to the complaint and counterclaim. In its counterclaim, AFAA asserted counts against FRA based upon acts taken by FRA that were not disclosed to AFAA during the effective period of the contract. These acts included: (i) FRA's misappropriation of AFAA's know-how and other trade secrets including AFAA's customer list; (ii) FRA's entering into non-compete agreements with fitness instructors of both AFAA and FRA (that FRA later threatened to enforce against AFAA if it continued its relationship with the contractors); and (iii) FRA's participation with direct competitors of AFAA to unfairly and deceptively drive AFAA and other fitness certification entities out of the fitness industry. (See Counterclaim) (Exhibit A).

4.      At a scheduling conference before the Court on May 18, 2005, the parties included as an agenda item "the likelihood that a protective order would be required during the discovery process in order to keep confidential certain trade secrets and confidential business information." At the scheduling conference, the parties agreed that the issue of a protective order would be presented to the Court if necessary during the discovery process.

5.      On May 24, 2005, FRA served upon AFAA a request for documents.[1] In its request, FRA sought a substantial amount of information that is unrelated to the contract between AFAA and FRA, including (a) AFAA's bank statements, financial statements, tax returns, and  receivables and payables information; (b) AFAA's membership information, workshop enrollees, registration and attendance lists; and (c) AFAA documents relating to its current personal trainer program including pricing information. (See FRA Document Request)

---

[1] FRA's document request was a re-written version of an earlier document request that FRA served at the very outset of the lawsuit, when the case was still in state court. The parties agreed that this initial document request would not be responded to and that instead AFAA would respond to the request

(Exhibit B).  FRA also sought documents that are related to the contract between the parties, many of which - as described in a letter from AFAA to FRA on August 4, 2005 -  are stored in volumes of boxes along with AFAA documents that are unrelated to the contract and that contain AFAA's confidential information such as its customers, vendors, and financial and marketing information. (See Exhibit C).

6.    In its response to FRA's document request, AFAA permitted inspection of documents by FRA as they are kept in the usual course of business, in accordance with Fed. R. Civ. P. 34.

7.    Following AFAA's document response, FRA sent a letter to AFAA counsel on July 20, 2005 requesting that some of FRA's 38 requests for documents be copied and shipped to Massachusetts, and that certain other requests be analyzed and that estimates be made of copying charges by AFAA.  (See Exhibit D).   In the same letter, FRA objected to its having to produce documents requested by AFAA in its document request that "relat[e] to any potential business relationship between FRA and ACE or IHRSA[2] at any time after AFAA's notice of termination [of the AFAA-FRA contract]."  (Exhibit D).

8.    Because FRA requested documents that are confidential to AFAA, and many documents that are related to FRA are stored with confidential records that are unrelated to FRA, AFAA forwarded to FRA counsel on July 21, 2005 a proposed confidentiality order that would authorize only FRA's counsel, experts, and those approved by AFAA to inspect AFAA's documents as they are kept in the usual course of business. (See Exhibit E).

---

by FRA on May 24th.

[2] As described in AFAA's counterclaims, these two entities are involved in the scheme to drive AFAA and other certifying entities from the fitness industry market.  Therefore, the documents requested

L:\13345\000\Pld\19

9.      On July 25, 2005, FRA counsel sent a letter to AFAA counsel stating that FRA had a "potential problem" with the proposed order. (See Exhibit F).  FRA counsel stated that an individual by the name of Rick Pendzick would need to review financial data of AFAA, and that he would "probably be considered an agent" of FRA who would be forbidden under the proposed order from reviewing the material. (See Exhibit F).

10.      In a letter to FRA counsel on August 4, 2005, AFAA counsel indicated that AFAA had determined that it had some 400 boxes of documents from 2000-2004 that are potentially covered by FRA's document request.  AFAA also informed FRA that it had in good faith attempted to determine whether it could reasonably comply with FRA's special request for copying and estimating the various groups of its 38 separate document requests.  AFAA suggested that the most efficient manner of production (in light of the fact that FRA is competing with AFAA and has joined forces with ACSM, another direct competitor of AFAA in presenting fitness workshops and whom AFAA has alleged in its counterclaim to be part of a collusive scheme to unfairly harm AFAA's business) is for FRA counsel and expert to inspect documents under the terms of the proposed confidentiality order as they are kept in the usual course of business. (See Exhibit C).   In the same August 4th letter, AFAA stated its willingness to allow FRA counsel "to share such information with others to allow you to prepare [FRA's] case, so long as AFAA's proprietary information will not be disclosed or compromised in any way." (See Exhibit C).

11.      On August 18, 2005, FRA counsel sent an electronic message to AFAA counsel, stating that "I will not agree to any protective order that prevents Rick Pendzick from reviewing

from FRA related to these two entities is highly relevant to AFAA's counterclaims against FRA.
L:\13345\000\Pld\19

AFAA's financial documents that relate to joint programs and the documents relating to AFAA's programs . . . . "  (See Exhibit G).

12.     In a separate letter of August 18, 2005, FRA counsel expressed disbelief in the method by which AFAA stores its documents, and stated among other things that he would seek sanctions if he traveled to California and discovered that AFAA's documents were more organized that he understood them to be. (See Exhibit H).

13.     On August 22, 2005, counsel for the parties discussed the confidentiality order. When AFAA counsel asked FRA counsel to describe the relationship between FRA and Rick Pendzick, FRA counsel stated that he was more than merely an "agent" for FRA, but that he also "shared a pillow" with FRA President, Paula Besson.

14.     In a letter of August 31, 2005, FRA counsel enclosed his own proposed confidentiality order that would be reciprocal for both AFAA and FRA documents.  FRA counsel also reiterated its objection to AFAA's proposed confidentiality order, and again insisted that Mr. Pendzick review AFAA documents. (See Exhibit I).

15.     By letter of September 9, 2005, AFAA counsel informed FRA counsel that its client had now spent several days at its storage facility identifying certain documents FRA had selected in its special request of July 20, 2005, and that AFAA had identified documents that would need to be disassembled, copied, and reassembled by a copying service.  While AFAA has made this specially requested set of documents available for FRA's inspection, AFAA again suggested that an inspection of AFAA documents under terms of a confidentiality agreement would be most efficient for all parties.  (Exhibit J).

16.     Following disclosure by FRA counsel that Rick Pendzick was more than merely an "agent" of FRA, AFAA's counsel determined through publicly available records that in fact Rick Pendzick was Ms. Besson's husband.  (Exhibit K).

17.     Additionally, AFAA 's counsel determined that Mr. Pendzick and Ms. Besson jointly owned real estate in Newton, MA, and that since the time of filing the lawsuit they had together granted a substantial mortgage on the property.  (Exhibit K).

18.     In a letter of September 9, 2005, AFAA counsel informed FRA counsel what it had learned about Mr. Pendzick through its own public record search, and stated that few if any people have a greater personal and financial interest in causing competitive harm to AFAA than Mr. Pendzick.  AFAA counsel questioned why the marital relationship, including joint financial obligations, had not been disclosed to him when FRA asked AFAA to consider having Mr. Pendzick review AFAA's confidential material.  (See Exhibit J).

19.     In response to AFAA's September 9th letter, FRA counsel sent a letter to AFAA counsel on September 12, 2005, wherein he stated that he was not aware of the marriage between Rick Pendzick and Paula Besson when he sent the July 25th letter describing Mr. Pendzick as an "agent" of FRA.   FRA counsel sought to minimize the distinction between Mr. Pendzick's being an "agent" of FRA and being married to and sharing joint financial commitments with FRA's President. (See Exhibit L).

L:\13345\000\Pld\19

**B.**     <u>Argument</u>

**1.     The Court Should Enter AFAA's Proposed Protective Order Due To The Ongoing Competition Between FRA and The Entities It Works With And AFAA, As Described Above And In The Counterclaim.**

The parties have agreed in principal to the entry of a confidentiality order, but disagree over whether Rick Pendzick and "FRA officers, directors, agents and employees" should be given access to AFAA's confidential information.

Under Fed. R. Civ. P. 26 (c), the Court "upon motion by a party . . .  and for good cause shown  . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including: (7) that a trade secret or other confidential research, development or commercial information not be disclosed or be disclosed only in a designated way."  During the discovery process, the risk of competitive injury is particularly high when the opposing party is a business competitor.  <u>American Standard Inc. v. Pfizer Inc.</u>, 828 F.2d 734, 741 (Fed.Cir. 1987) (sales information and patent royalty rate information restricted to trial counsel).  When designating an individual who will be granted access to information subject to a protective order, courts generally will deny access to individuals who create a risk of divulging the protected information to the opposing party, and frequently limit such information to outside counsel and experts. <u>See</u> <u>e.g.</u>, <u>GTE Products Corp. v. Arthur Gee et al.</u>, 112 F.R.D. 169, 170-71 (D. Mass. 1986) (court entered order preventing party from viewing competitors' pricing and customer information while allowing it to be viewed by counsel and independent expert); <u>Wang Laboratories, Inc. v. CFR Associates, Inc.</u>, 125 F.R.D. 10, 13-14 (D. Mass. 1989) (court prevented individual who consulted with Wang competitors

L:\13345\000\Pld\19

7

from gaining access to confidential information); <u>Cone Mills Corp. v. Joseph Bancroft & Sons Co.</u>, 33 F.R.D. 318, 321-22 (D. Del. 1963) (court limited access to confidential information to opposition's outside counsel and technical experts assisting in the preparation of the case).

Here, there is no question that FRA and entities it works with are in direct competition with AFAA.  FRA has never disputed this fact.  FRA also cannot seriously dispute that one of FRA's associates, the American College of Sports Medicine ("ACSM"), was part of a small group of fitness certifying entities that colluded with one another to deny certifying entities access to fitness clubs, as set forth in AFAA's counterclaim.  The fact that there is serious competition in the fitness certification industry, and that some groups FRA works with have attempted to drive others such as AFAA from the industry, clearly demonstrates why AFAA's confidential material should not be shared with FRA, its officers, directors, employees or agents.

In addition, FRA has insisted that Rick Pendzick be allowed to review AFAA's confidential information.  Allowing Mr. Pendzick to review AFAA's confidential material would unduly prejudice AFAA and its competitive position in the market, by exposing AFAA's confidential information to competitors who have attempted to harm AFAA (and other fitness certification companies).  Mr. Pendzick has as much of a personal and financial interest in causing competitive harm to AFAA as Ms. Besson herself, due to their marriage and joint financial obligations.

Furthermore, the fact that FRA through its counsel chose not to reveal to AFAA the marital relationship between Mr. Pendzick and FRA President, Paula Besson, and instead described it first as an "agent" relationship and as "sharing a pillow," coupled with the fact that

L:\13345\000\Pld\19

AFAA had to learn this information through its own research of public records, presents further evidence of why Mr. Pendzick and his wife should not be granted access to AFAA's confidential records.

Conversely, a protective order that limits inspection of AFAA's confidential information to FRA counsel, and an expert independent from FRA, would allow FRA to more than adequately prepare its case, without having to reveal AFAA's confidences to a direct competitor whom AFAA has asserted has engaged in unfair competition in violation of California law.[3]

> **2. FRA Should Pay AFAA's Expenses Associated With Seeking a Protective Order Excluding Review Of AFFA's Confidential Information By FRA And Rick Pendzick, And For Its Failure To Disclose Rick Pendzick's Marital Relationship with FRA's President.**

Pursuant to Fed. R. Civ. P. 37(a)(4)(B), the Court is authorized to award a party its just expenses in filing a motion seeking a protective order. Rickels v. City of South Bend, 33 F. 3d 785, 786-87 (7th Cir. 1994); see also Vogt v. Emerson Elec. Co., 805 F. Supp. 506, 513 (M.D. Tenn. 1992) (the proper remedy for uncooperative behavior during discovery is to move for judicial sanctions).

Here, the only reason for AFAA having to file a motion seeking a protective order is because FRA has insisted that Rick Pendzick be allowed to review AFAA's confidential documents. With the exception of FRA's proposal which would allow Mr. Pendzick and agents of FRA to review AFAA's confidential material, the dueling confidentiality orders proposed by AFAA and FRA are substantially the same. Furthermore, it took about one month for FRA to

---

[3] AFAA has obtained judgments in both California and Georgia invalidating certain non-compete contracts that FRA entered into with contractors of both AFAA and FRA and threatened to enforce against AFAA and the contractors. FRA's entry into those now invalid contracts forms in part the basis

admit that Mr. Pendzick is married to FRA President Paula Besson.  On July 25, 2005, when FRA first insisted that the terms of a confidentiality order allow for review of AFAA material by Mr. Pendzick, FRA disclosed that he was merely an "agent" of FRA.   On August 22, 2005, at the request of AFAA counsel, FRA counsel revealed that Mr. Pendzick did in fact "share a pillow" with FRA President Paula Besson.  However, at this point FRA never made it clear that Mr. Pendzick and FRA President Paula Besson were married.  It was only after AFAA did its own independent research of Mr. Pendzick through searching public records, and confronted FRA with the information it had discovered, that FRA admitted that Mr. Pendzick is in fact married to Ms. Besson.   The marital relationship, and the fact that Mr. Pendzick and Ms. Besson have substantial joint financial obligations, should have been revealed to AFAA at the outset of the discussions concerning a confidentiality order, due to the clear motivations that Mr. Pendzick has to use AFAA confidential material in a way that would benefit FRA and his wife's company to the detriment of its competitor, AFAA.

