# CASNER & EDWARDS, LLP

### ATTORNEYS AT LAW

303 Congress Street
Boston, Massachusetts 02210

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

October 4, 2005

Clerk's Office - Clerk
United States District Court
United States Courthouse
1 Courthouse Way
Boston, MA  02210

Re:     *Fitness Resource Associates, Inc. v Aerobics and Fitness Association of America, Inc.*
        U.S. District Court No.: 05-10003RGS

Dear Sir/Madam:

Please find enclosed for filing the following documents:

1.      FRA's Opposition to AFAA's Motion for Protective Order;
2.      Affidavit of Gregg S. Blackburn;
3.      Affidavit of Paula Besson; and
4.      Affidavit of Rick Pendzick.

Please take note that FRA expects to be filing a motion to compel production of documents based on AFAA's response to its document request as soon as FRA has been able to achieve compliance with Local Rule 37.1.  If the court intends to schedule a hearing on the various pending motions, it may wish to do so after the motion to compel and any opposition are filed as the issues raised in that motion are all directly related to the currently pending motions.

Thank you for your attention to these matters.

Sincerely,

Gregg S. Blackburn

GSB:ml
Enclosures
5880.3/364551.1

cc:  Edward V. Colbert, III, Esq. (w/encls.) (via electronically)

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DOCKET NO.: 05-10003RGS

FITNESS RESOURCE ASSOCIATES, INC.          :
                                           :
         Plaintiff                         :
                                           :
v.                                         :
                                           :
AEROBICS AND FITNESS ASSOCIATION           :
OF AMERICA, INC.                           :
                                           :
         Defendant                         :

**FRA'S OPPOSITION TO
AFAA'S MOTION FOR PROTECTIVE ORDER**

Fitness Resources Associates ("FRA") hereby opposes the motion of Aerobics and

Fitness Association of America ("AFAA") for a protective order. As grounds, FRA states that

AFAA has failed to show good cause for a protective order as required by Fed. R. Civ. P. 26(c)

and that the relief sought by AFAA would unjustifiably prejudice FRA. FRA relies upon its

argument set forth below and the accompanying affidavits and exhibits.

**A. Background**

This is an action for damages due to the alleged breach by AFAA of a Joint Venture

Agreement ("JVA," Attachment A), pursuant to which the parties together provided instruction

to personal trainers and a certification program over a period of 14 years. Generally, FRA

provided staff and paid air transportation and hotel costs for program workshops which were

offered nationally. AFAA provided marketing and a venue. FRA received 40% of the gross and

AFAA 60%.

FRA alleges that AFAA breached the JVA in the following ways:

1. **Book Sales**: AFAA commissioned the preparation of a textbook for and during the program, which is the subject of the joint venture. All net profits were to be shared equally and AFAA failed to pay any amount to FRA.

2. **Late Payments:** The JVA called for payment of FRA invoices by AFAA within 21 days. FRA was consistently months late in making payment causing financial hardship to FRA.

3. **Losses due to money losing workshops:** FRA alleges that AFAA breached the terms of the agreement by shifting program locations away from larger venues to smaller ones where it received free or reduced cost use of space in return for unauthorized discounts to providers of such space. In addition, FRA alleges that AFAA unreasonably forced FRA to staff workshops with far fewer than 15 enrollees, causing losses for FRA while preserving income for AFAA in breach of its fiduciary duties under the JVA.

4. **Losses due to unauthorized discounts and giveaways:** The JVA provided that the $295 course price initially agreed upon could be changed only by mutual agreement. FRA agreed to two discounts. The first was for attendees at annual "Apex" events where a special package price of $99 per day was offered due to large volume of participants. The second was for a 10% discount to enrollees who were pre-existing "members" of AFAA by virtue of having previously taken an AFAA course. FRA believes that AFAA offered the 10% member discount to far more persons than were entitled under AFAA's membership rules. FRA also believes that AFAA offered unauthorized discounts of 25% or free enrollments to members of clubs that would permit AFAA free or reduced-cost use of space.

## B. Argument

1. <u>AFAA's Proposed Protective Order Would Unfairly Prejudice FRA Without Good Cause.</u>

Before the court even considers a protective order, AFAA must demonstrate that it has

good cause for restricting dissemination on the ground that it would be harmed by its disclosures.

Fed. R. Civ. P. 26(c); *Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d ,* §

2043. *In Re Wilson*, 149 F.3d 249 C.A. 4th, (1998). If the court finds that good cause is shown,

it has broad discretion in tailoring a protective order. Fed R. Civ. P. 26(c).

The court should use its broad direction in fashioning protective orders to balance the

need for disclosure with preventing harm to the disclosing party. *Farnsworth v Procter &*

*Gamble Co.* 758 F2d 1545, 1 FR Serv 3d 1113 (1985, CA11, Ga).

This court should not approve the protective order proposed by AFAA since it would permit AFAA to designate all of the materials it produces as confidential and would prevent anyone other than FRA counsel and its paid experts from seeing such materials. A copy of the proposed protective order is Attachment B. The only limit on AFAA's right to designate materials as confidential is a provision permitting FRA to file the disputed material in court under seal with a motion for *in camera* inspection, an arrangement with the potential for abuse and one that shifts the "good cause" burden from the party seeking to avoid production, where it is placed by Rule 26(c), to the party seeking relevant discovery.

FRA would be greatly prejudiced since no expert could replace the knowledge of the principals involved in the subject matter of this case.  Moreover, it would mean that Rick Pendzick, who has already analyzed FRA's documents for this case, would be denied access to virtually all of AFAA's most relevant materials which have already been deemed confidential by AFAA in its response to FRA's document request. Attachment C. Mr. Pendzick has already spent more than 80 hours analyzing FRA's course workshop and financial materials and produced a 227-page spreadsheet providing detailed backup for FRA's claims of damage. Affidavit of Rick Pendzick. A copy was provided to AFAA counsel (with no request for a protective order) with the Initial Disclosures made in this matter.

Allowance of AFAA's motion would also prevent Mr. Pendzick from making a comparative study of AFAA's workshop documents and financial material which is crucial on the facts of this case. It would also force FRA, which is a fraction of the size of AFAA (which

bills itself as the "world's largest fitness and Telefitness educator."[1]) to hire an independent expert which it cannot afford to do. [2]

2.      Most documents sought by FRA are not of a confidential nature

Based on its response to FRA's document request, AFAA takes an extremely broad view of what is confidential.  Indeed, AFAA has even refused to produce documents relating to its participation in activities undertaken pursuant to the JVA without a protective order.  See Attachment C, responses 10, 14, 15, 16, 19, 22 and 23.

Most of the documents that AFAA claims are confidential and that are critical in this case relate to (1) data from 2000 to 2004 concerning the number of attendees and the amount of money paid by each at workshops offered by AFAA; (2) revenues and expenses relating to sales of a single book; (3) AFAA's financial ability to pay FRA's invoices on time between 2000 and 2004; (4) the amounts and quantities of discounts given by AFAA on programs run by FRA and (5) discounts AFAA received for workshop space in exchange for giving discounted or free admission not authorized by FRA.

On its face, this would not appear to be information of great benefit to a competitor.  In order to meet the "good cause" standard of Rule 26(c) it is AFAA's obligation to show with specificity that disclosure would likely cause a defined and serious injury. *Aetna Cas. & Sur. Co. v George Hyman Constr. Co.* (1994, ED Pa) 155 FRD 113; *Cipollone v Liggett Group, Inc.* 106 FRD 573, (1985, DC NJ); *Cuno, Inc. v Pall Corp.* 117 FRD 506(1987, ED NY)(Defendant would not be granted protective order where it simply alleged documents sought were internal proprietary documents containing valuable confidential technical information generated by its

---

[1] AFAA website.

[2] As plaintiff points out, Paula Besson, the principal of FRA recently took out a large equity loan on the in which she and her husband, Rick. Pendzick live in order to meet living expenses.  They are now in the process of selling the home and moving to a less costly residence in order to trim their living expenses.  (Affidavit of Paula Besson).

scientists and defendant failed to specifically identify clearly defined and serious injury that would occur in the event of disclosure); *Cooper Hospital/University Med. Ctr. v Sullivan,* 183 FRD 135 (1998, DC NJ)(Good cause is shown when it is specifically established that disclosure will cause clearly defined and serious injury; broad allegations of harm, unsubstantiated by specific examples, will not suffice).

The information that AFAA seeks to protect, as appears from its interrogatory answers, certainly does not justify the "attorneys and experts eyes only" standard sought by AFAA. Such a standard may be appropriate in patent cases or technical trade secrets such as *Wang Laboratories, Inc. v. CFR Associates, Inc.,* 125 F.R.D. 10, 13-14 (D. Mass. 1989) cited by AFAA, but this is clearly not such a case.

If the material is found to be confidential, a more appropriate solution would be an order preventing misuse rather than restricting access. *United States v International Business Machines Corp.* 82 FRD 183 (1979, SD NY)(protective order issued by court properly placed emphasis on preventing plaintiff's misuse rather than limiting its access to confidential information by requiring each person permitted access to information to submit affidavit stating that he would abide by its terms, thereby subjecting any misuser to sanction power of court).