For the reasons stated above, FRA's refusal to agree to a review of AFAA confidential records by its counsel and independent expert, and its insistence that the information be reviewed by Rick Pendzick, who FRA failed and refused to identify accurately to AFAA as being the husband of FRA President Paula Besson, is without justification.  By causing AFAA to file this motion, FRA should be ordered to pay AFAA its reasonable attorneys fees.

for AFAA's unfair competition claim against FRA.
L:\13345\000\Pld\19

**C.**    **Conclusion**

For the foregoing reasons, AFAA respectfully requests that its proposed protective order be entered, and that FRA be ordered to pay AFAA its reasonable attorneys fees associated with the filing of this motion.

> AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC.
>
> By its attorneys,

September 20, 2005
_/s/ Edward V. Colbert III_____
Richard J. Grahn (BBO#206620)
Edward V. Colbert III (BBO #566187)
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA  02110
(617) 951-2800

### RULE 26 (c) CERTIFICATE

I, Edward V. Colbert III, hereby certify that I have on several occasions conferred with counsel for FRA in a good faith attempt to resolve this dispute over the terms of a protective order.

__/s/_Edward V. Colbert III__ ____
Edward V. Colbert III

### CERTIFICATE OF SERVICE

I hereby certify that I have this 20th day of September 2005 served a copy of the foregoing pleading upon all parties hereto by mailing copies thereof, via first class mail, postage prepaid, properly addressed to:

> Gregg S. Blackburn, Esq.
> Casner & Edwards LLP
> 303 Congress Street
> Boston, MA 02210

__/s/_ Edward V. Colbert III____
Edward V. Colbert III

L:\13345\000\Pld\19

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

---

FITNESS RESOURCE ASSOCIATES, INC. )
)
)
Plaintiff, )
v. )
)
AEROBICS AND FITNESS ASSOCIATION )
OF AMERICA, INC. )
)
Defendant. )

Civil Action
No. 05-10003-RGS

---

## ANSWER AND COUNTERCLAIM OF DEFENDANT, AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC.

The defendant, Aerobics and Fitness Association of America, Inc. ("AFAA") states as follows in response to each paragraph of the complaint:

1.    AFAA admits that Fitness Resource Associates Inc. ("FRA") filed a complaint against AFAA seeking damages. AFAA denies the remaining allegations contained in paragraph one.

2.    AFAA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph two, and therefore neither admits nor denies said allegations, but calls upon plaintiff to prove the same.

3.    AFAA admits that it is a California corporation with a principal place of business in California, but denies the remaining allegations in the first sentence of paragraph three. AFAA denies the characterization of its business in the second sentence of paragraph three. AFAA has

L:\13345\000\Pld\08

been in the business of training and certifying fitness professionals, and has published fitness books and related material for approximately twenty years, independently from FRA.

4.    The allegations in paragraph four contain legal conclusions to which no response is required. To the extent that a response is required, AFAA denies the allegations.

5.    AFAA denies the allegation contained in paragraph five that FRA and AFAA had formed a joint venture. AFAA admits the allegation contained in paragraph five that before the 1990 contract, FRA existed as its own entity separate from AFAA but unlike AFAA did not perform certification of fitness professionals on a national basis. As to the remaining allegations contained in paragraph five, AFAA is without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore neither admits nor denies said allegations, but calls upon plaintiff to prove the same.

6.    AFAA denies the allegation contained in paragraph six that FRA and AFAA had formed a joint venture. AFAA admits that prior to entering into the 1990 contract with FRA, AFAA was already in the business of certifying aerobics instructors. In addition to certifying aerobics instructors, AFAA had also been in the business of certifying various other fitness professionals prior to the 1990 contract, and AFAA had developed a worldwide reputation as a leading fitness certification entity in a number of fitness disciplines. In 1990, AFAA agreed that FRA would provide FRA's personal trainer course and instruction at some of AFAA's fitness certification workshops.

7.    AFAA denies the allegation contained in paragraph seven that FRA and AFAA had formed a joint venture. AFAA admits that it entered into a written contract with FRA, a copy of

which is attached to plaintiff's complaint as Exhibit A, wherein FRA was to conduct instruction at some of AFAA's fitness certification workshops.

8.    Denied.

9.    AFAA denies the allegation contained in paragraph nine that FRA and AFAA had formed a joint venture. AFAA admits the allegations contained in the third sentence of paragraph nine. AFAA admits that AFAA advertised workshops, communicated with instructors, collected enrollment fees and certified individuals who passed exams. Because the remaining allegations appear to refer to an undefined period of time, AFAA is without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore neither admits nor denies said allegations, but calls upon plaintiff to prove the same.

10.    Denied.

11.    Denied.

12.    Denied.

13.    AFAA denies the allegations contained in the first sentence of paragraph thirteen. The allegations in the second sentence reference terms of a written contract, which speaks for itself. AFAA denies the allegations contained in the third and fourth sentences of paragraph thirteen.

14.    The allegations in the first sentence of paragraph fourteen reference terms of a written contract, which speaks for itself. As to the second sentence, AFAA admits that it paid for the printing of the study guide. AFAA denies the remaining allegations contained in paragraph fourteen.

15.    Denied.

16.    Denied.

L:\13345\000\Pld\08

3

17.    Denied.

18.    Denied.

19.    In response to the allegations contained in paragraph nineteen of the Complaint, AFAA repeats each of its responses to paragraphs one through eighteen as though fully set forth herein.

20.    Denied.

21.    Denied.

22.    Denied.

23.    In response to the allegations contained in paragraph twenty-three of the Complaint, AFAA repeats each of its responses to paragraphs one through twenty-two as though fully set forth herein.

24.    Denied.

25.    Denied.

26.    In response to the allegations contained in paragraph twenty-six of the Complaint, AFAA repeats each of its responses to paragraphs one through twenty-five as though fully set forth herein.

27.    Denied.

28.    Denied.

29.    In response to the allegations contained in paragraph twenty-nine of the Complaint, AFAA repeats each of its responses to paragraphs one through twenty-eight as though fully set forth herein.

30.    AFAA admits that the 1990 contract provides that "[a]ll books and/or training workbooks or manuals developed for and during these courses shall be the joint property of both parties and

L:\13345\000\Pld\08

4

any profits derived from their publication and sale, outside the courses, will be shared equally."

AFAA denies the remaining allegations contained in paragraph thirty.

31.    Denied.

32.    Denied.

33.    Denied.

34.    In response to the allegations contained in paragraph thirty-four of the Complaint, AFAA repeats each of its responses to paragraphs one through thirty-three as though fully set forth herein.

35.    Denied.

## SEPARATE DEFENSES

### FIRST SEPARATE DEFENSE

The complaint fails to state a claim against the defendant upon which relief can be granted and must therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### SECOND SEPARATE DEFENSE

The plaintiff's claims are barred by estoppel.

### THIRD SEPARATE DEFENSE

The plaintiffs' contractual claims are barred by lack of consideration.

### FOURTH SEPARATE DEFENSE

The plaintiff's claims are barred by the statute of frauds.

### FIFTH SEPARATE DEFENSE

The plaintiff's claims are barred by the statute of limitations.

### SIXTH SEPARATE DEFENSE

L:\13345\000\Pld\08

5

The plaintiff's claims are barred by waiver.

## SEVENTH SEPARATE DEFENSE

The plaintiff's claims are barred by laches.

## EIGHTH SEPARATE DEFENSE

The plaintiff's claims are barred by plaintiff's ratification.

## NINTH SEPARATE DEFENSE

The plaintiff's lawsuit should be transferred from the Unites States District Court in Massachusetts to the United States District Court in California (Central Division).

## TENTH SEPARATE DEFENSE

The plaintiff's contract claims are barred by its own prior material breach.

## ELEVENTH SEPARATE DEFENSE

The plaintiff's claim for breach of fiduciary duty should be dismissed, as there was no fiduciary duty owed by AFAA to FRA. To the extent that the relationship between AFAA and FRA created any such duties, FRA and not AFAA was the breaching party.

## COUNTERCLAIM

The Plaintiff-In-Counterclaim, Aerobics and Fitness Association of America, Inc. ("AFAA"), hereby asserts the following counterclaims against Fitness Resource Associates, Inc. ("FRA").

## PARTIES

1.    Counterclaim Plaintiff AFAA is a corporation duly organized and existing under the laws of the State of California.

2.    Counterclaim Defendant FRA is a corporation organized and existing under the laws of

L:\13345\000\Pld\08

6

the Commonwealth of Massachusetts.

## FACTS

3.    For the past twenty-two years, AFAA has been in the business of training and certifying

fitness professionals in a number of fitness disciplines, and of publishing various fitness-related

books and manuals.  During this time, AFAA has established successful business relationships

and good will with many fitness trainers, instructors and health clubs throughout the United

States and in foreign countries.

4.    In or prior to 1990, FRA was aware of the business relationships and good will that

existed between AFAA and its customers and other contacts, and that AFAA enjoyed business,

revenues, profits and other benefits from those relationships as described above.

5.    On or about October 30, 1990, AFAA and FRA entered into a written contract

(hereinafter "the contract").  The contract initially contemplated the presentation of personal

trainer/fitness counselor workshops.  Later, the parties agreed to present yoga workshops in a

similar manner.  The contract was drafted by the parties, and not by counsel. A copy of the

contract is attached hereto as Exhibit A.

6.    Pursuant to the terms of the contract, AFAA was responsible for marketing, promoting and

finding facilities in mutually agreed-upon locations to host workshops, and FRA was responsible

for providing the course and staff to teach the workshops.  Under the contract, AFAA and FRA

developed examinations to be given at the workshops.  AFAA determined the scores on those

examinations, and AFAA certified those who received acceptable scores.

7.    Under the contract, AFAA earned 60% and FRA earned 40% of the registration fees paid by

workshop attendees.  AFAA and FRA did not share the profits or the losses from these workshops.

L:\13345\000\Pld\08

7

8.      AFAA incurred its own expenses in carrying out its contractual duties under the contract, which included: selecting and contacting facilities to host the programs; booking and paying for facilities to host programs; scheduling the programs; advertising, publicizing and promoting programs through various media; processing enrollments; providing audio-visual equipment at workshops; collecting and accounting for enrollment fees and refunds; paying bank charges; and printing and mailing a study guide, among other costs. FRA did not share any of these costs.

9.      The 1990 contract did not require exclusive dealings between AFAA and FRA, nor did it restrict AFAA's right to continue providing its fitness certifications and related fitness activities. Before, during and after the contract, AFAA was free to conduct and did conduct many workshops and fitness-related activities separate from FRA related to teaching, training, testing and certifying fitness professionals in a variety of fitness disciplines, both nationally and internationally.

10.     The contract recognized that "AFAA publishes various books and manuals as a general course of doing business." Under the contract, training workbooks or manuals developed "for and during these courses" were to become joint property and profits shared equally by AFAA and FRA. However, the contract "[did] not exclude [AFAA's] right to develop and publish books and manuals that may cover like material . . ." Contract, par. II.

11.     Under the contract, the date and location of workshops to be conducted were to be jointly chosen by AFAA and FRA. Workshops with less than 15 enrollments were subject to cancellation but only with the mutual consent of AFAA and FRA.

12.     From approximately 1990 to 2003, AFAA and FRA conducted workshops throughout the United States. Due to the overall financial success and national market presence of the

L:\13345\000\Pld\08

8

workshops, FRA voluntarily continued to perform without meaningful objection under the contract, including conducting workshops where enrollment was less than fifteen people.

13.     By no later than 2003, the fitness certification industry had become very competitive. FRA demanded the cancellation of workshops that FRA did not deem profitable to FRA, without regard to the substantial expenses incurred by AFAA in scheduling, promoting and otherwise arranging for the workshops, overall profitability of the workshops nationally, or the need to maintain market share in the face of greater competition. FRA did not demand the cancellation of workshops that were profitable to FRA.

14.     When AFAA did not consent to cancellation of each workshop that FRA demanded be cancelled, FRA unilaterally cancelled workshops by refusing to perform its obligations under the contract. As a result of FRA's cancellations of workshops, AFAA sustained substantial damages in the form of expenditures incurred, *inter alia*, in scheduling the workshops, promoting and marketing the workshops, and processing enrollment fees and refunds. AFAA also incurred damages in lost enrollment fees, and damage to its reputation and good will.