3.    AFAA's claim that good cause is shown since the parties are indirect competitors is unsupported.

AFAA attempts to meet its burden of showing a defined and serious injury by suggesting that AFAA and FRA are competitors and that for reasons not fully explained the dissemination to FRA employees and agents would be harmful. It cites *American Standard Inc. v. Pfizer, Inc.,* 828 F.2d 734,741 (Fed. Cir. 1987) for the proposition that the risk of competitive injury is high when the parties are competitors. AFAA's claim that the parties are competitors is baseless.

AFAA's position is that FRA is involved with the American College of Sports Medicine (ACSM) which, AFAA alleges, is colluding with others to drive AFAA out of business. This argument is just as twisted as AFAA's argument that FRA's counsel was engaging in subterfuge by withholding information about the relationship between Pendzick and FRA's president, Paula Besson, which will be discussed below.

First, FRA and AFAA are not direct competitors. FRA's only business is to provide training for those interested in becoming "certified personal trainers." Personal trainers generally work one-on-one with members of gyms on individual fitness programs. AFAA's business is in offering fitness workshops in a far broader range of areas than training "personal trainers." In addition, it provides a certification program, issuing certificates of competence to those who pass its exams. FRA is not in that business at all. "Personal training" is but one of six categories of training program where AFAA offers training that leads to a certificate. AFAA also offers training in 16 other categories. Affidavit of Paula Besson, Exhibit A.

It is true that ACSM is a direct competitor with AFAA and that FRA supplies trainers to ACSM in "personal training." However, ACSM competes with AFAA only in "personal training" and there is no overlap with AFAA's many other offerings. Affidavit of Paula Besson.

AFAA suggests that confidentiality is required for its workshop attendance data since "one of FRA's associates . . . . ACSM, was part of a small group of fitness certifying entities that colluded with one another to deny certifying entities access to fitness clubs . . . ." What AFAA counsel refers to is an effort by the International Health and Racquet Sports Association (IHRSA) to bring minimum standards to the process of certifying fitness professionals who work in its member clubs. IHRSA invited a number of organizations certifying fitness professionals including AFAA to try to develop common standards for the safety of the public among other reasons. See Attachment D, the invitation letter from IHRSA addressed to AFAA which was

attached to correspondence from AFAA counsel to FRA counsel in connection with this matter. Those invited to participate in the initiative by IHRSA are listed on page two of the letter and include AFAA and ACSM among others (but not FRA). Not only was AFAA invited to be a member of the group alleged to be "colluding" to drive AFAA out of business, AFAA has never missed a meeting and its president, Linda Pfeffer, has missed only one! Attachment E, President's Blog, by AFAA president Linda Pfeffer, Article 2, P. 3.

The claim that FRA and ACSM are colluding to drive the world's largest provider of fitness training out of business is delusional at best or a fabrication at worst.

In addition, there is very little reason to believe that ACSM has any interest in AFAA's attendance figures for programs where they do not even compete which is basically what FRA seeks in its document requests. Affidavit of Paula Besson.

AFAA's claims that FRA can't be trusted with AFAA's "confidential" documents because counsel "chose not to reveal to AFAA the marital relationship between Mr. Pendzick and FRA President, Paula Besson, . . . coupled with the fact that AFAA had to learn this information through its own research of public records . . . " is just as baseless as the claim that FRA and ACSM, are colluding to drive AFAA out of business through involvement in IHRSA meetings faithfully attended by AFAA's president.

The facts that AFAA has misused to smear FRA through its counsel are as follows: AFAA proposed a confidentiality order, sent under cover of a letter dated July 22, 2005. Within a day or so of receipt, on July 25, 2005, counsel for FRA wrote to say that the proposal to prevent "FRA or any shareholder, officer, employee or agent of FRA" to review "confidential" documents created a potential issue between the parties. FRA pointed out that Rick Pendzick had already done considerable analysis on FRA's documents and needed to do the same with AFAA's documents. FRA counsel suggested that an effort be made to agree in advance on what

5880.3/363858.1                                                                                          7

was confidential rather than let AFAA alone make the decision, in order to see if there was a real problem.  Affidavit of Gregg S. Blackburn, Exhibit A.  At the time, FRA counsel did not know that Rick Pendzick was the clerk of FRA and he did not know whether Ms. Besson and Mr. Pendzick were married (since he had never inquired and they have different last names).  FRA counsel did believe that they appeared to be in a permanent relationship.  *Id.*  It was clear to FRA counsel that the intent of the proposed stipulation was to preclude someone in Mr. Pendzick's position from viewing "confidential" documents.  Since Mr. Pendzick did not seem to precisely fit any of the three terms used in the proposed protective order as an "officer" (given the state of counsel's knowledge at the time) or an "employee," FRA counsel used the term "agent" to describe Mr. Pendzick's status.  *Id.*  The important point is that FRA counsel voluntarily raised the issue immediately.  FRA counsel did not sign the agreement, take the documents and give them to Mr. Pendzick to review, thinking he might later be able to argue that Mr. Pendzick was not technically an "agent" under the JVA, something that FRA counsel could legitimately complain about.

Next, a month later on August 22, 2005, AFAA counsel called to discuss how to handle the document production problem.  FRA counsel still did not know that Ms. Besson and Mr. Pendzick were legally married, perceiving no need to inquire during the intervening month.  In the course of that conversation, FRA counsel told AFAA counsel he did not know if they were married, and further advised that it didn't really matter, because they "shared a pillow" which, in FRA counsel's view, was the functional equivalent.  Affidavit of Gregg S. Blackburn, Exhibit B. No one ever asked FRA counsel whether Ms. Besson and Mr. Pendzick also shared a mortgage or a house and FRA counsel did not volunteer the information since he did not have it or even think about whether it might or might not be relevant to anything.  *Id.*  No one ever asked FRA counsel to find out whether Ms. Besson and Mr. Pendzick were legally married.  AFAA counsel

simply took it upon himself to find that out and to find out that they had a mortgage "through

public records." AFAA counsel then used the "facts" that he "uncovered," never having asked

for them, to make an unwarranted personal attack on counsel.

AFAA has presented no information to suggest that its historical data on the subjects at

issue in this case would be of any use to anyone other than in this litigation or that it would not

be safe from further disclosure by FRA.

4.      The documents are necessary to FRA's case

Most of the documents that AFAA claims are confidential in its response to FRA's

document request are vital to proof of FRA's claims. By way of example, in Request No. 13,

FRA sought: All documents that constitute, refer or relate to enrollee counts for workshops of

all kinds operated by or marketed by AFAA from January 1, 2000 to the present.

AFAA responded with the following:

**OBJECTION**

AFAA objects to the request on the grounds that it seeks confidential and proprietary
business information, and is not reasonably calculated to lead to the discovery of admissible
evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 13**

Inspection permitted as to documents related to FRA, but not with regard to AFAA's
business operations that were separate from FRA, and subject to entry of a confidentiality order.

One of FRA's claims is that AFAA unreasonably refused to cancel workshops where

expected attendance was low. This had the effect of forcing FRA to provide a trainer and pay

the trainer's air fare and hotel costs. Those costs were often far greater than the revenue that

would ultimately flow to FRA under the JVA. At the same time, AFAA would still be able to

make money since it received 60% of the gross and, FRA believes, had far lower expenses per

workshop. FRA has reason to believe that in workshops that AFAA ran outside the joint

venture, its policy was to cancel workshops where attendance was low. FRA needs the documents showing enrollee counts to prove that AFAA had disparate policies for its own workshops where it was responsible to pay the trainer and travel expenses and for the FRA-run workshops where FRA was responsible for those expenses.

A review of FRA's document request shows that AFAA has consistently designated as confidential documents such as those sought in Request No. 13, vital to FRA's case. See Attachment C and particularly AFAA's responses to requests 10, 14, 15, 16, 19, 22 and 23.

## CONCLUSION

AFAA has failed to meet its burden of proving that the documents it seeks to protect as confidential are, in fact confidential, and that it has good cause to prevent their dissemination to FRA personnel or Rick Pendzick and no confidentiality order should be entered by the court.

Respectfully submitted,

FITNESS RESOURCE
ASSOCIATES, INC.
By its attorney,

Gregg S. Blackburn (BBO# 044430)
CASNER & EDWARDS, LLP
303 Congress Street, 2nd Floor
Boston, MA 02210
(617) 426-5900

## CERTIFICATE OF SERVICE

I, Gregg S. Blackburn, hereby certify that on October 4, 2005, that I caused FRA's Opposition to AFAA's Motion for Protective Order to be filed within the tracking time standards or be leave of the Regional Administrative Justice, and further that I caused a copy of said document to be sent electronically filed to:

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
101 Arch Street
Boston, MA  02110-1112

Gregg S. Blackburn (BBO#044430)

11

# ATTACHMENT A

## A JOINT VENTURE AGREEMENT
### between
### AFAA and FRA

This agreement is entered into this 30th _m_ day of October, 1990, between the Aerobics and Fitness Association of America, a California corporation, with offices located at 15250 Ventura Boulevard, Suite 310, Sherman Oaks, California, 91403, called "AFAA", and Fitness Resource Associates , Inc, a Massachusetts corporation, with offices located at 19 Brook Road, Suite 103, Needham, Massachusetts, 02194, called "FRA".

### RECITAL

AFAA is an educational and publishing company that specializes in the training and certification of aerobics and fitness instructors, throughout the world, emphasizing techniques in safety presentations and form.

FRA has developed and is teaching and training fitness counselors in various aspects of aerobics and fitness excellence. A copy of their Course Outline is attached and a part hereof.