15.     Under the contract, FRA agreed that AFAA would "hold a challenge exam for certification of Personal Trainers/Fitness Counselors" in conjunction with FRA's exclusive courses conducted in Massachusetts, New Hampshire, and Rhode Island, and agreed that AFAA was entitled to all money collected from those exams. Contract, par. V. The parties understood and agreed that FRA would hold such exams on AFAA's behalf. However, upon information and belief, FRA did not hold such exams on AFAA's behalf in conjunction with every FRA course conducted in Massachusetts, New Hampshire and Rhode Island, in violation of the contract, resulting in damages to AFAA.

L:\13345\000\Pld\08

9

16.    During the term of the contract, FRA obtained access to AFAA's customer list, which is a proprietary business asset belonging to AFAA, under agreement to use the information solely for workshops conducted jointly by AFAA and FRA. FRA used AFAA's customer list without authorization for its own use and as part of FRA's workshops, and with one or more of AFAA's competitors, including but not limited to the American College of Sports Medicine (ACSM). Additionally, an employee of AFAA who provided services as a workshop presenter for FRA, intentionally and with FRA's knowledge diverted business opportunities to FRA for its own use.

17.    In or about 2002, AFAA and FRA agreed as part of the contract to conduct workshops related to yoga certification, which was a three-tiered program. FRA agreed to and provided AFAA assurances that it would provide staff for the three-tiered yoga workshops beginning in November 2002. In or about August 2003, at FRA's request, AFAA agreed to an orderly phrase-out of the yoga workshops conditioned on FRA's agreement to staff all yoga workshops that had already been scheduled, including yoga workshops scheduled to take place at AFAA's annual "APEX" fitness program in multiple cities throughout the United States in February 2004. AFAA reasonably relied to its detriment upon FRA's agreement and assurances to provide staff for the yoga certification workshops, including those scheduled for "APEX" in February 2004, by scheduling, advertising, promoting and accepting enrollments in workshops. FRA refused to staff some of the yoga workshops, in violation of the agreement and assurances to AFAA, resulting in damage to AFAA. Starting in approximately June 2004, while the contract was still in effect, FRA commenced its own yoga certification workshops without AFAA, using the AFAA customer list without AFAA's consent, and FRA claimed that the workshops were adopted by AFAA even though AFAA was excluded from the programs.

L:\13345\000\Pld\08

10

18.    On or about July 16, 2004, AFAA lawfully gave notice of termination of its contract with FRA, effective 90 days after the date of the notice, which contract had previously been breached by FRA.

19.    During the term of the 1990 contract, FRA without AFAA's knowledge entered into written non-compete agreements with certain fitness instructors with whom AFAA had existing relationships as a separate entity.  In 2004, when FRA was demanding substantial payments from AFAA to resolve their competing disputes, FRA threatened to enforce those non-compete agreements against AFAA and the fitness instructors so that AFAA could not conduct its own workshops using these presenters.  FRA has since acknowledged in papers filed in the present action that at least some of these agreements may be not be enforceable under California law and that it is FRA's intention not to defend the enforceability of the non-compete agreements in California.

20.    Starting in or about 2004, during the term of the 1990 contract, pursuant to a plan initiated and orchestrated by the International Healthclub and Racquet Sports Association (IHRSA), FRA applied to the National Commission on Certifying Agencies (NCCA) for accreditation as an issuer of fitness certifications in direct competition with AFAA. Pursuant to the IHRSA plan, only certifications issued by certifying organizations that had been accredited by NCCA are to be recognized by health clubs that belong to IHRSA. By acting in concert with IHRSA and the NCCA, FRA was seeking to compete with AFAA and to exclude AFAA from engaging in business in the fitness industry.

L:\13345\000\Pld\08

11

## COUNT I
## BREACH OF CONTRACT

21.    AFAA repeats each of its allegations contained in paragraphs one through twenty as though fully set forth herein.

22.    As set forth above, FRA entered into a written contract with AFAA in 1990, and AFAA has fully performed its obligations under the contract.

23.    As set forth above, FRA breached the contract by, among other things, unilaterally refusing to provide staff and services or various scheduled workshops, thus compelling AFAA to cancel such workshops, and not holding challenge exams on behalf of AFAA in conjunction with each FRA workshops held in the states of Massachusetts, New Hampshire and Rhode Island.

24.    As a result of FRA's breaches of contract, AFAA suffered damages, for which FRA is liable to AFAA.

## COUNT II
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

25.    AFAA repeats each of its allegations contained in paragraphs one through twenty-four as though fully set forth herein.

26.    As set forth above, FRA entered into a written contract with AFAA in 1990, which contained therein an implied covenant on the part of the parties of good faith and fair dealing.

27.    FRA breached the implied covenant of good faith and fair dealing owed to AFAA by, among other things, unilaterally canceling workshops, failing to perform its obligations in providing staff and services at those workshops, not holding challenge exams on behalf of AFAA in conjunction

L:\13345\000\Pld\08

12

with every FRA workshop held in the states of Massachusetts, New Hampshire and Rhode Island,
using AFAA's customer list and other proprietary information for its own use and in competition
with AFAA, and knowingly diverting business opportunities of AFAA for its own use.

28.    As a result of FRA's breaches of the implied covenant of good faith and fair dealing,
AFAA has suffered damages for which FRA is liable to AFAA.

**COUNT III**
**PROMISSORY ESTOPPEL/DETRIMENTAL RELIANCE**

29.    AFAA repeats each of its allegations contained in paragraphs one through twenty-eight as
though fully set forth herein.

30.    As set forth above, FRA made a clear promise and intended through its representations to
induce AFAA into conducting fitness workshops.

31.    AFAA reasonably relied and acted upon to their detriment FRA's representations, by
expending funds to schedule, promote and otherwise arrange for such workshops.

32.    As a consequence of FRA's representations and its failure or refusal to provide staff and
services at the workshops, AFAA suffered damages for which FRA is liable to AFAA.

**COUNT IV**
**MISAPPROPRIATION OF TRADE SECRETS**

33.    AFAA repeats each of its allegations contained in paragraphs one through thirty-two as
though fully set forth herein.

34.    AFAA was the rightful owner of certain confidential business information, including its
customer list described above, and the resulting business and good will of its customers.

L:\13345\000\Pld\08

35.   FRA used AFAA's confidential business information under circumstances in which they had a duty to refrain from doing so.

36.   FRA disclosed or used AFAA's confidential business information, as aforesaid, without AFAA's consent and for FRA's own benefit.

37.   As a proximate result of FRA's conduct as described herein, AFAA has suffered damages for which FRA is liable to AFAA.

## COUNT V
### INTENTIONAL INTERFERENCE WITH
### BUSINESS RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGE

38.   AFAA repeats each of its allegations contained in paragraphs one through thirty-seven as though fully set forth herein.

39.   Over the course of twenty-two years, AFAA had established successful business relationships and good will with many fitness trainers, instructors, health clubs and other contacts throughout the United States, and in foreign countries, from which relationships AFAA enjoyed and expected to enjoy business, revenues, profits and other benefits.

40.   FRA knew about the business relationships and good will that existed between AFAA and its customers and other contacts, and that AFAA enjoyed and expected to enjoy business, revenues, profits and other benefits from those relationships as described above.

41.   FRA intentionally interfered with AFAA's relationships with customers and other contacts by, among other things, improperly using AFAA's customer list and diverting business away from AFAA to or for the benefit of FRA and other fitness certification entities which

L:\13345\000\Pld\08

14

compete with AFAA, and by acting in concert with others to exclude AFAA from business in the fitness industry.

42.     The conduct of FRA was calculated to enable FRA to obtain and enjoy AFAA's business and customer good will for its own benefit and the benefit of other fitness certification entities which are competitors of AFAA with whom FRA has entered into business relations, including but not limited to ACSM.

43.     FRA's conduct, as aforesaid, was done with the unlawful purpose of causing damage to and interfering with existing and prospective business relationships and good will that existed between AFAA and its customers and other contacts, without right or justification.

44.     As a result of the conduct of FRA as aforesaid, AFAA's relationship with its customers and other contacts has been harmed, and AFAA has suffered and continues to suffer actual damage and loss of business for which FRA is liable to AFAA.

## COUNT VI
## CONVERSION

45.     AFAA repeats each of its allegations contained in paragraphs one through forty-four as though fully set forth herein.

46.     FRA converted to its own use the confidential business information of AFAA, including its customer lists and good will.

47.     As a proximate result of FRA's conduct as described herein, AFAA has suffered damages for which FRA is liable to AFAA.

L:\13345\000\Pld\08

15

## COUNT VII
## **UNFAIR COMPETITION**

48.     AFAA repeats each of its allegations contained in paragraphs one through forty-seven as though fully set forth herein.

49.     As set forth above, FRA violated the California Business and Professional Code, § 17200 by, among other things, using AFAA's customer list for its own benefit, diverting opportunities away from AFAA, threatening to enforce unlawful non-compete agreements against AFAA and those with whom AFAA had existing business relationships, and by acting in concert with others to exclude AFAA from business in the fitness industry.

50.     As a result of FRA's actions, AFAA has incurred damages for which FRA is liable to AFAA.

WHEREFORE, Plaintiff-In-Counterclaim, AFAA, respectfully requests that judgment enter:

1.     Dismissing FRA's Complaint with prejudice against AFAA;

2.     Awarding damages to AFAA on its counterclaim in an amount to be determined at trial, together with interest, costs and attorneys' fees;

3.     For such further relief as this Court deems proper and just.

L:\13345\000\Pld\08

16

## **JURY DEMAND**

The Defendant/Plaintiff-In-Counterclaim demands a trial by jury on all claims so triable.

AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC.

By its attorneys,

February 17, 2005

/s/ Edward V. Colbert III
Richard J. Grahn (BBO #206620)
Edward V. Colbert III (BBO #566187)
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800

L:\13345\000\Pld\08

17

## **VERIFICATION**

I, Linda Pfeffer, under penalties of perjury, state that I am the President of Aerobics and Fitness Association of America, Inc., that I have reviewed the foregoing counterclaim, and have personal knowledge of the matters set forth therein except those based on information and belief, which matters I believe to be true.

_____
Linda Pfeffer

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this 17th day of February 2005 served a copy of the foregoing pleading upon all parties hereto by mailing copies thereof, via first class mail, postage prepaid, properly addressed to:

Gregg S. Blackburn, Esq.
Casner & Edwards LLP
303 Congress Street
Boston, MA 02210

__/s/_____
Edward V. Colbert III

L:\13345\000\Pld\08

18

**EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DOCKET NO.: 05-10003RGS

FITNESS RESOURCE ASSOCIATES, INC.:

      Plaintiff

v.

AEROBICS AND FITNESS ASSOCIATION
OF AMERICA, INC.

      Defendant

**PLAINTIFF FITNESS RESOURCE ASSOCIATES, INC.'S FIRST REQUEST
FOR PRODUCTION OF DOCUMENTS TO DEFENDANT AEROBICS
<u>AND FITNESS ASSOCIATION OF AMERICA, INC.</u>**

Plaintiff Fitness Resource Associates, Inc. ("FRA"), pursuant to Fed.R.Civ.P. 34, hereby requests that defendant Aerobics and Fitness Association of America, Inc. ("AFAA") produce for inspection and copying to FRA, by its counsel, the documents and tangible things described herein that are in AFAA's actual or constructive possession, custody, or control. FRA further requests that the true and correct originals of these items be produced at the offices of Plaintiff's counsel, Casner & Edwards, LLP, 303 Congress Street, Boston, Massachusetts 02210, or at such location as is mutually agreed to by counsel for the parties, within thirty (30) days of the date of service of this request.

<u>**Definitions**</u>

1.    As used herein, the words "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside its scope.

353853_1.DOC

2.      As used herein, the term "FRA" means plaintiff Fitness Resource Associates, Inc. and its agents, employees, officers, directors, attorneys, subsidiaries, affiliates, and predecessors.

3.      As used herein, the term "AFAA" means Aerobics and Fitness Association of America, Inc. and its agents, employees, officers, directors, attorneys, parent(s), subsidiaries, affiliates, and predecessors.

4.      As used herein, the word "document(s)" means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise (including, without limitation, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intraoffice communications, offers, notations of any sort of conversations, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, data stored in computers, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures), electronic, mechanical, or electric records and representations of any kind (including, without limitation, tapes, cassettes, discs, recordings). The term "document(s)" also shall include the file folders or jackets, envelopes, or any other containers in which any documents are maintained.

5.      As used herein, the word "communication(s)" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) including, but not limited to, documents, telephone or face-to-face conversations, electronic mail transmissions, meetings, or conferences.

6.  As used herein, the word "person" means any natural person or any business, legal, or governmental entity or association.

7.  As used herein, a document that "relates" to a given subject matter means a document that constitutes, embodies, comprises, reflects, identifies, states, clarifies, refers to, deals with, comments on, explains, responds to, describes, analyzes, contains information concerning, or is in any way pertinent to the subject matter, including but not limited to documents concerning the preparation of other documents.