Comes now the desire of both parties to jointly present fitness courses to the general public, all in accordance with the covenants defined hereunder.

### NOW THEREFORE IT IS AGREED

### I. COURSE OBJECTIVE

As the fitness industry continues to grow in terms of participation and dollars spent, so grows the need for more qualified fitness professionals.

In spite of great advancements in the past decade, our industry continues to cater to the inherently motivated, intrinsic exerciser and ignores the 66-80% of adult Americans who do not exercise regularly. It is clearly time to provide this non-athletically elite population, with information and guidance.

Using health related fitness goals, the course will provide information and skills assisting the participant in working one-on-one with individual clients.

The knowledge base of the program will integrate the most practical methods and procedures for fitness assessment and exercise prescription, with educational theory on how people learn and how the trainer can develop basic counseling skills which will in turn help the client assume new health behaviors.

### page one of six

## II. THE COURSE

FRA will develop the course and make revisions as deemed appropriate, AFAA having the right to review and approve the course content.

All books and/or training workbooks or manuals developed for and during these courses shall be the joint property of both parties and any profits derived from their publication and sale, outside the courses , will be shared equally. It shall be the responsibility of FRA to timely file necessary copyrights for all materials used in the courses and for obtaining permission from any contributing authors, editors or publishers for the use of any reprinted materials.

AFAA publishes various books and manuals as a general course of doing business. They, therefore, agree that they will not use any of the materials developed for this course in their other publications, unless with the written permission of FRA. However, AFAA does not exclude their right to develop and publish books and manuals that may cover like material: including but not limited to: methods/formats.

The copy of the initial Course Outline, attached hereto is hereby agreed too.

## III. PREREQUISITE

The prerequisite for enrollment in this course for Personal Trainers/ Fitness Counselors is that each participant meets one or more of the following criteria;

1. Be certified by AFAA, IDEA, ACSM or IAR
2. Have a bachelor degree in a health/fitness science program
3. Successfully completed FRA's six hour "Introduction to Exercise Science" course

All sales staff will be aware of this prerequisite and be required to ascertain that all participants meet this requirement before enrollment.

Introduction to Exercise Science will be held prior to any certification training and exam for Personal Trainers/ Fitness Counselors with the mutual agreement of AFAA and FRA. FRA having developed this course maintains the right to final decision on content and materials used with AFAA having review and approval rights. FRA has the exclusive rights to offer and hold Introduction to Exercise Science in Massachusetts, New Hampshire and Rhode Island.

page two of six

## IV. INSTRUCTORS AND EXAM

FRA will, after consultation with AFAA, have the responsibility and final approval of hiring and training the instructors to be used in teaching the courses.

AFAA and FRA will co-develop the exam with final approval of FRA. Scoring and notification of results and issuance of a certification to the participants will be the responsibility of AFAA.

It shall be required by all Course Instructors, before they commence teaching a course, to show proof they have obtained liability insurance to cover their personal training; and, they must sign FRA's Standard Independent Contractor's Agreement.

## V. LOCATIONS

FRA and AFAA will jointly choose city locations for all course workshops and their dates. AFAA will find the host facility for each location using the following guidelines:

1. Hotel preferred
2. Available parking
3. Chairs for participants
4. Quiet lecture area
5. Overhead projector for lectures
6. Space enough for 100 people
7. Easy access

FRA will maintain exclusive rights to offer and run this course in Massachusetts, New Hampshire and Rhode Island. In conjunction with FRA 's courses in this restricted area AFAA will hold a challenge exam for certification of Personal Trainers/ Fitness Counselors. All monies collected for the courses held in the restricted area will go to FRA. All monies collected for the challenge exam in the restricted area will go to AFAA. Any changes regarding the exclusivity of Massachusetts, New Hampshire and Rhode Island will be the decision of FRA.

## VI. MARKETING AND SALES

AFAA will provide their marketing and sales department to advertise, promote and register participants in the courses. FRA reserves the right to assist the development and revision of course description, phone scripts, registration procedure and post sales follow-up techniques.

Advertising and promotion of the courses by either party shall be readily identified with the names and/or logos of both AFAA and FRA.

## VII. CONTINUING EDUCATION CREDITS

As a part of maintaining certification as an AFAA Certified Instructor, each instructor must continue to enhance their knowledge and skills through programs, workshops, home-study course, etc... After the full development and approval of AFAA, of the course to be offered hereunder, AFAA shall grant to each course participant 12 AFAA Continuing Education Credits.

## VIII. CONTINUING EDUCATION PROGRAM

As part of the ongoing educational process AFAA will institute a continuing education program for all certified Personal Trainers/ Fitness Counselors in order that they may maintain their certification. Paula Besson, M.Ed., from FRA, will be a member of the decision making continuing education provider system.

## IX. INCOME AND EXPENSES

The initial charge to attend the course for Personal Trainers/ Fitness Counselors is two-hundred and ninety-five dollars ($295.00). The charge to attend Introduction to Exercise Science is ninety dollars ($90.00). The price may only be changed or revised by the mutual consent of both parties.
Distribution of these fees shall be :

          AFAA     Sixty Percent   (60%)
          FRA      Forty Percent   (40%)

Distribution will be within 21 days of each course completion.

AFAA shall be responsible to pay from their portion of the income all expenses to:

      a. Advertise
      b. Furnish course material
      c. Telemarketing costs
      d. Telemarketer commissions
      e. Credit card clearing
      f. Bank charges
      g. Registration and administration costs

FRA shall be responsible to pay from their portion of the income all expenses to:

      a. Develop and update the course program
      b. Pay instructor expenses to include; airfare and hotel
      c. Instructor fees
      d. Instructor assistants fees as required

It is agreed that any course will be subject to cancellation if enrollment does not meet a minimum of fifteen (15) people with the mutual consent of both parties.

## X.  SPONSORSHIP

Both parties shall make every effort to interest a sponsor or sponsors to support the program.  FRA, recognizes that AFAA already works with several sponsors on other programs and conflicts of interest could be created; therefore, FRA will cooperate with AFAA in these endeavors and agrees to AFAA's final approval of any sponsor.

Incomes generated from any sponsor shall be divided as referred to above.

## XI.  TERMINATION

This agreement shall be for a period of one year from the date fully executed and be automatically extended for one year periods so long as both parties agree.
To terminate this agreement, either party shall give the other a ninety day written notice after the first nine month period.

## XII. INSURANCE

Both parties agree to maintain their own liability insurance in the amount of one million dollars.  Each party will name the other party as additionally insured on their existing policy and have a certificate of insurance to that effect mailed to the named insured.

## XIII.  MISCELLANEOUS

This agreement may not be assigned in whole or in part to another person, organization or entity.
This agreement is a California Contract.  It is the intention of the parties that this Agreement, including any suits or special proceedings hereunder (wherever commenced) shall be governed and interpreted by the laws of the State of California.

**page five of six**

This is the only contractual area in which the parties have agreements and any further agreements, changes or revision must be first submitted and agreed in writing.

The consideration of each party to the development of the programs outlined hereunder shall constitute the consideration to enter into this agreement.

IN WITNESS WHEREOF, the parties hereto cause this agreement to be duly executed and delivered as of the day and year above written.

Aerobics and Fitness Association of America


Linda Pfeiffer, President


Fitness Resource Associates, Inc.


Paula Besson, President


page six of six

# ATTACHMENT B

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FITNESS RESOURCE ASSOCIATES, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action |
| ) | No. 05-10003-RGS |
| AEROBICS AND FITNESS ASSOCIATION ) | |
| OF AMERICA, INC. ) | |
| ) | |
| Defendant. ) | |

### STIPULATION AND ORDER REGARDING CONFIDENTIALITY OF
### TRADE SECRET, PROPRIETARY AND/OR FINANCIAL INFORMATION

By the signatures of their attorneys of record to this document, the parties to this action

stipulate and agree that:

1.    Any trade secret, proprietary and/or financial information provided by Aerobics

and Fitness Association of America, Inc. ("AFAA") to Fitness Resource Associates, Inc. ("FRA"),

in response to FRA discovery requests, that AFAA claims and marks as "CONFIDENTIAL -

FOR ATTORNEY'S EYES ONLY" shall be:

a.    Deemed confidential information that may be used by counsel for FRA

solely for the purposes of this action; and

b.    FRA Counsel shall not reveal or disclose this information, or make it

available for inspection and copying to any person, including FRA or any shareholder,

officer, employee or agent of FRA.  FRA counsel may make confidential information

available to attorneys or employees of FRA counsel's law firm for purposes of this action,

or to others with the express written permission of counsel for AFAA or by Order of the

13345.000/pl/16

Court. In the event FRA counsel retains an expert or experts in this action, each such expert shall sign and forward to counsel for AFAA an affidavit in the form attached as Exhibit A to this Order, prior to receiving or reviewing any confidential information.

2.     In the event AFAA elects to produce documents for inspection and FRA elects to inspect them, no designation of confidential information need be made in advance of the inspection. For purposes of such inspection, all documents produced shall be considered as confidential information. If FRA counsel selects specified documents to be copied, AFAA shall be obligated to designate any confidential information in accordance with paragraph one at the time the copies are produced.

3.     Marking the cover of a multi-page document "CONFIDENTIAL - FOR ATTORNEY"S EYES ONLY" shall be deemed a designation of all pages of the document as confidential, and subject to the provisions of this Stipulation and Order.