8.  As used herein, "Agreement" means the document entitled "Joint Venture Agreement" between AFAA and FRA dated October 30, 1990.

## Instructions

1.  These requests seek documents in the possession, custody, and control of AFAA, which includes documents in the possession of its agents, representatives, and (unless privileged) attorneys.

2.  Pursuant to Mass. R. Civ. P 34(b), documents produced pursuant to these requests should be organized and labeled to correspond to the categories in this request or shall be produced as they are kept in the normal course of business.

3.  If, in response to any of these requests, you encounter any ambiguity in construing either a request or definitions and instructions relevant to the requests, set forth the matter deemed ambiguous and the construction of the ambiguity that you believe is most reasonable, and respond to the request applying that construction.

4.  If documents responsive to the following requests were but no longer are in your possession, custody or control, identify each such document and state:

(a) the date of the document;
(b) the name(s) of the author(s) of the document;
(c) the person(s) for whom the document was prepared and to whom it was sent;
(d) the subject matter of the document;
(e) the date the document was discarded, destroyed or otherwise transferred from your possession, custody or control;
(f) the person(s) who authorized such action; and
(g) the reason the document is no longer in your possession, custody or control.

5.    With respect to any document called for by this request which is withheld by you

pursuant to any claim of privilege, list the following information for each such document:

(a) the title and general subject matter of the document;
(b) the date of the document;
(c) the identity of the author(s) of the document;
(d) the nature of and the basis for the claim of privilege; and
(e) the identity of all persons who saw the contents of the document.

6.    Unless otherwise indicated, each request encompasses a period of time

commencing January 1, 2000 up to and including the date of responses to these requests. You

are also required to supplement the responses to these document requests to the extent required

by Mass. R. Civ. P. 26(e).


## REQUESTS FOR PRODUCTION

1.    All documents that constitute, refer to, or relate to the Agreement or any

supplement to the Agreement.

2.    All documents that constitute, refer to, or relate to the negotiation of the

Agreement or any supplement to the Agreement.

3.    All documents that constitute, refer to, or relate to the execution of the Agreement

or any supplement to the Agreement.

4.    All documents that constitute, refer to, or relate to enrollments for workshops in which FRA provided or was at any time scheduled to provide trainers from January 1, 2000 to the present including without limitation:

  (a) information provided to students and prospective students concerning payment policies of AFAA;
  (b) all communications between AFAA and workshop enrollees concerning payment;
  (c) all documents relating to invoices by AFAA to enrollees;
  (d) all documents relating to receipts and receivables from enrollees;
  (e) all documents relating to discounts given to any enrollees; and
  (f) all documents relating to waivers of tuition for any enrollees.

5.    All documents that constitute, refer to, or relate to the date and location of each workshop marketed by AFAA that was taught or at any time scheduled to be taught by FRA from January 1, 2000 to the present.

6.    All invoices from FRA to AFAA relating to FRA's participation in workshops marketed by AFAA from January 1, 2000 to the present.

7.    All documents that constitute, refer to or relate to payments by AFAA to FRA for FRA's participation in workshops marketed by AFAA from January 1, 2000 to the present.

8.    All bank statements for each account in which AFAA was an owner or signatory from January 1, 2000 to the present.

9.    Copies of all ledgers or other documents recording receivables owed to AFAA for all workshops that it marketed or organized from January 1, 2000 to the present.

10.    All ledgers or documents showing payables by AFAA related to the marketing and operation of workshops of all kinds between January 1, 2000 to the present.

11.    All financial statements, audited and unaudited, of AFAA from January 1, 1999 to the present.

12.    All communications between FRA on the one hand and AFAA on the other that constitute, refer to or relate to sums owed or claimed to be owed by AFAA to FRA for FRA's participation in workshops organized or marketed by AFAA from January 1, 2000 to the present.

13.    All documents that constitute to, refer or relate to enrollee counts for workshops of all kinds operated by or marketed by AFAA from January 1, 2000 to the present.

14.    All documents that constitute, refer or relate to AFAA's perceived business need to grant financial concessions to enrollees or potential enrollees in any workshops in which FRA participated or was at any time scheduled to participate from January 1, 2000 to the present.

15.    All documents that constitute, refer or relate to AFAA's perceived need to operate any and all workshops (whether FRA was involved or otherwise) in which AFAA anticipated fewer than 15 enrollees between January 1, 2000 and the present.

16.    All documents that constitute, refer or relate to adjustments in prices for enrollees in workshops in which FRA was a participant and which were organized or marketed by AFAA from January 1, 2000 to the present.

17.    All documents that constitute, refer or relate to the cost of production, marketing and distribution of books and printed materials sold by AFAA in conjunction with workshops in which FRA was a participant from January 1, 2000 to the present.

18.    All documents that constitute, refer or relate to income from the sale and distribution of books and printed materials sold by AFAA in conjunction with workshops in which FRA was a participant from January 1, 2000 to the present.

19.    All documents upon which AFAA relies to justify its continued and persistent late payment of sums owed to FRA from January 1, 2000 to the present.

20.    All documents relating to communications between AFAA and FRA concerning late payment of sums owed to FRA from January 1, 2000 to the present.

21.    All documents used in connection with presenting AFAA's present Personal Trainer program including but not limited to documents relating to lecture content and distributed to attendees.

22.    All documents identifying members of AFAA from Jan. 1, 1998 to Dec. 15, 2004, including names and dates on which such persons became members. FRA will limit this request to documents identifying members who also took the Personal Trainer program and the Advanced Personal Trainer program from January 1, 1999 to Nov. 15, 2004, at AFAA's election.

23.    All  AFAA registration forms and documents that show the number of attendees and the payments received as of the date of printing for each Personal Trainer and Advanced Personal Trainer workshop from January 1, 1999 to Nov. 15, 2004.

24.    All course evaluations prepared by attendees at Personal Trainer and Advanced Personal Trainer workshops from January 1, 1990 to Nov. 15, 2004.

25.    All documents relating to or supporting AFAA's contention in its Eighth Separate Defense that plaintiff's claims are barred by plaintiff's ratification.

26.    All documents relating to or referring to AFAA's Eleventh Separate Defense that there was no fiduciary duty and that FRA was the breaching party.

27.    All documents referring or relating to the contention made in paragraph 12 of the counterclaim that FRA voluntarily continued to perform without meaningful objection under the contract, including conducting workshops where enrollment was less than 15 people.

28.    All documents referring or relating to your contention in paragraph 13 of the counterclaim that by no later than 2003 the fitness certification industry had become very competitive.

29.    All documents referring or relating to your contention in paragraph 16 of the counterclaim that FRA misused AFAA's customer list.

30.    All documents referring or relating to your contention in paragraph 17 of the counterclaim that in or about 2002 AFAA and FRA agreed "as part of the contract" to conduct workshops related to yoga certification.

31.    All documents referring or relating to the contention made in paragraph 17 of the counterclaim that, starting in approximately June, 2004, FRA commenced its own yoga certification workshops using the AFAA customer list without AFAA's consent and FRA claims that the workshops were adopted by AFAA even though AFAA was excluded from the programs.

32.    All documents referring or relating to the contention made in paragraph 19 of the counterclaim that FRA threatened to enforce non-compete agreements against AFAA.

33.    All documents referring or relating to the contentions made in paragraph 20 of the counterclaim.

34.    All documents that constitute, refer to or relate to the Joint Venture Agreement between AFAA and FRA.

35.    All documents that constitute, refer to or relate to the negotiation and/or execution of the Joint Venture Agreement or any supplement or modification to the Joint Venture Agreement.

36.    All documents that constitute, refer to or relate to any of AFAA's costs and

expenses for AFAA/FRA workshops during the period October 30, 1990 to the present.

37.    All federal tax returns of AFAA from the years 1990 to present.

38.    All financial statements, audited and unaudited, of AFAA from October 30, 1990

to the present.

Respectfully submitted,

FITNESS RESOURCE ASSOCIATES, INC.
By its attorney,

Gregg S. Blackburn (BBO# 044430)
CASNER & EDWARDS, LLP
303 Congress Street, 2nd Floor
Boston, MA 02210
(617) 426-5900

### CERTIFICATE OF SERVICE

I, Gregg S. Blackburn, hereby certify that on May 24, 2005, that I caused PLAINTIFF
FITNESS RESOURCES ASSOCIATES, INC.'S FIRST REQUEST FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT AEROBICS AND FITNESS ASSOCIATION OF
AMERICA, INC. to be filed within the tracking time standards or be leave of the Regional
Administrative Justice, and further that I caused a copy of said document to be sent via first class
mail to:

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
101 Arch Street
Boston, MA 02110-1112

Gregg S. Blackburn (BBO#044430)

**EXHIBIT C**

# Looney & Grossman LLP
## Attorneys at Law

Edward V. Colbert, III, Esq.
Voicemail: Ext 545
Email: ecolbert@lgllp.com

101 Arch Street
Boston, Massachusetts 02110-1112
Telephone (617) 951-2800
Telecopier (617) 951-2819
www.lgllp.com

August 4, 2005

Gregg S. Blackburn, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210

> Re:     **Fitness Resource Associates, Inc. v. Aerobics and Fitness Association of America, Inc., U.S.D.C. # 05-10003-RGS**

Dear Attorney Blackburn:

I take this opportunity to write because I understand that you will be out of the office until August 22, 2005.

Following your two letters of July 20 and 25, 2005, our client AFAA undertook to determine whether it could in any way reasonably comply with your request to: (a) ship you copies of categories of documents identified from your Rule 34 document request (which you identified as "Category I" documents); and (b) separately provide you with an estimate of another category of documents identified from your document request (which you identified as "Category II" documents).

As I have informed you via voicemail, AFAA has approximately 400 boxes of documents that contain material from the years 2000-2004 and that are responsive to your request. AFAA does not separate its records according to those entities with whom it conducts workshops, and information and documents relating to the workshops, publications, income, expenses and the like that relate to FRA are not separated from documents that relate to AFAA's other workshops and activities unrelated to FRA. It is for this reason that we responded to your Rule 34 document request by: (a) stating that we would make documents available for your inspection as they are kept in the usual course of business, as we are authorized to do under Fed. R. Civ. P. 34 (b); and (b) requesting that we enter into a confidentiality order prior to your inspection due to the fact that you will be viewing proprietary information that is unrelated to FRA, and FRA is now competing with AFAA and working with other competitors of AFAA.

As to your comments regarding the proposed confidentiality order, I would be willing to discuss provisions in the confidentiality order that contemplate sharing information with others to allow you to prepare your case, so long as AFAA's proprietary information will not be

disclosed or compromised in any way. I am also willing to discuss our respective disagreements over objections to producing documents when you return to the office.

Finally, I would very much like to inspect the documents that we have requested from FRA and that you have stated are available for our inspection. I am available the week of August 22, 2005. Please let me know what day I may conduct my inspection.

Very truly yours,

Edward V. Colbert, III

EVC/wmg

Cc:    Linda Pfeffer
       Jonathan Kirsch, Esq.

EXHIBIT D



CASNER & EDWARDS, LLP

ATTORNEYS AT LAW

303 Congress Street
Boston, Massachusetts 02210

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

July 20, 2005

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
101 Arch Street
Boston, MA  02110-1112

Re:   *Fitness Resource Associates, Inc. v Aerobics and Fitness Association of America, Inc.*
U.S. District Civil Action No.: 05-10003RGS

Dear Ed:

I am writing to respond to your question about FRA's document response and to provide you with a list of documents that FRA would like to have copied by AFAA and shipped to Massachusetts, some subject to obtaining an estimate of the cost.

First, with respect to your requests 38 and 40, I take it that you are looking for any documents at all relating to ACE or IHRSA, whether or not they involved communications addressed to FRA.  I will contact my client to determine whether any such documents exist.  However, as before, we object to producing any documents relating to any potential business relationship between FRA and either of those entities at any time after AFAA's notice of termination.

With respect to your response to FRA's first request for production of documents, I would first like to provide you with a list of the response numbers for which we would like to obtain copies to be shipped to Massachusetts.  I then have some comments on some of your individual responses and objections.

First, I will list the documents that we would like to have shipped, regardless of the volume, as I anticipate that the volume for each of these categories will be relatively small.  Those are numbers 1, 2, 3, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, and 35 (Category I documents).

I would like to have estimates of the volume for the cost of copying documents for the following response numbers:  4, 5, 7, 9, 13, and 36 (Category II documents)

With respect to the objections raised in your discovery responses, I have comments to make on the following:

On response 10, you agree to produce letters and documents showing payables by AFAA related to the marketing and operation of workshops, but not for those regarding AFAA's

## CASNER & EDWARDS, LLP

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
July 20, 2005
Page 2

business operations that were separate from FRA. I suspect I will not have a problem with this, so long as the bookkeeping records are such that AFAA separated out its costs and expenses for running the FRA-related workshops from all of its other business. We reserve the right to seek additional documents should that turn out not to be the case.