4.     AFAA shall have 30 days following receipt of a deposition transcript to designate as confidential specific portions of the transcript, and shall serve such designation upon counsel for FRA. During the 30-day period following receipt of a deposition transcript by AFAA, the entire deposition transcript shall be deemed confidential and subject to the provisions of this Stipulation and Order. Following the 30-day period, all portions of a deposition transcript designated confidential by AFAA shall be subject to the provisions of this Stipulation and Order.

5.     If the parties are unable to resolve any dispute as to whether the information is or should be regarded as confidential and subject to the provisions of this stipulation, and only after attempts to resolve any dispute, counsel for FRA may file the disputed information with the Court, under seal, and seek a ruling from the court in camera concerning whether the information deserves the protection of this stipulation as confidential.

6.    All documents filed with the Court by any party to this action that are agreed by the parties, or ordered by the Court, to comprise or contain financial and proprietary information that could be potentially injurious to AFAA's business as commercially or competitively sensitive, including all pleadings, deposition transcripts, exhibits, discovery responses or memoranda purporting to reproduce or paraphrase such information, shall be filed in sealed envelopes or other appropriately sealed containers that shall be endorsed with the title of this action, an indication of the nature of the contents of the sealed envelopes or other containers, the word "CONFIDENTIAL" and a statement in substantially the following form:

> "This envelope contains confidential documents and is not to be opened, nor are the contents to be displayed or revealed except by Order of this Court."

7.    Within 30 days following the conclusion of this litigation, all documents, deposition transcripts and other materials, and all copies, summaries and reports containing information or material that have been marked "CONFIDENTIAL– FOR ATTORNEY'S EYES ONLY" will be returned to counsel for AFAA.

8.    The parties intend that this stipulation be approved and adopted as an Order of the Court and that its violation will be enforceable as an Order of the Court, including by means of proceedings for contempt of court.

9.    The inadvertent or unintentional disclosure of a confidential document and information shall not be deemed a waiver, in whole or in part, of AFAA's claim of confidentiality.

10.    Nothing in this stipulation or any order resulting from this stipulation constitutes a waiver or admission as to the admissibility or lack of admissibility of any matter at the trial of

this action.

|  | Respectfully submitted, |
|---|---|
| FITNESS RESOURCE ASSOCIATES, INC. | AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC. |
| By its attorney, | By its attorneys, |

_____

Gregg Blackburn (BBO #044430)
Casner & Edwards LLP
303 Congress Street
Boston, MA 02210
(617) 426-5900

_____

Richard J. Grahn (BBO#206620)
Edward V. Colbert III (BBO#566187)
LOONEY & GROSSMAN, LLP
101 Arch Street
Boston, Massachusetts 02110
(617) 951-2800


SO ORDERED:


_____

By the Court

# ATTACHMENT C

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FITNESS RESOURCE ASSOCIATES, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action |
| ) | No. 05-10003-RGS |
| AEROBICS AND FITNESS ASSOCIATION ) | |
| OF AMERICA, INC. ) | |
| ) | |
| Defendant. ) | |

**AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC.'S RESPONSE TO
FITNESS RESOURCE ASSOCIATES, INC.'S FIRST REQUEST
FOR PRODUCTION OF DOCUMENTS**

Aerobics and Fitness Association of America, Inc. ("AFAA") responds to Fitness

Resource Associates. Inc.'s ("FRA"), request for the production of documents as follows:

**GENERAL OBJECTIONS**

AFAA provides the following general objections, which are incorporated into each and

every objection made in response to a specifically numbered request.

1.      AFAA objects to producing the original documents at the offices of FRA's

counsel, Casner & Edwards, LLP, 303 Congress Street, Boston, Massachusetts 02210. AFAA

will make the documents available for inspection at AFAA's principal place of business in

Sherman Oaks, California, as they are kept in the usual course of business, in accordance with

Fed. R. Civ. P. 34 (b).

2.      AFAA objects to producing documents that are protected by the attorney-client

privilege, the attorney-work product doctrine, and all other applicable privileges under federal

law and the law of California.

      3.     AFAA objects to producing any document that is not presently within its

possession, custody or control.

      4.     AFAA objects to FRA's instruction with regard to the categories of information

to be contained in a privilege log.  Upon a claim of privilege and withholding of a document,

AFAA will describe the document in a manner that will enable FRA to assess the applicability of

the privilege or protection.

      5.     AFAA objects to producing documents encompassing a period of time

commencing on and before January 1, 2000, for that date precedes the statutes of limitations

period applicable to FRA's claims against AFAA.

## RESPONSES TO REQUESTS

1.     All documents that constitute, refer to, or relate to the Agreement or any supplement to
the Agreement.

    **OBJECTION**
    AFAA objects to the request on the ground that it is overly broad and unduly
burdensome.  Notwithstanding and without waiving the objection, AFAA responds as follows:

    **RESPONSE NO. 1**
    Inspection permitted.

2.     All documents that constitute, refer to, or relate to the negotiation of the Agreement or
any supplement to the Agreement.

    **OBJECTION**
    AFAA objects to the request on the ground that it is overly broad and unduly
burdensome.  Notwithstanding and without waiving the objection, AFAA responds as follows:

    **RESPONSE NO. 2**
    Inspection permitted.

3.     All documents that constitute, refer to, or relate to the execution of the Agreement or any
supplement to the Agreement.

**OBJECTION**

AFAA objects to the request on the ground that it is overly broad and unduly burdensome. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 3**
Inspection permitted.

4.    All documents that constitute, refer to, or relate to enrollments for workshops in which FRA provided or was at any time scheduled to provide trainers from January 1, 2000 to the present including without limitation:

        (a) information provided to students and prospective students concerning payment policies of AFAA;
        (b) all communications between AFAA and workshop enrollees concerning payment;
        (c) al documents relating to invoices by AFAA to enrollees;
        (d) all documents relating to receipts and receivables from enrollees;
        (e) all documents relating to discounts given to any enrollees; and
        (I) all documents relating to waivers of tuition for any enrollees.

**RESPONSE NO. 4**
Inspection permitted.

5.    All documents that constitute, refer to, or relate to the date and location of each workshop marketed by AFAA that was taught or at any time scheduled to be taught by FRA from January 1, 2000 to the present.

**RESPONSE NO. 5**
Inspection permitted.

6.    All invoices from FRA to AFAA relating to FRA's participation in workshops marketed by AFAA from January 1, 2000 to the present.

**RESPONSE NO. 6**
Inspection permitted.

7.    All documents that constitute, refer to or relate to payments by AFAA to FRA for FRA's participation in workshops marketed by AFAA from January 1, 2000 to the present.

**RESPONSE NO. 7**
Inspection permitted.

8.    All bank statement for each account in which AFAA was an owner or signatory from January 1, 2000 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence.

9.    Copies of all ledgers or other documents recording receivables owed to AFAA for all workshops that it marketed or organized from January 1, 2000 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 9**
Inspection permitted as to documents related to FRA but not with regard to AFAA's business operations that were separate form FRA, and subject to entry of a confidentiality order

10.    All ledgers or documents showing payables by AFAA related to the marketing and operation of workshops of all kinds between January 1, 2000 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**.RESPONSE NO. 10**
Inspection permitted as to documents related to FRA but not with regard to AFAA's business operations that were separate from FRA, and subject to entry of a confidentiality order.

11.    All financial statements, audited and unaudited, of AFAA from January 1, 1999 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence.

12.    All communications between FRA on the one hand and AFAA on the other that constitute, refer to or relate to sums owed or claimed to be owed by AFAA to FRA for FRA's participation in workshops organized or marketed by AFAA from January 1, 2000 to the present.

**RESPONSE NO. 12**
Inspection permitted.

4

13.    All documents that constitute to, refer or relate to enrollee counts for workshops of all kinds operated by or marketed by AFAA from January 1, 2000 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 13**
Inspection permitted as to documents related to FRA, but not with regard to AFAA's business operations that were separate from FRA, and subject to entry of a confidentiality order.

14.    All documents that constitute refer or relate to AFAA's perceived business need to grant financial concessions to enrollees or potential enrollees in any workshops in which FRA participated or was at any time scheduled to participate from January 1, 2000 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it mischaracterizes the evidence, seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 14**
Inspection permitted as to documents related to FRA but not with regard to AFAA's business operations that were separate from FRA, and subject to entry of a confidentiality order.

15.    All documents that constitute, refer or relate to AFAA perceived need to operate any and all workshops (whether FRA was involved or otherwise) in which AFAA anticipated fewer than 15 enrollees between January 1, 2000 and the present.

**OBJECTION**
AFAA objects to the request on the grounds that it mischaracterizes the evidence. AFAA further objects on the grounds that the request seeks confidential and proprietary business information, and is not reasonably related to the discovery of admissible evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 15**
Inspection permitted as to documents related to FRA but not with regard to AFAA's business operations that were separate from FRA, and subject to entry of a confidentiality order.

16.    All documents that constitute, refer or relate to adjustments in prices for enrollees in workshops in which FRA was a participant and which were organized or marketed by AFAA from January 1, 2000 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it mischaracterizes the evidence, seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 16**
Inspection permitted as to documents related to FRA, but not with regard to AFAA's business operations that were separate from FRA, and subject to entry of a confidentiality order.