With respect to response 13, your offer to produce enrollee counts for workshops only related to the FRA program is not acceptable. AFAA's conduct in staffing its own programs with low enrollment is relevant to FRA's claims that it was forcing FRA to staff programs with low attendance.

I would make the same argument with respect to responses 15 and 16. AFAA's conduct in running its own programs is relevant for comparison purposes to what occurred in the FRA-related programs.

On requests 19 and 20, you appear to agree to produce only records directly relating to AFAA's late payments to FRA. If AFAA is going to claim that it had cash flow problems or if there were extraneous reasons for not paying FRA promptly, than FRA has a right to learn of same in discovery. Therefore, in my view, any documents relating to the late payment issue are relevant. If you will stipulate that AFAA at all times had the ability to pay FRA's bills on time per the contract, then we have no issue with this response.

With respect to paragraph 22, you object to producing membership information concerning AFAA's business operations that were separate from FRA. As you know, it is FRA's contention that AFAA failed to follow the terms of the agreement which permitted discounts for persons who were members of AFAA prior to signing up for an FRA-related program. Therefore, FRA has a right to learn the date of membership in AFAA of any person who was given a membership discount by AFAA when enrolling in an FRA-related program. Your objection was a bit unclear to me, but if you intended to include documents responsive to the request as just described, then we have no problem.

With respect to request number 23, you indicated that you did not understand it. My understanding from FRA is that AFAA maintained documents for each workshop as enrollments were being taken that showed the number of enrollees who had applied or signed up and all sums of money received from those enrollees with the date of receipt. In my view, such documents are clearly relevant to FRA's claims in this matter since, at the very least, they show the amounts that were received by AFAA for the FRA-related programs and they show the number of paid enrollees, which would relate to whether or not enrollment was below 15, creating a question under the agreement as to whether the workshop would be staffed.

Since we have a relatively short period of time for discovery, I would appreciate it if you would make arrangements with AFAA to have all the documents requested in the Category I

CASNER & EDWARDS, LLP

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
July 20, 2005
Page 3

copied and sent as soon as possible. Similarly, for the Category II documents where a request is made for the volume, we would appreciate receiving such estimates as quickly as possible. With respect to the responses where I have disputed your objections, I would appreciate getting the documents that are not objected to as soon as they are ordered rather than waiting for the resolution of the disputes.

In making my list of your objections that I dispute, I have attempted to be practical and focus on the most important items needed. The list set forth here is not necessarily a final list.

Thank you for your attention to these matters.

Sincerely,

Gregg S. Blackburn

GSB:lnm
5880.3/358749.1

**EXHIBIT E**

# Looney & Grossman LLP
### Attorneys at Law

Edward V. Colbert, III, Esq.
Voicemail: Ext 545
Email: ecolbert@lgllp.com

101 Arch Street
Boston, Massachusetts 02110-1112
Telephone (617) 951-2800
Telecopier (617) 951-2819
www.lgllp.com

July 21, 2005

Gregg S. Blackburn, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210

> Re:    **Fitness Resource Associates, Inc. v. Aerobics and Fitness Association of America, Inc., U.S.D.C. # 05-10003-RGS**

Dear Attorney Blackburn:

Enclosed please find a draft protective order that I would like to file with the Court by way of a stipulation prior to your inspection of AFAA's documents. Please let me know if the protective order is acceptable to you.

Additionally, I have reviewed in more detail Fitness Resource Associates, Inc.'s Response To AFAA's First Request For Production of Documents. I have the following concerns:

1.    Request/Response No. 15. AFAA requested correspondence between FRA and AFAA's customers. In its response, FRA did not make available correspondence between FRA and what it considers to be "joint" customers of FRA/AFAA. We disagree with your view of "joint" customers, but regardless of this disagreement our request clearly contemplates all correspondence between FRA and those customers that AFAA has established both prior to and during its contractual relationship with FRA. Among other things, these documents are relevant to AFAA's count against FRA for misappropriation of trade secrets and unfair competition, and AFAA is entitled to discover these documents.

2.    Request/Response No. 37 & 38. AFAA requested documents relating to communications between FRA and ACE and between FRA and ACSM. FRA objected, and stated its willingness to produce only those communications that preceded termination of the AFAA/FRA contract. As you know, AFAA's claim against FRA includes allegations that FRA, acting for its own benefit and/or in concert with competitors of AFAA, diverted opportunities away from AFAA, threatened to enforce

unlawful non-compete agreements against AFAA and those with whom AFAA had existing business relationships, and acted in concert with other entities to exclude AFAA from business in the fitness industry. Because ACSM and ACE are entities that are competitive to AFAA in the industry, AFAA is entitled to discover such communications that may lead to the discovery of admissible evidence with regard to these allegations, whether the communications occurred before, during, or after termination of its contract with AFAA. Additionally, in "Response No. 38" you wrote, "No such documents exist," rather than writing the request itself. This would appear to be a typographical error.

3.    Request No. 40. As mentioned in my letter to you of June 21, 2005, as to Request No. 40, FRA responded that no documents exist concerning communications with the International Health Club and Racquet Sports Association (IHRSA). I remind you that the request is not limited to communications between IHRSA and your client, FRA, and encompasses all IHRSA communications that FRA has in its possession.

4.    Request/Response No. 50. AFAA requested documents relating to any business activities of FRA "and/or its principals" in Jamaica, including but not limited to the lease or purchase of real property in Jamaica and/or any loans secured for that purpose. FRA responded that "FRA" owns no property in Jamaica, but omitted reference in its response as to whether FRA has any such documents related to itself "and/or its principals." AFAA has reason to believe that FRA conducted workshops in Jamaica, and its request for documents relating to FRA's "business activities" in Jamaica includes a request for documents relating to these workshops. Also, AFAA's request for documents relating to any property owned or leased by FRA "and/or its principals" would include shareholders, officers and/or directors of FRA. Because such property could have impacted FRA's business activities and FRA's lack of cooperation in staffing workshops with AFAA, AFAA is entitled to discover documents related to such property, whether the interest is in the name of FRA or any of its principals.

I would like to arrange with you a conference pursuant to Local Rule 7.1 and 37.1 to discuss these issues. Please respond accordingly.

Very truly yours,

Edward V. Colbert, III

EVC/wmg

Cc:    Linda Pfeffer
       Jonathan Kirsch, Esq.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FITNESS RESOURCE ASSOCIATES, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action |
| v. ) | No. 05-10003-RGS |
| ) | |
| AEROBICS AND FITNESS ASSOCIATION ) | |
| OF AMERICA, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | |

## STIPULATION AND ORDER REGARDING CONFIDENTIALITY OF
## TRADE SECRET, PROPRIETARY AND/OR FINANCIAL INFORMATION

By the signatures of their attorneys of record to this document, the parties to this action stipulate and agree that:

1. Any trade secret, proprietary and/or financial information provided by Aerobics and Fitness Association of America, Inc. ("AFAA") to Fitness Resource Associates, Inc. ("FRA"), in response to FRA discovery requests, that AFAA claims and marks as "CONFIDENTIAL - FOR ATTORNEY'S EYES ONLY" shall be:

a. Deemed confidential information that may be used by counsel for FRA solely for the purposes of this action; and

b. FRA Counsel shall not reveal or disclose this information, or make it available for inspection and copying to any person, including FRA or any shareholder, officer, employee or agent of FRA. FRA counsel may make confidential information available to attorneys or employees of FRA counsel's law firm for purposes of this action, or to others with the express written permission of counsel for AFAA or by Order of the

Court. In the event FRA counsel retains an expert or experts in this action, each such expert shall sign and forward to counsel for AFAA an affidavit in the form attached as Exhibit A to this Order, prior to receiving or reviewing any confidential information.

2.     In the event AFAA elects to produce documents for inspection and FRA elects to inspect them, no designation of confidential information need be made in advance of the inspection. For purposes of such inspection, all documents produced shall be considered as confidential information. If FRA counsel selects specified documents to be copied, AFAA shall be obligated to designate any confidential information in accordance with paragraph one at the time the copies are produced.

3.     Marking the cover of a multi-page document "CONFIDENTIAL - FOR ATTORNEY"S EYES ONLY" shall be deemed a designation of all pages of the document as confidential, and subject to the provisions of this Stipulation and Order.

4.     AFAA shall have 30 days following receipt of a deposition transcript to designate as confidential specific portions of the transcript, and shall serve such designation upon counsel for FRA. During the 30-day period following receipt of a deposition transcript by AFAA, the entire deposition transcript shall be deemed confidential and subject to the provisions of this Stipulation and Order. Following the 30-day period, all portions of a deposition transcript designated confidential by AFAA shall be subject to the provisions of this Stipulation and Order.

5.     If the parties are unable to resolve any dispute as to whether the information is or should be regarded as confidential and subject to the provisions of this stipulation, and only after attempts to resolve any dispute, counsel for FRA may file the disputed information with the Court, under seal, and seek a ruling from the court in camera concerning whether the information deserves the protection of this stipulation as confidential.

6.    All documents filed with the Court by any party to this action that are agreed by the parties, or ordered by the Court, to comprise or contain financial and proprietary information that could be potentially injurious to AFAA's business as commercially or competitively sensitive, including all pleadings, deposition transcripts, exhibits, discovery responses or memoranda purporting to reproduce or paraphrase such information, shall be filed in sealed envelopes or other appropriately sealed containers that shall be endorsed with the title of this action, an indication of the nature of the contents of the sealed envelopes or other containers, the word "CONFIDENTIAL" and a statement in substantially the following form:

> "This envelope contains confidential documents and is not to be opened, nor are the contents to be displayed or revealed except by Order of this Court."

7.    Within 30 days following the conclusion of this litigation, all documents, deposition transcripts and other materials, and all copies, summaries and reports containing information or material that have been marked "CONFIDENTIAL– FOR ATTORNEY'S EYES ONLY" will be returned to counsel for AFAA.

8.    The parties intend that this stipulation be approved and adopted as an Order of the Court and that its violation will be enforceable as an Order of the Court, including by means of proceedings for contempt of court.

9.    The inadvertent or unintentional disclosure of a confidential document and information shall not be deemed a waiver, in whole or in part, of AFAA's claim of confidentiality.

10.    Nothing in this stipulation or any order resulting from this stipulation constitutes a waiver or admission as to the admissibility or lack of admissibility of any matter at the trial of

this action.

|  |  |
|---|---|
| | Respectfully submitted, |
| FITNESS RESOURCE ASSOCIATES, INC. | AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC. |
| By its attorney, | By its attorneys, |

---

Gregg Blackburn (BBO #044430)
Casner & Edwards LLP
303 Congress Street
Boston, MA 02210
(617) 426-5900

---

Richard J. Grahn (BBO#206620)
Edward V. Colbert III (BBO#566187)
LOONEY & GROSSMAN, LLP
101 Arch Street
Boston, Massachusetts 02110
(617) 951-2800

SO ORDERED:

---

By the Court

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FITNESS RESOURCE ASSOCIATES, INC.   )<br><br>            Plaintiff,     )<br><br>v.                        )<br><br>AEROBICS AND FITNESS ASSOCIATION  )<br>OF AMERICA, INC.          )<br><br>           Defendant.   )<br> | Civil Action<br>No. 05-10003-RGS |

## AFFIDAVIT OF [            ]

I [            ] , hereby deposes and say that:

1.     I have read the Stipulation and Order Regarding Confidentiality Of Certain Proprietary And Financial Information ("Order"), in the above-captioned matter.

2.     I understand that pursuant to the Order, I am authorized to review information that has been designated confidential upon signature of this affidavit.

3.     I agree that I will not disclose or discuss confidential information I have reviewed except with counsel for FRA, or as authorized by this Court.

4.     I understand that should I disclose or discuss information designated confidential, I may be held in contempt of a Court Order.

Signed Under Penalties of Perjury this __ day of _____, 200[ ].

_____

[Notary]

**EXHIBIT F**

# CASNER & EDWARDS, LLP

A T T O R N E Y S    A T    L A W

303 Congress Street
Boston, Massachusetts 02210

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

July 25, 2005

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
101 Arch Street
Boston, MA  02110-1112

Re:    *Fitness Resource Associates, Inc. v Aerobics and Fitness Association of America, Inc.*
U.S. District Civil Action No.: 05-10003RGS

Dear Ed:

I am writing concerning your proposed confidentiality order. We have a potential problem with the order. As you probably know, we have done a good bit of financial analysis on our claims. The work was performed by Rick Pendzick who works closely with FRA and would probably be considered an agent. He will need to review the financial data of AFAA as he did with the data of FRA which you have received in spreadsheet format.

I would imagine that very little of what AFAA will produce would legitimately be classified as confidential, but I cannot agree to the order without knowing what will be so designated. If we can agree in advance on what categories of document are confidential, then I can see if we can live with your designations and agree to the order (as modified by pre-designation). Of course, we would want a mirror image document for FRA's sensitive documents.