17.    All documents that constitute, refer or relate to the cost of production, marketing and distribution of books and printed materials sold by AFAA in conjunction with workshops in which FRA was a participant from January 1, 2000 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it mischaracterizes the evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 17**
Inspection permitted.

18.    All documents that constitute, refer or relate to income from the sale and distribution of books and printed materials sold by AFAA in conjunction with workshops in which FRA was a participant from January 1, 2000 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it mischaracterizes the evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 18**
Inspection permitted.

19.    All documents upon which AFAA relies to justify its continued and persistent late payment of sums owed to FRA from January 1, 2000 to the present.

**OBJECTION**
AFAA objects to the request on the grounds that it mischaracterizes the evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

**RESPONSE NO. 19**
To the extent that FRA seeks documents related to AFAA's payments to FRA, inspection permitted.

20.    All documents relating to communications between AFAA and FRA concerning late payment of sums owed to FRA from January 1, 2000 to the present.

### OBJECTION

AFAA objects to the request on the grounds that it mischaracterizes the evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

### RESPONSE NO. 20

To the extent that FRA seeks documents related to communications between AFAA and FRA related to AFAA's payments to FRA, inspection permitted.

21.    All documents used in connection with presenting AFAA's present Personal Trainer program including but not limited to documents relating to lecture content and distributed to attendees.

### OBJECTION

AFAA objects to the request on the grounds that it seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

### RESPONSE NO. 21

Inspection permitted as to documents that are available to the general public.

22.    All documents identifying members of AFAA from Jan. 1, 1998 to Dec. 15, 2004, including names and dates on which such persons became members. FRA will limit this request to documents identifying members who also took the Personal Trainer program and the Advanced Personal Trainer program from January 1, 1999 to Nov. 15, 2004 at AFAA's election.

### OBJECTION

AFAA objects to the request on the grounds that it seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

### RESPONSE NO. 22

Inspection permitted as to documents related to FRA, but not with regard to AFAA's business operations that were separate from FRA, and subject to entry of a confidentiality order.

23.    All AFAA registration forms and documents that show the number of attendees and the payments received as of the date of printing for each Personal Trainer and Advanced Personal Trainer workshop from January 1, 1999 to Nov. 15, 2004.

### OBJECTION

AFAA objects to the request on the grounds that the request is unintelligible, is unduly burdensome, and to the extent it can be reasonably determined seeks confidential and proprietary business information and is not reasonably calculated to lead to the discovery of admissible evidence.

24.    All course evaluations prepared by attendees at Personal Trainer and Advanced Personal Trainer workshops from January 1, 1990 to Nov. 15, 2004.

**RESPONSE NO. 24**
No such documents are presently in the possession, custody or control of AFAA.  This response will be seasonably supplemented if necessary.

25.    All documents relating to or supporting AFAA's contention in its Eighth Separate Defense that plaintiff's claims are barred by plaintiff's ratification.

**RESPONSE NO. 25**
Inspection permitted.

26.    All documents relating to or referring to AFAA's Eleventh Separate Defense that there was no fiduciary duty and that FRA was the breaching party.

**RESPONSE NO. 26**
Inspection permitted.

27.    All documents referring or relating to the contention made in paragraph 12 of the counterclaim that FRA voluntarily continued to perform without meaningful objection under the contract, including conducting workshops where enrollment was less than 15 people.

**RESPONSE NO. 27**
Inspection permitted.

28.    All documents referring or relating to your contention in paragraph 13 of the counterclaim that by no later than 2003 the fitness certification industry had become very competitive.

**RESPONSE NO. 28**
Inspection permitted.

29.    All documents referring or relating to your contention in paragraph 16 of the counterclaim that FRA misused AFAA's customer list.

**RESPONSE NO. 29**
Inspection permitted, subject to entry of a confidentiality order.

30.    All documents referring or relating to your contention in paragraph 17 of the counterclaim that in or about 2002 AFAA and FRA agreed "as part of the contract" to conduct workshops related to yoga certification.

**RESPONSE NO. 30**
Inspection permitted.

31.    All documents referring or relating to the contention made in paragraph 17 of the counterclaim that, starting in approximately June, 2004, FRA commenced its own yoga certification workshops using the AFAA customer list without AFAA's consent and FRA claims that the workshops were adopted by AFAA even though AFAA was excluded from the programs.

### RESPONSE NO. 31
Inspection permitted.

32.    All documents referring or relating to the contention made in paragraph 19 of the counterclaim that FRA threatened to enforce non-compete agreements against AFAA.

### RESPONSE NO. 32
Inspection permitted.

33.    All documents referring or relating to the contentions made in paragraph 20 of the counterclaim.

### RESPONSE NO. 33
Inspection permitted subject to entry of a confidentiality order.

34.    All documents that constitute, refer to or relate to the Joint Venture Agreement between AFAA and FRA.

### OBJECTION
AFAA objects to the request on the ground that it mischaracterizes the evidence, in that there was no joint venture between the parties, and on the grounds that it is overly broad, unduly burdensome, is repetitive, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the objection, AFAA responds as follows:

### RESPONSE NO. 34
Inspection permitted.

35.    All documents that constitute refer to or relate to the negotiation and/or execution of the Joint Venture Agreement or any supplement or modification to the Joint Venture Agreement.

### OBJECTION
AFAA objects to the request on the ground that it mischaracterizes the evidence, in that there was no joint venture between the parties. Notwithstanding and without waiving the objection, AFAA responds as follows:

### RESPONSE NO. 35
Inspection permitted.

36.    All documents that constitute, refer to or relate to any of AFAA's costs and expenses for

AFAA/FRA workshops during the period October 30, 1990 to the present.

### RESPONSE NO. 36
Inspection permitted subject to entry of a confidentiality order.

37.    All federal tax returns of AFAA from the years 1990 to present.

### OBJECTION
AFAA objects to the request on the grounds that it seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence.

38.    All financial statements, audited and unaudited, of AFAA from October 30, 1990 to the present.

### OBJECTION
AFAA objects to the request on the grounds that it seeks confidential and proprietary business information, and is not reasonably calculated to lead to the discovery of admissible evidence.

AEROBICS AND FITNESS ASSOCIATION OF AMERICA, INC.

By its attorneys,

Richard J. Grahn (BBO#206620)
Edward V. Colbert III (BBO #566187)
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA  02110
(617) 951-2800

### CERTIFICATE OF SERVICE

I hereby certify that I have this 27th day of June 2005 served a copy of the foregoing pleading upon all parties hereto by mailing copies thereof, via first class mail, postage prepaid, properly addressed to:

Gregg S. Blackburn, Esq.
Casner & Edwards LLP
303 Congress Street
Boston, MA 02210

Edward V. Colbert III

10

# ATTACHMENT D

**International**
**Health, Racquet &**
**Sportsclub Association**

<u>**EXHIBIT A**</u>

December 27, 2001

Ms. Robin Foss
Aerobics & Fitness Association of America
15250 Ventura Boulevard
Suite 200
Sherman Oaks, CA  91403

Dear Ms. Foss:

The following six recommendations regarding personal training certification programs represent a consensus of health club industry leaders from around the country. They have resulted from the legal liabilities to which clubs are exposed from such programs.

They arise from a determination to protect clubs from such liabilities and, above all, to insure the safety of club members and club clients.

We believe that these recommendations can make a significant contribution to the success of your organization as well as to the protection of clubs and the safety of the general public.

Thus, we encourage your participation in the following six-point program.

I. <u>IHRSA Plans To Recommend To Its Members and to the Industry Five Personal Training Certification Programs</u>

By some estimates, there are 235 organization in the U.S. that certify fitness professionals and/or personal trainers. The proliferation of such certification programs presents the industry with several problems:

1. A <u>financial</u> risk to the business of personal training;
2. A <u>credibility</u> risk to legitimate certifying organizations;

263 Summer Street
Boston, MA 02210 USA
617.951.0055
800.228.4772
fax: 617.951.0056

www.ihrsa.org
www.healthclubs.com



As a result, IHRSA has determined that for the protection of its member clubs and for the safety of the general public, minimum certification standards must be established in the personal training field.

While setting no preconceived limit, IHRSA has also determined that the following five organizations meet these standards. Those organizations are ACE, ACSM, AFAA, Cooper, and NSCA.

These organizations were selected for three reasons:

First, IHRSA has worked collaboratively with each of them for almost 20 years;

Second, each of these organizations enjoys a longstanding reputation for integrity and credibility;

Third, each enjoys the respect and confidence of thousands of clubs and many thousands of fitness professionals and personal trainers.

## II. IHRSA Will Recommend To Its Members and To the Industry That All Personal Training Certifications Be Kept Current

To us in the club business, it is clear that many personal trainers do not keep their personal training certifications current. This, too, presents a liability risk to clubs and a safety risk to the general public.

As a result, IHRSA plans to recommend that its member clubs urge every personal trainer in their employ to have a current certification.

In doing this, IHRSA believes that it can make a positive contribution to the businesses of the recommended certifying organizations.

IHRSA also believes that in order to do this it will be necessary to link to the IHRSA website to a list of currently certified personal trainers on the websites of the five recommended certifying organizations.

## III. IHRSA Will Require That The Recommended Certifying Organizations Incorporate Into Their Certification Programs Ten Governing Principles Aimed At Reducing Club Liability and Enhancing Client Safety

Because of current legal damages pending against .

personal trainers - IHRSA has composed a draft document entitled "Ten Governing Principles For Personal Trainers" (attached).