Please let me know whether this is agreeable and if so, when we could expect to receive designation information. I am concerned that this may delay discovery and we need to get the paper discovery done in order to move onto depositions and make the November deadline.

With respect to the issues you raise in your discovery, I will contact my client right away and get back to you shortly.

Thank you for your attention to these matters.

Sincerely,

Gregg S. Blackburn

359105_1.DOC

**EXHIBIT G**

## Edward V. Colbert, III

**From:** Blackburn, Gregg S. [blackburn@casneredwards.com]
**Sent:** Thursday, August 18, 2005 9:43 AM
**To:** Edward V. Colbert, III
**Subject:** FRA - AFAA Document issue

Ed:

I am sending out a letter today to request further efforts to identify, copy and ship requested documents. In case that does not happen I want to notice a 30(b)(6) person from AFAA most knowledgeable about its filing systems and the location of documents in my request. I'd like to do this in September and schedule it for a Monday with three days to follow for inspection of documents.

Can we do the deposition in AFAA's offices?

Can we schedule it for Sept 19-22 or Sept 26-29?

Of course, we will also need to agree on a protective order beforehand if AFAA insists on having one. To make my position clear, I will not agree to any protective order that prevents Rick Pendzick from reviewing AFAA's financial documents that relate to joint programs and the documents relating to AFAA's own programs which will need to be examined for comparative analysis of AFAA's practices relating to workshops with low enrollments etc. If this is not going to be acceptable to you, please let me know ASAP, so that we can file a motion to get a court decision.

Thank you.

Gregg Blackburn
Casner & Edwards
617-426-5900
<<Gregg Blackburn (blackburn@casneredwards.com).vcf>>

8/18/2005

**EXHIBIT H**



CASNER & EDWARDS, LLP

ATTORNEYS AT LAW

303 Congress Street
Boston, Massachusetts 02210

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

August 18, 2005

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
101 Arch Street
Boston, MA  02110-1112

Re:   *Fitness Resource Associates, Inc. v Aerobics and Fitness Association of America, Inc.*
      U.S. District Civil Action No.: 05-10003RGS

Dear Ed:

I am writing in response to yours of August 4th concerning document productions and in light of our recent conversation on that topic.

As I understand it, AFAA cannot comply with my request to produce Category I documents as described in my letter of July 20 since AFAA has approximately 400 boxes of documents that contain material from the years 2000-2004 that are responsive to the requests. I understand further from our telephone conversation that AFAA simply dumps batches of documents into boxes when its employees have finished working with them and that there is no particular order to the boxes other than by date. With respect to most of my Category I requests as described in my letter to you of July 20, 2005, I suspect there has been a failure of communication somewhere along the way. I simply cannot imagine that a successful business such as AFAA could survive and handle all of its documents in this fashion.

For example, my Request No. 1 was for documents that relate to the Joint Venture Agreement. If AFAA still has a copy of the contract and any documents relating to the negotiation of the contract or documents discussing or disputing its terms, I simply do not believe that such documents were placed randomly in file boxes when some AFAA employee decided they were no longer needed at the moment. I believe that the same applies to Category I Request Nos. 2, 3, 12, 14, 15, 17, 18, 19, 20, 21, 22, 25, 29, 30, 31, 32, 33, 34 and 35.

In addition, even if financial reports are filed randomly and cannot be found without searching all the boxes, I cannot imagine that AFAA's computer system is unable to generate reports responsive to some of the financial information sought in the various document requests such as amounts paid to FRA over the years and expenses incurred for individual workshops. At the very least, AFAA should be able to produce a printout of its check registers for the periods in question.

Accordingly, I renew my request for the copying and production of such documents.

CASNER & EDWARDS, LLP

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
August 18, 2005
Page 2

In addition, in order to try to get a grip on what I might be dealing with concerning the 400 boxes, I am writing to request the immediate shipment of whatever number of boxes cover the period between March 1, 2002 and April 30, 2002, to be used as a sample.

If AFAA is unwilling to produce the documents described above that I suspect are in identifiable files and if it refuses to produce the sample boxes requested herein it is my plan to examine the documents at AFAA's offices in California sometime in September. If I find that in fact AFAA does keep its documents in more organized fashion, such as in folders pertaining to correspondence with FRA or folders relating to the contract with FRA, or folders containing financial reports and check register printouts, then I will apply to the court for sanctions including the cost of travel and time.

You should also be advised that the document production issues that have arisen between us such as those described above and the fact that we have not been able to agree on a confidentiality order makes it clear that the scheduling order by the court for discovery to be concluded by November 18, 2005 will be impossible to meet. I suggest that we immediately file a joint motion with the court for a substantial extension of the discovery period in view of these problems.

With respect to FRA's documents, as you requested, I have made inquiry of my client as to the volume of documents to be produced. I am told that there will be something less than ten cartons of documents. Arrangements can be made for you to view the responsive documents at your convenience at FRA's offices in Needham once we have agreed upon any protective order that is to apply to the documents produced by our respective clients.

Thank you for your attention to these matters.

Sincerely,

Gregg S. Blackburn

GSB:ml
5880.3/361145.1

**EXHIBIT I**



CASNER & EDWARDS, LLP

ATTORNEYS AT LAW

303 Congress Street
Boston, Massachusetts 02210

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

August 31, 2005

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
101 Arch Street
Boston, MA 02110-1112

Re:     *Fitness Resource Associates, Inc. v Aerobics and Fitness Association of America, Inc.*
        <u>U.S. District Civil Action No.: 05-10003RGS</u>

Dear Ed:

I have reviewed the proposed confidentiality order that you sent on July 21st and which was discussed in my letter of July 25th. For the reasons set forth in the July 25th letter, I cannot agree to the confidentiality order that you propose. It permits AFAA to unilaterally declare what materials are confidential and it prevents Mr. Pendzick from viewing the documents.

I propose instead the enclosed confidentiality order which I believe provides sufficient protection to both of our clients. I recognize that my proposed confidentiality agreement includes in paragraph 4 b. permission for a person in Rick Pendzick's position to review the documents. I understand that you are not willing to agree to this and that it will have to be the subject of a motion. I will prepare and serve such a motion, but as we discussed, it would be best to reach agreement as to the remainder of the confidentiality order before drafting and serving the motion.

Thank you for your attention to these matters.

Sincerely,

Gregg S. Blackburn

GSB:ml
Enclosure
5880.3/362204.1

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                SUPERIOR COURT
                                           CIVIL ACTION NO.:

FITNESS RESOURCE ASSOCIATES, INC.          :
                                           :
        Plaintiff                          :
                                           :
v.                                         :
                                           :
AEROBICS AND FITNESS ASSOCIATION           :
OF AMERICA, INC.                           :
                                           :
        Defendant                          :

## CONFIDENTIALITY AGREEMENT

It is hereby agreed among the undersigned parties that:

1.      Documents produced by FRA or AFAA bearing the designation
"confidential," or information designated as confidential on the transcript of a deposition,
shall be used solely for the purposes of this action.

2.      Designation of a document or information as confidential shall be made at
the time of production or disclosure by stamping or otherwise marking the document as
"confidential" or by designating the information as confidential on the transcript of a
deposition.

3.      Confidential information shall be used solely in connection with, and only
as necessary to, this action and may not be used or disclosed by any person for any
business or competitive purpose or for any other purpose except as necessary for the
prosecution or defense of this action.

4.      Documents or transcripts which are designated confidential may be
furnished, shown or disclosed by the receiving party to the following individuals only:

        a.      Counsel for the parties and their employees involved in the conduct
                of this litigation;

        b.      Officers, directors, agents and employees of the parties to the

5880.3/362207.1                                                                      1

extent necessary for preparing or assisting in this litigation;

    c.    Any potential witnesses as necessary, in the sole discretion of the lawyer interviewing, preparing or examining the witness, to the statement or testimony of the witness;

    d.    Experts and consultants retained or consulted by a party for purposes of assisting in this litigation;

    e.    Any person who was involved in preparing, receiving or reviewing a document containing such information prior to this litigation;

    f.    The court, jury, court personnel, court reporters and similar personnel;

    g.    Any other person with the prior written consent of the party producing the document or information; or

    h.    Any other person pursuant to order of the court with jurisdiction to make said order.

Any such disclosures of confidential information shall be made only to the extent necessary for preparation and trial of this action.

5.    In the event any confidential information is disclosed in a court proceeding herein, it shall not lose its status through such disclosure, and the parties shall take all steps reasonably required to protect its confidentiality.

6.    Any person to whom any confidential material is furnished, shown or disclosed, shall, prior to the time he or she receives such material, be provided with a copy of this Agreement and shall sign indicating agreement to be bound by its terms and to maintain the confidential information in accordance with this Agreement.

7.    In the event that any recipient of confidential information (a) is served with a subpoena or other legal process in another action, or (b) is served with a request or demand in another action to which he or she is a party, or (c) is served with a request or demand or any other legal process by one not a party to this case concerning documents or information subject to this Agreement, that person (the recipient of confidential material) shall give prompt written notice of such event to the party designating such

materials as confidential and shall object on the basis of this Agreement to producing or responding to such request, demand or subpoena. Within ten (10) days from the giving of such written notice, a party designating such materials as confidential shall advise the person who is to respond to the subpoena or request or demand of the designating party's position concerning the production of the documents subject to this Agreement. Thereafter, the party designating such materials as confidential shall assume responsibility for preserving and prosecuting any objection to the request, demand or subpoena. Any recipient of confidential information shall be obligated to cooperate to the extent necessary to enforce the terms of this Agreement.

8.     Within thirty (30) days from the termination date of this action, all originals and copies of any documents containing confidential information produced by a party which is in the possession, custody or control of any non-producing party shall be returned to the producing party. This provision, regarding return of documents, does not apply to work-product of counsel. The other terms of this Agreement shall, however continue to apply to any and all documents, including memoranda, other writings, and work-product, which contain or relate to confidential information or materials, including pleadings, briefs, and transcripts.

9.     This Agreement shall not preclude or limit any party's right to oppose discovery on any ground which otherwise would be available.

10.    Material designated as confidential which is subject to dispute as to whether it is , in fact, confidential shall be treated as confidential until contrary order of the court.

11.    Any party or person making any intentional unauthorized disclosure or use of confidential information shall be subject to such sanctions as may be appropriate and to any independent proceedings for civil contempt and/or damages.

12.    In the event that any confidential material is disclosed in contradiction of this Agreement, either willfully or inadvertently, it shall not lose its protected status through such disclosure and the parties shall take all steps reasonably required to assure its continued confidentiality.

5880.3/362207.1                                                               3

13.    After termination of this case the provisions of this Agreement shall

continue to be binding.

FITNESS RESOURCE
ASSOCIATES, INC.
By its attorney,


AEROBICS AND FITNESS
ASSOCIATION
OF AMERICA, INC.
By its attorney,

_____
Gregg S. Blackburn (BBO# 044450)
CASNER & EDWARDS, LLP
303 Congress Street, 2nd Floor
Boston, MA 02210
(617) 426-5900

_____
Edward V. Colbert, III (BBO# 566187)
Looney & Grossman LLP
101 Arch Street
Boston, MA  02110-1112
(617) 951-2800

DATED:

DATED:

**EXHIBIT J**

# Looney & Grossman LLP
## Attorneys at Law

Edward V. Colbert, III, Esq.
Voicemail: Ext 545
Email: ecolbert@lgllp.com

101 Arch Street
Boston, Massachusetts 02110-1112
Telephone (617) 951-2800
Telecopier (617) 951-2819
www.lgllp.com

September 9, 2005

Gregg S. Blackburn, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, MA 02210

Re:    **Fitness Resource Associates, Inc. v. Aerobics and Fitness Association of America, Inc., U.S.D.C. No. 05-10003-RGS**

Dear Attorney Blackburn:

Upon my return from vacation this week, I reviewed your letter of August 31, 2005, along with your enclosed confidentiality order. I had hoped that you would simply mark up the draft confidentiality order that I sent to you on July 21, 2005, to make it reciprocal if you felt it necessary for your client, rather than drafting a counter proposal and having us pick apart terms even where we agree that a confidentiality order is appropriate under these circumstances.

Although I believe the substantive terms of our respective proposals contain many of the same elements, I reiterate that I am not in agreement with paragraph 4, which allows FRA, its officers, directors, agents and employees to review AFAA's confidential and proprietary information. As I have repeatedly informed you, FRA competes with AFAA in the fitness industry, and works with and has associated with others including ACSM which is a direct competitor of AFAA. Within the past few years, these direct competitors of AFAA, including ACSM, have colluded with one other to drive certifying entities out of business and exclude them from fitness clubs. I have attached a copy of a letter from the International Health, Racquet & Sportsclub Association that describes this anti-competitive and collusive activity (See Exhibit A). Allowing FRA and its officers, directors, and agents to review AFAA's confidential and proprietary information, as you suggest in your proposed confidentiality order, when FRA and other AFAA competitors have acted in such an anti-competitive and collusive fashion against AFAA, would obviously be against AFAA's interest and would further promote the unfair and anti-competitive practices that have gone on to date.