These 10 principles aim to eradicate personal training practices that present liability risks to clubs as well as to personal trainers themselves. Above all, these 10 principles aim to enhance the safety of club members and club clients.

IHRSA will require that each of the recommended organizations incorporate the substance of these 10 principles into their certification protocols.

This, we believe, will protect clubs, as well as personal trainers, and promote the health and safety of consumers.

## IV. IHRSA Will Offer a 'Partnership Program' To the Recommended Certifying Organizations

As stated above, IHRSA plans to recognize and recommend to its members five certifying organizations. This recommendation will be made consistently and continuously.

As stated above, IHRSA also plans to recommend that every club, for its own safety and the safety of its members, urge its personal trainers to maintain a current certification.

We believe that these recommendations can have a positive effect on the businesses of the recommended certifying organizations.

To maximize the effectiveness of these initiatives, IHRSA will offer a Partnership Program to each of the recommended organizations.

## V. The IHRSA Partnership Program

IHRSA's Personal Training Certification Partners will receive the following: 1) A Full-Page Black-and-White Ad for their Organization's Personal Training Certification Program in CBI four times a year; 2) A one-third page, IHRSA Ad for its Certification Partners in every issue of CBI; 3) A trade show booth at IHRSA's Annual Convention; 4) The Annual Opportunity to Offer Your Certification Program onsite at the IHRSA Convention as part of the Official Convention Program; 5) A Link To Your Certification Program on the IHRSA Website; 6) Six Times Per Year, IHRSA will electronically post a promote its Certification Partners to its member and

prospect clubs; 7) IHRSA's participation p-------
that organization's website.

Each certifying organization that chooses to belong to the partnership program will pay IHRSA $15,000 per year.  Every penny of these funds will be allocated to promoting, individually and collectively, IHRSA's legitimate certification partners.

VI. Implementing The Plan To Achieve These Objectives

In March 2002, in conjunction with its Convention in Phoenix, IHRSA will invite leaders from the five recommended certifying organizations to a meeting.

This meeting will have three purposes: first, to begin develop consensus on the minimum requirements for a valid certification program; second, to discuss the incorporation of IHRSA's Ten Governing Principles into the Certification Protocols of the Recommended Certification Programs; and, third, to answer your questions regarding participation in IHRSA's Partnership Program.

This meeting will take place on Wednesday, March 6, from 10 AM till 3 PM.  We invite you to participate in this meeting and consider becoming an IHRSA Certification Partner.

I plan to call each of you in the next few days.

Regards,

John McCarthy
Executive Director

Enclosure

CLUB OWNERS TEN COMMANDMENTS

## PERSONAL TRAINING

Client safety is the governing principle of personal training. When client safety is not the governing principle, the risk of harm to clients increases. Personal training can never be an effective tool to achieving improved physical fitness if it is not first and foremost safe for the client. The following "Ten Commandments for Personal Training" are intended as guidelines for clubs owners to ensure that the safety of their members is paramount in their personal training program.

1. Personal trainers shall not diagnose illnesses or treat injuries, except for the preliminary treatment of an injury following basic first aid measures.
2. Personal trainers shall not recommend specific supplements, medicine or curative practices to clients for specific illnesses, injuries, or health condition unless the personal trainer has additional appropriate credentials/certifications to make such a recommendation.
3. Personal trainers shall not train clients with a serious diagnosed chronic health condition unless they have been specifically trained and certified to provide training to individuals with such conditions or are following the procedures prescribed and supervised by a physician.
4. Personal trainers shall not begin training a client before the personal trainer has received and reviewed a signed, comprehensive health history from the client.
5. Personal trainers shall ask the client, before each training session, if they are currently experiencing any specific pains or health problems or if they are taking any specific medications that might be affecting them.
6. Whenever a personal trainer becomes aware of an undiagnosed illness, injury or a risk factor, the trainer should immediately advise the client to contact the appropriate medical or allied health practitioner.
7. No personal trainer shall offer specific and individualized nutritional advice, unless they have been specifically trained and certified to do so.
8. If, in the course of personal training, a client experiences any unusual pain or discomfort, the trainer should immediately discontinue the training session and advise the client to see a physician or appropriate medical professional.
9. No personal trainer shall engage in personal training unless he or she had had first aid training and certification to use CPR and AED (if an AED is available on site for use).
10. Personal trainers should be certified or they should be licensed in a related field such as physical therapy or athletic training.

# ATTACHMENT E

However, it is true that AFAA has expressed its concerns about certain proposals under discussion by the Committee, and we will continue to make our views known to the Committee in future deliberations.

Question: "How was it that AFAA got involved in the first place?"

Answer: As noted above, AFAA, along with four other organizations, was invited by IHRSA to serve on the Industry Initiative Committee, and we have been an active member of the Committee from its inception. The membership of the Committee grew as additional organizations were invited by IHRSA to join. However, many organizations are still not represented on the Committee.

Question: "Is there any exclusion going on?"

We are concerned about the fact that many fitness organizations were, and continue to be, excluded from participation in the Committee, and therefore aren't being represented in deliberations that will affect competition and employment in the fitness industry, both now and in the future.

Question: "Can any association be accredited."

Answer: We are concerned about the designation of a single accrediting body and the shortness of time within which organizations may become accredited. Many organizations are still not aware of what lies ahead should they fail to meet the December 31, 2004, deadline.

Question: What does the future hold? What would a desirable resolution be?"

Answer: We cannot foretell the future, of course, but a desirable resolution would be a fair and reasonable approach to certification that promotes excellence in fitness training, competition in the marketplace, and a variety of choices for the fitness professional and the consumer.

To sum it all up, AFAA favors both quality and variety in fitness certifications for instructors.

Thank you for considering these comments.

Sincerely yours,

Linda D. Pfeffer, President

**ARTICLE TWO – May 13, 2004 :**

On behalf of AFAA, here are answers to the questions you posed in your email of May 11, 2004.

Thanks for the opportunity to comment on these important issues.

**Q: Do you feel accreditation is a good way to maintain high standards in the fitness industry?**

**A:** Accreditation of organizations that offer fitness certifications is one of several possible approaches to maintaining high standards in the fitness industry, but whether or not it turns out to be a good way to achieve the goal depends entirely on how and by whom accreditation is carried out. If the accreditation process is fair, open, reasonable, effective, offered by more than one accrediting agency, and accessible to all participants on an equal footing, then it may be one of several good ways to maintain high standards.

**Q: Do you support any of the organizations that have popped up since IHRSA's announcement regarding accreditation?**

**A:** AFAA has been impressed by the vision and creativity of many participants in the current discussions about the future industry. For example, the National Board of Fitness Examiners offers the prospect of a "level playing field" in fitness testing by offering standardized tests. A good working relationship between the NBFE and the NCCA and other accrediting agencies is one way to make sure that accreditation is handled in fair and effective ways.

AFAA has a 20-year working relationship with Vital Research, the organization that has accredited AFAA's certifications, and we regard Vital Research as one of several organizations that are well-qualified to offer accreditation. To say that Vital Research has "popped up," however, would be inaccurate because it is a respected organization of long experience and deep expertise. And there are a good many other organizations that ought to be considered for a role in the accreditation process.

**Q: What is your ideal situation concerning accreditation?**

**A** : As stated above, the "ideal situation" concerning accreditation would be an accreditation process that is fair, open, reasonable, effective, offered by more than one accrediting agency, and accessible to all participants on an equal footing. We also believe that standardized testing as promoted by the National Board of Fitness Examiners is an important component of an ideal accreditation process. Finally, as mentioned below, state licensing of fitness professionals may

or may not be on the horizon, too. Obviously, it is important to harmonize these various efforts in order to standardize fitness training and testing and thus enable fitness professionals to cope with the changes we are all facing.

**Q: Do you think your organization will follow IHRSA's recommendations and become certified by NOCA/NCCA .**

**A:** In addition to its accreditation by Vital Research, AFAA is fully committed to participating in all opportunities to represent our members in the accreditation process. We are currently taking all necessary steps to obtain additional accreditations, and we fully expect to achieve such additional accreditations in due course. At the same time, we are committed to a fair, open and accessible accreditation process, and we are an active participant in policy discussions on the accreditation issue.

**Q: Do you think the 12/31/05 deadline is acceptable and possible for companies to follow through on?**

**A:** We strongly believe that the deadline for accreditation should be flexible and reasonable, especially in light of the fact that many fitness organizations were not even aware of IHRSA's initiative until fairly recently.

**Q: Do you think the government needs to step in to help regulate personal trainers?**

**A:** We think that state licensing of personal trainers may or may not turn out to be a way to achieve the goal of maintaining high standards in the fitness industry while, at the same time, making sure that the process is fair, reasonable, effective and accessible. It is too early to say whether state licensing is the only way or the most effective way to reach these goals. But state licensing is one of several approaches that may have to be given serious consideration should the various states decide to adopt a licensing requirement for fitness professionals.

**Q: Why do you think IHRSA decide to make these recommendations?**

**A:** That's a question best asked of IHRSA.

**Q: Did you attend the meeting in Las Vegas in March? If so, do you think it was a useful meeting? Were important issues covered and cleared up?**

**A:** I attended the meeting in Las Vegas as part of AFAA's early and ongoing commitment to playing an active role in policy discussions in the fitness industry. In fact, AFAA has been represented at *every* meeting of IHRSA's "industry initiative," and I have personally attended all but one meeting. It was a useful meeting, and many important issues were covered. However, the process is an on-going one, and I don't think we can say that the issues have been "cleared up." More effort will be required, more approaches need to be considered, and more fitness organizations need to be brought into the process.