Furthermore, your insistence that Richard Pendzick be allowed to review AFAA's proprietary information is untenable and disturbing. In your email to me on August 18, 2005, you said that Mr. Pendzick must be allowed to examine documents from "AFAA's own programs" that had nothing to do with FRA. What you did not disclose to me in the email or otherwise was the relationship between Mr. Pendzick and Paula Besson, the President and owner of FRA. When I asked you about it on the telephone, you confessed that Mr. Pendzick "shared a

# Looney & Grossman LLP

September 9, 2005
Page 2

pillow" with Ms. Besson, leading me to believe that I was not being told the entire truth behind Mr. Pendzick. I have since learned from public records that not only do Mr. Pendzick and Ms. Besson share a pillow, but that they purchased a home several years ago in Newton as a married couple. I have attached a copy of the deed granted to Ms. Besson and Mr. Pendzick on 53 Selwyn Road in Newton as husband and wife (See Exhibit B). Moreover, public records also show that after Ms. Besson and FRA filed this lawsuit against AFAA, Ms. Besson and Mr. Pendzick have taken out a substantial line of credit on the home. I have attached a copy of a recent open-end mortgage with Fleet Bank that Ms. Besson and Mr. Pendzick granted for $200,000 (Exhibit C).

In short Gregg, there are few if any people who have a greater personal and financial interest in FRA gaining an unfair competitive advantage over AFAA than Mr. Pendzick. Your withholding of relevant information from me in this regard is not only troublesome as we proceed with the litigation, but the lack of disclosure gives greater credence to our concerns about your client's trustworthiness in complying with a confidentiality order. Again, we are amenable to you having someone independent from FRA, such as an accountant, review relevant AFAA information with you under the terms of a confidentiality order. We simply need to keep proprietary information far away from your client, its officers, directors, employees and their family members.

At this time, it only makes sense that we deal with this important issue of the confidentiality order prior to embarking upon inspection of documents. Once a confidentiality order is entered, my understanding is that FRA will then make documents available for my inspection. AFAA will do the same for you. As to your request in your letter of August 18, 2005, that AFAA copy and send you responsive documents that you have selected from the volumes of documents you have requested, I reiterate that your inspection of the documents as they are kept in the ordinary course of business, as per the terms of Fed. R. Civ. P. 34, is the most appropriate method for all parties. This is particularly so where, as here, many of AFAA's documents involving FRA are not segregated from its documents that do not involve FRA or workshops they conducted together. AFAA should not have to spend the time and resources at its storage facility segregating out documents you select, particularly where you will have to travel to California in any event to conduct depositions. You may not even want copies of the documents that AFAA selects for you. I remind you that your client chose this lawsuit, not ours. Your client also chose to file the lawsuit in Massachusetts, and opposed our attempt to move it to California, where discovery logistics would have been substantially easier.

Notwithstanding the above, and as an accommodation to you and in response to your August 18 letter, AFAA has spent several days at its storage facility going through documents. This was done solely at your request, and without any obligation under the rules. AFAA has identified boxes that contain "reconciliations" of revenues from various workshops staffed by FRA during the snapshot period (March – April 2002) you selected. Each reconciliation for a particular workshop is a multi-page document, averaging seven pages per workshop, and each

# Looney & Grossman LLP

September 9, 2005
Page 3

one is accompanied by an adding-machine tape and a copy of the check that was issued to FRA, all of which are stapled together. Each set of documents will need to be disassembled, copied, and reassembled by a copying service. The documents will be made available at the office of AFAA's counsel in Los Angeles. If you provide me the name of your copying service, I shall forward it along to counsel.

In the meantime, I intend to file a draft confidentiality order with the Court along with a motion within the next ten days. I am also still waiting for you to send me a draft motion to extend the discovery schedule for my review, as you promised some time ago.

Very truly yours,

Edward V. Colbert, III

EVC/wmg

Cc:    Linda Pfeffer
       Jonathan Kirsch, Esq.

L:\13345\000\Ltr\14

International
Health, Racquet &
**Sportsclub Association**

EXHIBIT A

December 27, 2001


Ms. Robin Foss
Aerobics & Fitness Association of America
15250 Ventura Boulevard
Suite 200
Sherman Oaks, CA  91403


Dear Ms. Foss:

The following six recommendations regarding personal training certification programs represent a consensus of health club industry leaders from around the country. They have resulted from the legal liabilities to which clubs are exposed from such programs.

They arise from a determination to protect clubs from such liabilities and, above all, to insure the safety of club members and club clients.

We believe that these recommendations can make a significant contribution to the success of your organization as well as to the protection of clubs and the safety of the general public.

Thus, we encourage your participation in the following six-point program.

I. IHRSA Plans To Recommend To Its Members and to the Industry Five Personal Training Certification Programs

By some estimates, there are 235 organization in the U.S. that certify fitness professionals and/or personal trainers. The proliferation of such certification programs presents the industry with a potential risk.

    1. A <u>financial</u> risk to the business of personal training;

    2. A <u>credibility</u> risk to legitimate certifying organizations;

263 Summer Street
Boston, MA 02210 USA
617.951.0055
800.228.4772
fax: 617.951.0056

www.ihrsa.org
www.healthclubs.com


100M
2010

As a result, IHRSA has determined that for the protection of its member clubs and for the safety of the general public, minimum certification standards must be established in the personal training field.

While setting no preconceived limit, IHRSA has also determined that the following five organizations meet these standards. Those organizations are ACE, ACSM, AFAA, Cooper, and NSCA.

These organizations were selected for three reasons:

First, IHRSA has worked collaboratively with each of them for almost 20 years;

Second, each of these organizations enjoys a longstanding reputation for integrity and credibility;

Third, each enjoys the respect and confidence of thousands of clubs and many thousands of fitness professionals and personal trainers.

## II. IHRSA Will Recommend To Its Members and To the Industry That All Personal Training Certifications Be Kept Current

To us in the club business, it is clear that many personal trainers do not keep their personal training certifications current. This, too, presents a liability risk to clubs and a safety risk to the general public.

As a result, IHRSA plans to recommend that its member clubs urge every personal trainer in their employ to have a current certification.

In doing this, IHRSA believes that it can make a positive contribution to the businesses of the recommended certifying organizations.

IHRSA also believes that in order to do this it will be necessary to link to the IHRSA website to a list of currently certified personal trainers on the websites of the five recommended certifying organizations.

## III. IHRSA Will Require That The Recommended Certifying Organizations Incorporate Into Their Certification Programs Ten Governing Principles Aimed At Reducing Club Liability and Enhancing Client Safety

Because of current legal damages pending against personal trainers - IHRSA has composed a draft document entitled "Ten Governing Principles For Personal Trainers" (attached).

These 10 principles aim to eradicate personal training practices that present liability risks to clubs as well as to personal trainers themselves. Above all, these 10 principles aim to enhance the safety of club members and club clients.

IHRSA will require that each of the recommended organizations incorporate the substance of these 10 principles into their certification protocols.

This, we believe, will protect clubs, as well as personal trainers, and promote the health and safety of consumers.

IV. IHRSA Will Offer a 'Partnership Program' To the Recommended Certifying Organizations

As stated above, IHRSA plans to recognize and recommend to its members five certifying organizations. This recommendation will be made consistently and continuously.

As stated above, IHRSA also plans to recommend that every club, for its own safety and the safety of its members, urge its personal trainers to maintain a current certification.

We believe that these recommendations can have a positive effect on the businesses of the recommended certifying organizations.

To maximize the effectiveness of these initiatives, IHRSA will offer a Partnership Program to each of the recommended organizations.

V. The IHRSA Partnership Program

IHRSA's Personal Training Certification Partners will receive the following: 1) A Full-Page Black-and-White Ad for their Organization's Personal Training Certification Program in CBI four times a year; 2) A one-third page, IHRSA Ad for its Certification Partners in every issue of CBI; 3) A trade show booth at IHRSA's Annual Convention; 4) The Annual Opportunity to Offer Your Certification Program onsite at the IHRSA Convention as part of the Official Convention Program; 5) A Link To Your Certification Program on the IHRSA Website; 6) Six Times Per Year, IHRSA will electronically post a promote its Certification Partners to its member and

prospect clubs; 7) IHRSA's participation pa........          .
that organization's website.

Each certifying organization that chooses to belong to the partnership program will pay IHRSA $15,000 per year. Every penny of these funds will be allocated to promoting, individually and collectively, IHRSA's legitimate certification partners.

## VI. Implementing The Plan To Achieve These Objectives

In March 2002, in conjunction with its Convention in Phoenix, IHRSA will invite leaders from the five recommended certifying organizations to a meeting.

This meeting will have three purposes: first, to begin develop consensus on the minimum requirements for a valid certification program; second, to discuss the incorporation of IHRSA's Ten Governing Principles into the Certification Protocols of the Recommended Certification Programs; and, third, to answer your questions regarding participation in IHRSA's Partnership Program.

This meeting will take place on Wednesday, March 6, from 10 AM till 3 PM. We invite you to participate in this meeting and consider becoming an IHRSA Certification Partner.

I plan to call each of you in the next few days.

Regards,

John McCarthy
Executive Director


Enclosure

CLUB OWNERS TEN COMMANDMENTS FOR
PERSONAL TRAINING

Client safety is the governing principle of personal training. When client safety is not the governing principle, the risk of harm to clients increases. Personal training can never be an effective tool to achieving improved physical fitness if it is not first and foremost safe for the client. The following "Ten Commandments for Personal Training" are intended as guidelines for clubs owners to ensure that the safety of their members is paramount in their personal training program.

1. Personal trainers shall not diagnose illnesses or treat injuries, except for the preliminary treatment of an injury following basic first aid measures.

2. Personal trainers shall not recommend specific supplements, medicine or curative practices to clients for specific illnesses, injuries, or health condition unless the personal trainer has additional appropriate credentials/certifications to make such a recommendation.

3. Personal trainers shall not train clients with a serious diagnosed chronic health condition unless they have been specifically trained and certified to provide training to individuals with such conditions or are following the procedures prescribed and supervised by a physician.

4. Personal trainers shall not begin training a client before the personal trainer has received and reviewed a signed, comprehensive health history from the client.

5. Personal trainers shall ask the client, before each training session, if they are currently experiencing any specific pains or health problems or if they are taking any specific medications that might be affecting them.

6. Whenever a personal trainer becomes aware of an undiagnosed illness, injury or a risk factor, the trainer should immediately advise the client to contact the appropriate medical or allied health practitioner.

7. No personal trainer shall offer specific and individualized nutritional advice, unless they have been specifically trained and certified to do so.

8. If, in the course of personal training, a client experiences any unusual pain or discomfort, the trainer should immediately discontinue the training session and advise the client to see a physician or appropriate medical professional.

9. No personal trainer shall engage in personal training unless he or she had had first aid training and certification to use CPR and AED (if an AED is available on site for use).

10. Personal trainers should be certified or they should be licensed in a related field such as physical therapy or athletic training.

## EXHIBIT B

BK 24329PG097

LARRY HONIKMAN and ELAINE HONIKMAN, 6 Old Bridge Lane, Sharc
Massachusetts, husband and wife, as tenants by the Entirety, f
consideration paid of $386,250, grant to RICHARD J. PENDZICK a
PAULA BESSON, Husband and Wife as Tenants By The Entirety

with quitclaim covenants,

a certain parcel of land, with the buildings thereon, situated
Selwyn Road in Newton, Middlesex County, Massachusetts shown as I
30 on a plan entitled "Plan of Section 6, Parkwood Manor, Newto
Massachusetts", dated September 28, 1953, by Joseph Selwyn, Civ
Engineer, recorded with Middlesex South District Registry of Deec
in Book 8154, Page 301, said Lot 30 being more particularly bound
and described as follows:

SOUTHEASTERLY: by Selwyn Road, eighty-five (85) feet;
NORTHEASTERLY: by a curved line forming the junction
Mildred Road and Selwyn Road, twenty-seven a
51/100 (27.51) feet;
NORTHERLY: by Mildred Road, forty-one and 34/100 (41.3
feet;
NORTHWESTERLY: by Lots 14 and 15, as shown on said plan b;
broken line in two bounds measuring eight
five and 21/100 (85.21) feet and thirty a
54/100 (30.54) feet, respectively; and
SOUTHWESTERLY: by Lot 29, as shown on said plan, eighty-fc
and 97/100 (84.97) feet.

Containing 7,685 square feet of land according to said plan.