**ARTICLE THREE – May 28, 2004 :**

1. **Q:** *Official name, title, location for purposes of attribution .*

**A:** Linda D. Pfeffer, President, Aerobics and Fitness Association of America

Sherman Oaks, California

2. **Q:** *What is AFAA's opinion about the IHRSA recommendation that their member clubs only hire trainers from organizations that have met the accreditation standards of NOCA/NCCA? Does AFAA support or not support this step? Why or why not?*

**A:** AFAA has been an active participant in the "industry initiative" from the beginning, and continues to play an active role in the process. I have personally attended all but one meeting, and a representative of AFAA has been present at *all* meetings.

Although AFAA is a full participant in IHRSA's industry initiative, AFAA has expressed some misgivings about various proposals under consideration.

First, AFAA believes that the industry initiative should be an open process, and that *all* fitness organizations should be invited to participate. AFAA is pleased that IHRSA has broadened the reach by inviting additional organizations to participate, but more work is necessary to make it a truly "industry-wide" initiative.

Second, AFAA believes that more than one accrediting agency should be brought into the process. So far, IHRSA has announced that it will only recognize accreditations issued by a single agency, the National Commission for Certifying Agencies (NCCA). AFAA urges that additional agencies be recognized along with NCCA. AFAA's certifications are, in fact, accredited by Vital Research, a recognized organization with whom AFAA has worked for a period of 20 years.

Third, AFAA believes that realistic deadlines should be set to give all organizations a reasonable opportunity to achieve accreditation. At the urging of AFAA and other participants in the industry initiative, IHRSA has already extended the deadline to December 31, 2005, but additional extensions may be necessary.

Fourth, AFAA supports the latest development in the ongoing discussion of fitness training and certification, that is, a two-pronged approach that consists of separate but related elements: Accreditation and standardized testing.

As discussed above, it has been proposed that fitness certification organizations be accredited by one of several independent accrediting agencies. At the same time, the National Board of Fitness Examiners (NBFE) is developing a set of standardized tests in collaboration with the various certifying organizations. Under the NBFE approach, fitness trainers who pass the standardized tests will be entered on a national registry, which will allow potential employers and clients to readily confirm the trainer's status as national board-registered fitness trainer.

It is important to focus on the fact that accreditation and standardized testing are different and distinct approaches to maintaining high standards in the fitness industry. The current

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DOCKET NO.: 05-10003RGS

FITNESS RESOURCE ASSOCIATES, INC.:

      Plaintiff

v.

AEROBICS AND FITNESS ASSOCIATION
OF AMERICA, INC.

      Defendant

## **AFFIDAVIT OF GREGG S. BLACKBURN**

I, Gregg S. Blackburn, do hereby depose and state as follows:

1.    I am counsel for the plaintiff in this matter, Fitness Resource Associates, Inc. ("FRA").

2.    I received AFAA's proposed stipulation and order regarding confidentiality on or about Friday, July 22, 2005.

3.    I noted that the proposed order permitted AFAA to designate documents confidential in which case, FRA counsel was not permitted to disclose the information to any person "including FRA or any shareholder, officer, employee or agent of FRA."

4.    In the period after this action was filed and before automatic disclosures were made, Rick Pendzick created a database of information from the files of FRA designed to quantify and illuminate the damages that FRA alleges it suffered as a result of breach of the Joint Venture Agreement between FRA and AFAA by AFAA. Mr. Pendzick produced a spreadsheet totaling 227 pages of data and conclusions based thereon to the defendants herein at the time FRA made initial disclosures. FRA sought no protective order or stipulation regarding the production of such information.

5.    At the time I received AFAA's proposed stipulation, I had no knowledge of the fact that Rick Pendzick is a clerk of FRA.

6.    At the time I received AFAA's proposed stipulation, I knew that Rick Pendzick and Paula Besson, the president of FRA, were in a romantic

relationship.  However, they have different last names and I did not know whether they were legally married.

7.     Although I did not know that Mr. Pendzick was a clerk in FRA or that he was legally married to Paula Besson at the time I received AFAA's proposed confidentiality stipulation, I did believe that the intent of the stipulation would prevent Mr. Pendzick from viewing documents designated as confidential by AFAA.  For this reason, I wrote to AFAA's counsel on July 25, 2005 as an opening effort to resolve this potential problem.  Exhibit A hereto is a true and accurate copy of my letter of July 25, 2005 to Attorney Colbert.  In that letter, since Mr. Pendzick did not seem to fit as an officer (given my knowledge at the time) or an employee of FRA, I used the term "agent" to describe Mr. Pendzick's status.  I also suggested in the July 25, 2005 letter that I would be willing to discuss a confidentiality order where we agreed in advance on what categories of documents would be considered confidential in an effort to determine whether AFAA would produce documents critical to Mr. Pendzick's review that would not be designated confidential.

8.     Counsel for AFAA made no inquiry between July 25, 2005 and August 22, 2005 concerning the identity of Rick Pendzick or the reasons why it was so important for FRA to have him review the documents in question.

9.     On August 22, 2005, AFAA counsel called and the matter came up in conversation.  At that time, I still did not know whether Ms. Besson and Mr. Pendzick were legally married as it was not relevant to me.  In response to inquiry from AFAA's counsel, I advised that I did not know whether they were legally married or not, but that in my view it did not really matter, because they shared a pillow which, in my view, was the functional equivalent.  At no time on that date or any other was I ever asked by AFAA counsel whether Ms. Besson and Mr. Pendzick also shared a mortgage or a house and I did not volunteer such information since I did not know it and I did not even think about whether it might or might not be relevant to any matter in this case.

10.    On September 12, 2005, I wrote to explain this state of affairs in response to a letter of September 9, 2005 in which AFAA counsel accused me of misleading him.  Exhibit B hereto is a true and accurate copy of my letter of September 12, 2005 to Attorney Colbert

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS ___4th___ DAY OF October, 2005.

Gregg S. Blackburn

# EXHIBIT A

# CASNER & EDWARDS, LLP

A T T O R N E Y S   A T   L A W

303 Congress Street
Boston, Massachusetts 02210

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

July 25, 2005

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
101 Arch Street
Boston, MA  02110-1112

Re:    *Fitness Resource Associates, Inc. v Aerobics and Fitness Association of America, Inc.*
       U.S. District Civil Action No.: 05-10003RGS

Dear Ed:

I am writing concerning your proposed confidentiality order.  We have a potential problem with the order.  As you probably know, we have done a good bit of financial analysis on our claims. The work was performed by Rick Pendzick who works closely with FRA and would probably be considered an agent.  He will need to review the financial data of AFAA as he did with the data of FRA which you have received in spreadsheet format.

I would imagine that very little of what AFAA will produce would legitimately be classified as confidential, but I cannot agree to the order without knowing what will be so designated. If we can agree in advance on what categories of document are confidential, then I can see if we can live with your designations and agree to the order (as modified by pre-designation).  Of course, we would want a mirror image document for FRA's sensitive documents.

Please let me know whether this is agreeable and if so, when we could expect to receive designation information.  I am concerned that this may delay discovery and we need to get the paper discovery done in order to move onto depositions and make the November deadline.

With respect to the issues you raise in your discovery, I will contact my client right away and get back to you shortly.

Thank you for your attention to these matters.

Sincerely,

Gregg S. Blackburn

359105_1.DOC

# EXHIBIT B



**CASNER & EDWARDS, LLP**

303 Congress Street
Boston, Massachusetts 02210

ATTORNEYS AT LAW

Telephone (617) 426-5900
Facsimile (617) 426-8810
www.casneredwards.com

September 12, 2005

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
101 Arch Street
Boston, MA 02110-1112

Re:   *Fitness Resource Associates, Inc. v Aerobics and Fitness Association of America, Inc.*
      U.S. District Civil Action No.: 05-10003RGS

Dear Mr. Colbert:

I am writing in response to yours of September 9th.

I sent you a proposed joint motion to extend discovery by e-mail this morning. I knew that you were on vacation and thought it ran into this week (the week of September 12th) so did not rush to get it to you before that time. I trust I will hear your response shortly. I also wish to remind you that I am waiting for dates on which I can take the deposition of your client's record keepers in California. At this point, since so much time has passed since my e-mail request of August 18th, it appears that late September will not work for my schedule and we will have to look at October. I will await proposed dates from you.

With respect to your paragraph that begins on the bottom of page 1, I am most dismayed at the tone and what appears to me to be the intent. I hope that I am mistaken.

I voluntarily disclosed to you on July 25, 2005, four days after receipt of your proposed confidentiality order that Rick Pendzick "works closely with FRA and would probably be considered an agent" of FRA. I alerted you to the issue that FRA had with your proposed confidentiality order and invited a discussion to attempt to resolve it. At that time, I did not know the exact relationship between Rick Pendzick and Paula Besson. Since that time, I have learned that they are married and more recently that Mr. Pendzick is a clerk in FRA.