TITLE REFERENCE:           Deed to grantors dated July 24, 1993 a
recorded in Middlesex (S) Registry
Deeds, Book 23481, Page 409.
ADDRESS OF PROPERTY:        53 Selwyn Road, Newton, Massachusetts
ADDRESS OF GRANTEE:         53 Selwyn Road, Newton, Massachusetts

Witness our hands and seals this 28th day of February 1994.

_Larry Hitonic man_                      _Elaine C Honikman_
LARRY HONIKMAN                           ELAINE HONIKMAN

COMMONWEALTH OF MASSACHUSETTS            FEBRUARY 28, 1994
NORFOLK, SS

Then personally appeared before me, LARRY HONIKMAN and ELA
HONIKMAN, and acknowledge the foregoing instrument to be their f
act and deed.

_STUART I. AUGUST, notary public_
commission expires: 7/28/2000

c:\realestate\54selwyn.dee

*** MASS. EXCISE TAX: 1762.44 ***
871    25.00
RSD 03/04/94 02:47:54

EXHIBIT C

Bk: 45600 Pg: 469

If property is located in RHODE ISLAND;
This is an open-end mortgage to secure present
and future loans under Chapter 25 of Title 34.

If property is located in PENNSYLVANIA;
This is an open-end mortgage to secure future
advances under 42 Pa. C.S.A. 8143.

## Fleet Bank

### Open-End Mortgage

(for use in CT, FL, MA, ME, PA and RI)



Bk: 45600 Pg: 469    Doc: M
Page: 1 of 7    07/13/2005 t

**Maximum Principal Sum: U.S. $**

$200,000.00

**Borrower(s)/Mortgagor(s):**

PAULA BESSON
RICHARD J. PENDZICK    G490

At the option of the Lender the Maturity Date may
be extended to:  05/26/35

**Maturity Date:**

05/26/25

**Property Address:**

53 SELWYN RD        . NEWTON
MA 02461

THIS MORTGAGE is between each Mortgagor signing below ("Borrower") and the following Mortgagee (

Name of Lender:            FLEET NATIONAL BANK, PRINCIPALLY LOCATED IN RHODE

Lender's Address for Notices:    CONSUMER LOAN OPERATIONS
315 COURT STREET
P.O. BOX 3092
UTICA, NY 13502

BORROWER has entered into a Home Equity Line of Credit Agreement ("Agreement") w
dated the same date as this Mortgage, which is a consumer revolving loan agreement that provides for a
credit plan (as defined in the Truth in Lending Act). Under the Agreement, Borrower may obtain advance
re-advances of any repaid principal) and is indebted to Lender for all amounts advanced and outstanding f
time. All amounts advanced under the Agreement or this Mortgage, if not sooner paid, are due and pa
Maturity Date. The maximum principal amount that is or may be secured by this Mortgage at any time an
to time shall not exceed the Maximum Principal Sum shown above.

TO SECURE to Lender the repayment of the indebtedness evidenced by the Agreement, together with inter
and all renewals, extensions, and conversions of modifications to the Agreement; the payment of all
provided in the Agreement or advanced to protect the security of this Mortgage; and the performance
covenants and agreements of Borrower contained herein and in the Agreement, for consideration paid, Borre
mortgages, grants, and conveys to Lender, its successors and assigns forever, with statutory power
applicable) and with mortgage covenants, the property described in Exhibit A to this Mortgage (the "Prop
Mortgage is given on the statutory condition (except in Florida). If the Property is located in New Yor
rights under this Mortgage are in addition to and not exclusive of rights conferred under Sections 254, 2
291-F of the New York Real Property Law.

### PROPERTY UNDER MORTGAGE

The Property includes: all improvements erected on the Property; all of Borrower's rights and p
all land, water, streets, and roads next to and on all sides of the Property (called "easements,
appurtenances"); all rents from the Property; all proceeds (to the extent necessary to repay the amount Bor
from the Property, including insurance proceeds and proceeds from the taking of all or any part of the Pr
government agency or anyone else authorized by law; and all property and rights described above tha
acquires in the future.

### OWNERSHIP OF PROPERTY

Borrower promises that Borrower lawfully owns the Property and has the right to mortgage
convey the Property, and that there are no claims or charges (called "encumbrances") against the Property
encumbrances disclosed to Lender. Borrower is fully responsible for any losses Lender suffers because sor

**EXHIBIT K**

BK 24329PG0097

LARRY HONIKMAN and ELAINE HONIKMAN, 6 Old Bridge Lane, Sharo
Massachusetts, husband and wife, as tenants by the Entirety, f
consideration paid of $386,250, grant to RICHARD J. PENDZICK a
PAULA BESSON, Husband and Wife as Tenants By The Entirety

with quitclaim covenants,

a certain parcel of land, with the buildings thereon, situated
Selwyn Road in Newton, Middlesex County, Massachusetts shown as 1
30 on a plan entitled "Plan of Section 6, Parkwood Manor, Newto
Massachusetts", dated September 28, 1953, by Joseph Selwyn, Ci
Engineer, recorded with Middlesex South District Registry of Deed
in Book 8154, Page 301, said Lot 30 being more particularly bound
and described as follows:

| | |
|---|---|
| SOUTHEASTERLY: | by Selwyn Road, eighty-five (85) feet; |
| NORTHEASTERLY: | by a curved line forming the junction Mildred Road and Selwyn Road, twenty-seven a 51/100 (27.51) feet; |
| NORTHERLY: | by Mildred Road, forty-one and 34/100 (41.3 feet; |
| NORTHWESTERLY: | by Lots 14 and 15, as shown on said plan by broken line in two bounds measuring eight five and 21/100 (85.21) feet and thirty a 54/100 (30.54) feet, respectively; and |
| SOUTHWESTERLY: | by Lot 29, as shown on said plan, eighty-f and 97/100 (84.97) feet. |

Containing 7,685 square feet of land according to said plan.

TITLE REFERENCE:        Deed to grantors dated July 24, 1993 .
                        recorded in Middlesex (S) Registry
                        Deeds, Book 23481, Page 409.
ADDRESS OF PROPERTY:    53 Selwyn Road, Newton, Massachusetts
ADDRESS OF GRANTEE:     53 Selwyn Road, Newton, Massachusetts

Witness our hands and seals this 28th day of February 1994.

_Larry Hitomi nand_
LARRY HONIKMAN

_Elaine C Honikman_
ELAINE HONIKMAN

COMMONWEALTH OF MASSACHUSETTS                FEBRUARY 28, 1994
NORFOLK, SS

Then personally appeared before me, LARRY HONIKMAN and ELA
HONIKMAN, and acknowledge the foregoing instrument to be their f
act and deed,

_signature_
STUART I. AUGUST, notary public
commission expires: 7/28/2000

c:\realestate\54selwyn.dee

*left margin, rotated text:*
RECD 03/04/94 02:47:54    871    25.00    1762.44 tax
**** MASS. EXCISE TAX:

Bk: 45600 Pg: 469

If property is located in RHODE ISLAND:
This is an open-end mortgage to secure present
and future loans under Chapter 25 of sec. : 34.

If property is located in PENNSYLVANIA:
This is an open-end mortgage to secure future
advances under 42 Pa. C.S.A. 8143.

## Fleet Bank
### Open-End Mortgage
(for use in CT, FL, MA, ME, PA and RI)



Bk: 45600 Pg: 469    Doc: N
Page: 3 of 7    07/13/2005 t

Maximum Principal Sum: U.S. $
$200,000.00

Maturity Date:
05/26/25

Borrower(s)/Mortgagor(s):
PAULA BESSON
RICHARD J. PENDZICK    9490

Property Address:
53 SELWYN RD    , NEWTON
MA 02461

At the option of the Lender the Maturity Date may
be extended to:___05/26/35

THIS MORTGAGE is between each Mortgagor signing below ("Borrower") and the following Mortgagee (

Name of Lender:    FLEET NATIONAL BANK, PRINCIPALLY LOCATED IN RHODE

Lender's Address for Notices:    CONSUMER LOAN OPERATIONS
315 COURT STREET
P.O. BOX 3092
UTICA, NY 13502

        BORROWER has entered into a Home Equity Line of Credit Agreement ("Agreement") w
dated the same date as this Mortgage, which is a consumer revolving loan agreement that provides for :
credit plan (as defined in the Truth in Lending Act). Under the Agreement, Borrower may obtain advance
re-advances of any repaid principal) and is indebted to Lender for all amounts advanced and outstanding f
time. All amounts advanced under the Agreement or this Mortgage, if not sooner paid, are due and pa
Maturity Date. The maximum principal amount that is or may be secured by this Mortgage at any time an
to time shall not exceed the Maximum Principal Sum shown above.

TO SECURE to Lender the repayment of the indebtedness evidenced by the Agreement, together with inter
and all renewals, extensions, and conversions of or modifications to the Agreement; the payment of all
provided in the Agreement or advanced to protect the security of this Mortgage; and the performance
covenants and agreements of Borrower contained herein and in the Agreement, for consideration paid, Borr
mortgages, grants, and conveys to Lender, its successors and assigns forever, with statutory power
applicable) and with mortgage covenants, the property described in Exhibit A to this Mortgage (the "Prop
Mortgage is given on the statutory condition (except in Florida). If the Property is located in New Yor
rights under this Mortgage are in addition to and not exclusive of rights conferred under Sections 254, 2
291-F of the New York Real Property Law.

### PROPERTY UNDER MORTGAGE

        The Property includes: all improvements erected on the Property; all of Borrower's rights and j
all land, water, streets, and roads next to and on all sides of the Property (called "easements,
appurtenances"); all rents from the Property; all proceeds (to the extent necessary to repay the amount Bor
from the Property, including insurance proceeds and proceeds from the taking of all or any part of the P
government agency or anyone else authorized by law; and all property and rights described above the
acquires in the future.

### OWNERSHIP OF PROPERTY

        Borrower promises that Borrower lawfully owns the Property and has the right to mortgage
convey the Property, and that there are no claims or charges (called "encumbrances") against the Property
encumbrances disclosed to Lender. Borrower is fully responsible for any losses Lender suffers because so

**EXHIBIT L**



CASNER & EDWARDS, LLP

A T T O R N E Y S   A T   L A W

303 Congress Street
Boston, Massachusetts 02210

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

September 12, 2005

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
101 Arch Street
Boston, MA  02110-1112

Re:     *Fitness Resource Associates, Inc. v Aerobics and Fitness Association of America, Inc.*
        U.S. District Civil Action No.: 05-10003RGS

Dear Mr. Colbert:

I am writing in response to yours of September 9th.

I sent you a proposed joint motion to extend discovery by e-mail this morning. I knew that you were on vacation and thought it ran into this week (the week of September 12th) so did not rush to get it to you before that time. I trust I will hear your response shortly. I also wish to remind you that I am waiting for dates on which I can take the deposition of your client's record keepers in California. At this point, since so much time has passed since my e-mail request of August 18th, it appears that late September will not work for my schedule and we will have to look at October. I will await proposed dates from you.

With respect to your paragraph that begins on the bottom of page 1, I am most dismayed at the tone and what appears to me to be the intent. I hope that I am mistaken.

I voluntarily disclosed to you on July 25, 2005, four days after receipt of your proposed confidentiality order that Rick Pendzick "works closely with FRA and would probably be considered an agent" of FRA. I alerted you to the issue that FRA had with your proposed confidentiality order and invited a discussion to attempt to resolve it. At that time, I did not know the exact relationship between Rick Pendzick and Paula Besson. Since that time, I have learned that they are married and more recently that Mr. Pendzick is a clerk in FRA.

At no time did I ever conceal anything from you or "confess" anything to you or withhold any relevant information. The comments in your letter appear to have been with the intent of being attached to some later motion concerning this litigation. The fact that I immediately disclosed to you that Rick Pendzick is someone who would probably fall within the scope of your proposed confidentiality order should tell you that I was not trying to deceive you as you appear to suggest. My litigation practice has always been to cooperate with opposing counsel and to exchange discovery in the spirit in which the rules intend in order to present a case to the court on its merits rather than to play legal gamesmanship. Your letter and your charged words

CASNER & EDWARDS, LLP

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
September 12, 2005
Page 2

lead me to believe that you have a different approach in mind. I hope that I am mistaken about that. In any event, I suggest that we both agree not to engage in that sort of behavior immediately. I am prepared to do so and await your response. I will interpret a non-response as a negative and conduct myself accordingly in the future.

With respect to your efforts to provide us with sample boxes of AFAA's documents, I thank you for your efforts, but I was looking for sample boxes as they are kept in the ordinary course of AFAA's business and not simply the documents relevant to the joint venture between AFAA and FRA. I thought that this was obvious from the substance of our conversations concerning this topic. If necessary, I will agree to the confidentiality order proposed by you as respects these sample boxes only, so you need not worry about "competitors" of AFAA having access to the documents. Please let me know at your earliest convenience whether this is agreeable.

Thank you for your attention to these matters.

Sincerely,

Gregg S. Blackburn

GSB:ml
5880.3/362855.1