At no time did I ever conceal anything from you or "confess" anything to you or withhold any relevant information. The comments in your letter appear to have been with the intent of being attached to some later motion concerning this litigation. The fact that I immediately disclosed to you that Rick Pendzick is someone who would probably fall within the scope of your proposed confidentiality order should tell you that I was not trying to deceive you as you appear to suggest. My litigation practice has always been to cooperate with opposing counsel and to exchange discovery in the spirit in which the rules intend in order to present a case to the court on its merits rather than to play legal gamesmanship. Your letter and your charged words

# CASNER & EDWARDS, LLP

Edward V. Colbert, III, Esq.
Looney & Grossman LLP
September 12, 2005
Page 2

lead me to believe that you have a different approach in mind. I hope that I am mistaken about that. In any event, I suggest that we both agree not to engage in that sort of behavior immediately. I am prepared to do so and await your response. I will interpret a non-response as a negative and conduct myself accordingly in the future.

With respect to your efforts to provide us with sample boxes of AFAA's documents, I thank you for your efforts, but I was looking for sample boxes as they are kept in the ordinary course of AFAA's business and not simply the documents relevant to the joint venture between AFAA and FRA. I thought that this was obvious from the substance of our conversations concerning this topic. If necessary, I will agree to the confidentiality order proposed by you as respects these sample boxes only, so you need not worry about "competitors" of AFAA having access to the documents. Please let me know at your earliest convenience whether this is agreeable.

Thank you for your attention to these matters.

Sincerely,

Gregg S. Blackburn

GSB:ml
5880.3/362855.1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DOCKET NO.: 05-10003RGS

FITNESS RESOURCE ASSOCIATES, INC.:

      Plaintiff              :

                            :

v.                              :

AEROBICS AND FITNESS ASSOCIATION    :
OF AMERICA, INC.

                            :

      Defendant          :

## <u>AFFIDAVIT OF PAULA BESSON</u>

I, Paula Besson, do hereby depose and state as follows:

1.    I am the president of Fitness Resource Associates, Inc. ("FRA") which is the plaintiff in this matter.

2.    From 1990 to 2004, FRA and the defendant, Aerobics and Fitness Association of America, Inc. ("AFAA") were involved in a joint venture whereby FRA provided trainers to staff workshops marketed by AFAA to teach "personal training." "Personal training" in this context refers to the process of teaching teachers of personal fitness training typically provided to individuals in gyms and sports clubs.

3.    The agreement provided that AFAA would receive 60% of the gross proceeds and FRA 40%. It was FRA's responsibility to provide the trainers for the workshops which were held all over the United States and to provide airfare and accommodation. It was the responsibility of AFAA to market the workshops, provide a facility in which to hold them and to certify those who passed written and practical examinations.

4.    In addition to providing certifications in "personal training," AFAA provides educational programs and certifications in five other specialized areas. A list of those areas is set forth on Exhibit A hereto, which I obtained from the AFAA website.

5.    In addition to the six programs in which AFAA provides training and certification, AFAA offers 13 other programs not connected to a certification process. A list of those areas is set forth on Exhibit A hereto.

6.  AFAA is a much larger business than FRA ever was and bills itself as the largest fitness training and telefitness company in the world.

7.  After AFAA terminated the Joint Venture Agreement in 2004, FRA entered into negotiations with the American College of Sports Medicine ("ACSM") to offer to staff its training programs in "personal training." ACSM offers personal training and certification to personal training instructors and in that respect is a direct competitor of AFAA. However, I do not believe that ACSM competes with AFAA in any other program offered by AFAA.

8.  I am aware through industry publications of an initiative starting in approximately 2001 whereby the International Health and Racquet Sports Association ("IHRSA") attempted to organize a group of entities each of which offered certifications to personal trainers. I have no memory of ever being solicited by IHRSA to be involved in the initiative and FRA has never been so involved. I am aware that ACSM is or has been involved in the IHRSA initiative, but have no knowledge of any effort by ACSM or IHRSA to exclude AFAA from the market in any way.

9.  The only area in which FRA and AFAA compete is that both now offer "personal training" programs.

10. Because FRA provided the staff for all personal training workshops offered by AFAA in the period from 1990 to 2004, I am aware of the number of attendees at each such workshop and the amount of money that AFAA received, at least according to AFAA's reports to me during the period of the Joint Venture Agreement. I have never shared this information with ACSM and have no intention of doing so.

11. FRA does not compete even on an indirect basis with any program other than personal training run by AFAA and has no competitive reason or desire to make use of any information concerning AFAA's enrollments or income from such activities in the period 2000 to 2004 which is what I understand this lawsuit covers.

12. I know of no reason why ACSM would be interested in any attendance records at AFAA workshops not involving personal training or in the amount of income that AFAA received for such activities in the period 2000 to 2004 or any other period.

13. I understand that AFAA counsel has examined the registry of deeds and learned that my husband, Rick Pendzick, and I took out a home equity loan after this case was filed. That is correct and at this time the house is being marketed for sale. AFAA's termination of the joint venture

agreement has cut into our income and we are planning to move to a less costly residence.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS  3ʳᵈ DAY OF October, 2005.

Paula Besson

# EXHIBIT A



**Certification/Workshop Q**

Zip [    ] Miles Radius |

Workshop Locator    Continuing Education    Host

As the world's largest fitness educator, AFAA has certified more than 200,000 fitness instructors from 73 countries around th 1983. Each year more than 2,500 workshops are hosted by health clubs and studios across the nation. AFAA's written and p certification examinations are accredited by Vital Research. AFAA is also proud to announce that it has been granted affiliate the National Board of Fitness Examiners (NBFE).

**Certification Workshops**

▸ Personal Fitness Trainer Certification
▸ Primary Group Exercise Certification
▸ KickBoxing Certification
▸ Step Certification
▸ AFAA Challenge Exam
▸ The Wave Workout™

**Specialty Workshops**

▸Practical Pilates™
▸Practical Yoga Instructor Training
▸Practical Skills & Choreography
▸KickBoxing Skills & Choreography
▸Step Skills & Choreography
▸Mat Science I
▸Mat Science I I
▸Midlife Fitness for Women
▸Aqua Fitness
▸The Metabolic Connection to Obesity
▸Perinatal Fitness
▸Injury Prevention and Exercise Progressions
▸Resistance Training-The Class Format
▸Senior Fitness
▸Indoor Cycling
▸Extension

For information about AFAA's Emergency Response Certification, please call Tere Filer at 1-800-446-2322 ext 283. For infor AFAA's Fitness Practitioner (AFP), please call Felix at 1-800-446-2322 ext 420.

Submit your email address and Zip code if you would like to be notified by email of upcoming Workshops and events in your

EMail: [          ]    Zip: [      ]    [ Submit ]

Also, be sure to check out our new TeleFitness Internet Software Certification—AFAA's first online certification program that how to manage fitness information systems using patented, web-based tools. Read more...

Contact Us ⌐ Terms of Use ⌐ Privacy Statement ⌐ Press
© 1995-2005 Aerobics and Fitness Association of America
AFAA Certification Testing Accredited by Vital Research.
Fitness Triage®, TeleFitness®, Nutrition Gets Personal™,
Exercise Gets Personal™ and Fitness Gets Personal®
are protected by U.S. patent.
15250 Ventura Blvd. Suite 200, Sherman Oaks, CA 91403.

1-877-YOURBODY (1-877-968-7263)
Mon-Fri 6:30am-6:30pm Sat 7am-1pm PST

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DOCKET NO.: 05-10003RGS

FITNESS RESOURCE ASSOCIATES, INC.:

     Plaintiff                 :

v.                             :

AEROBICS AND FITNESS ASSOCIATION  :
OF AMERICA, INC.                 :

     Defendant              :

## AFFIDAVIT OF RICK PENDZICK

I, Rick Pendzick, do hereby depose and state as follows:

1.     I am the clerk of Fitness Resource Associates, Inc. ("FRA") which is the plaintiff in this matter. I am also married to Paula Besson, the president of FRA.

2.     I am a computer database engineer and, in connection with this lawsuit, I have created a database from FRA documents that includes the number of workshops that FRA ran for AFAA, the income received, the attendance at each workshop, AFAA's late payment history and other data significant to this lawsuit. The complete spreadsheet showing such data totals 227 pages.

3.     I have personally worked for more than 80 hours on this project and am intimately familiar with the FRA recordkeeping system and the documents involved in preparation of the database.

4.     I had planned to review corresponding data from AFAA when it was received for the purpose of corroborating FRA's data concerning the jointly run "personal trainer" programs.

5.     In addition, I had planned, at the request of counsel, to review and compile data to be obtained from AFAA concerning programs that it runs other than "personal trainer" programs in order to confirm FRA's suspicions that AFAA had disparate policies concerning cancellation policies for programs where FRA provided the trainer and paid travel expenses, as

compared to programs where AFAA was responsible for such expenses itself.

6.    I had also planned to review AFAA's data concerning the cost of production of the textbook involved in this matter as to which FRA claims entitlement to a share of the proceeds as well as to review financial records concerning AFAA's ability to pay FRA in a timely fashion as provided for in the agreement of the parties.

7.    Although FRA does business with the American College of Sports Medicine (ACSM), I have no direct involvement with anyone at ACSM and have no intention or reason to disseminate any material that might be obtained from AFAA to ACSM or any other person or entity.

8.    It would be prohibitively expensive for FRA to hire an independent expert to obtain, review and analyze the data in question

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _3 rd___ DAY OF October, 2005.

Rick Pendzick